ZIMMERMAN REED, LLP
HART L. ROBINOVITCH (AZ SBN 020910)
14648 N. Scottsdale Road., Suite 130
Scottsdale, AZ 85254
Telephone: 480/348-6400
480/348-6415 (fax)
Email: hart.robinovitch@zimmreed.com

*Local Counsel for Plaintiffs*

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
TOR GRONBORG
LAURIE L. LARGENT
SARAH A. FALLON
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

*Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Treasurer of the State of North Carolina, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>Leslie's, Inc., Michael R, Egeck, and Steven M. Weddell,<br><br>Defendants. | No. CV-23-1887-PHX-SMB<br><br>CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>(Assigned to the Honorable Susan M. Brnovich)<br><br><u>DEMAND FOR JURY TRIAL</u> |

## TABLE OF CONTENTS


Page

I. INTRODUCTION AND OVERVIEW OF ALLEGATIONS ... 1

II. JURISDICTION AND VENUE ... 3

III. PARTIES ... 4

IV. FACTUAL BACKGROUND ... 6

V. DEFENDANTS' MISLEADING STATEMENTS AND MATERIAL OMISSIONS ... 13

A. Q1 2022 Earnings Report ... 13

B. Q2 2022 Earnings Report ... 14

C. June 6 and 7, 2022 Analyst Conference Calls ... 16

D. Q3 2022 Earnings Report ... 17

E. Q4 2022 and FY 2022 Earnings Report and Investor Day Conference ... 18

F. Q1 2023 Earnings Report ... 20

G. Q2 2023 Earnings Report ... 23

VI. DISCLOSURE OF THE TRUTH AND POST CLASS PERIOD EVENTS ... 26

VII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' KNOWLEDGE AND ACCESS TO INFORMATION ... 31

A. The Fraud Involved Leslie's Core Business and the Individual Defendants Are the Company's Senior Executives Who Were Directly Involved in or Informed of the Company's Operations and Performance Metrics ... 31

B. Market Research Analysts Frequently Asked Questions About, and Defendants Frequently Evinced Personal Knowledge by Commenting on, Leslie's Sales, Demand, and Inventory ... 31

C. Egeck and Weddell Signed Sarbanes-Oxley Act Certifications Attesting that They Personally Supervised Leslie's Controls and Procedures ... 37

VIII. LOSS CAUSATION ... 38

IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE ... 42

X. CLASS ACTION ALLEGATIONS ... 42

**Page**

XI. CAUSES OF ACTION ........ 44

COUNT I
For Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ........ 44

COUNT II
For Violation of §20(a) of the Exchange Act Against All Defendants ........ 46

PRAYER FOR RELIEF ........ 47

JURY DEMAND ........ 48

Lead Plaintiff Treasurer of the State of North Carolina, on behalf of the North Carolina Retirement Systems, and the North Carolina Department of State Treasurer and the North Carolina Supplemental Retirement Board of Trustees, on behalf of the North Carolina Supplemental Retirement Plans ("Lead Plaintiff" or "North Carolina") and plaintiff Macomb County Employees' Retirement System ("Macomb County ERS") (collectively, "Plaintiffs"), by and through their counsel Robbins Geller Rudman & Dowd LLP, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.[1]

## I. INTRODUCTION AND OVERVIEW OF ALLEGATIONS

1. This securities class action is brought on behalf of those who purchased or otherwise acquired Leslie's common stock between February 3, 2022 and July 13, 2023, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78j(b), 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b 5).

2. Leslie's is the largest direct-to-consumer brand in the pool and spa care industry, serving residential and professional consumers.

3. Throughout the Class Period, Defendants misled the market and investors about demand for the Company's products and the status of its inventory, particularly in chlorine-based pool treatments.[2] Specifically, during the Class Period, Leslie's inventory of chlorine-based products exceeded the amount needed by customers. The Company's

---

[1] Plaintiffs' information and belief is based on, among other things, the independent investigation of Counsel, which includes, but is not limited to, a review and analysis of: (a) Leslie's, Inc.'s ("Leslie's" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) transcripts of Leslie's senior management's conference calls with investors and analysts; (c) releases and media reports issued about and disseminated by the Company; (d) analyst reports issued about Leslie's; (e) interviews of former Leslie's employees; (f) other public information and data regarding the Company; and (g) documents cited herein. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

[2] The "Defendants" and "Individual Defendants" are identified and defined *infra*, §III.

distribution centers had reached capacity, forcing Leslie's to send retail stores more inventory than they could store safely. Despite the fact that improper storage of chlorine-based products creates serious fire hazards, retail locations had no choice but to store excess product in parking lots and closets, and managers had to shift inventory around to cope with the overflow and associated dangers. As the situation became untenable, Defendants were forced to enlist third-party chemical storage companies to handle the excess inventory.

4. To rid Leslie's of this growing excess inventory, by the start of the Class Period, Defendants had undertook efforts to offload chlorine-based products on its customers. Specifically, in later 2021 Defendants began sending letters to Leslie's loyalty customers, stating that the Company "couldn't guarantee product availability in the second half" of 2022 and "encourag[ing] them to purchase [chlorine-based products] early prior to the pool season," which belied their repeated public assertions that Defendants were "happy with [their] current supply" and that Leslie's had an "always-on procurement strategy." However, Defendants knew their offloading of chlorine-based products resulted in customers holding excess "garage and shed inventory." This drove down demand for Leslie's products and slashed the Company's sales and gross margin results, eventually leading to Leslie's earnings collapsing in Q3 2023.

5. During the Class Period, Defendants concealed from investors that the Company and its customers had a glut of inventory, which would inevitably depress future demand. Instead, Defendants publicly touted "durable" and "strong consumer demand" for Leslie's products, and assured investors that they were "strategically invest[ing] in inventory to meet heightened consumer demand." And, specifically, that they "haven't seen any indication of any meaningful pull-forward" of customer purchases.

6. As Leslie's reported quarterly inventory balances continued to rise, Defendants assuaged investors that the Company's inventory position was "appropriate" and that they would "strategically manage inventory levels" as necessary. In response to analyst questions about the Company's inventory, particularly at the beginning of 2023 in

the wake of lower sales, Defendants again reassured investors that it was just an "outsized weather impact" and a "timing shift" that caused the reduction in demand. This story could not, however, excuse the declines in sales and gross margins which Leslie's experienced during its first quarter of peak pool season in 2023 (*i.e.*, Q3 2023). Defendants were finally forced to admit that "consumers entered the pool season with a greater than normal amount of chemicals left []over from last year." Leslie's inventory levels deeply impacted earnings results, as "gross margins were down year-over-year due to higher product costs that we could not pass through to consumers, the impact of higher distribution-related expenses and capitalized costs as we reduce inventory from peak levels, and fixed cost deleverage."

7. Defendants knew or were reckless in not knowing that their Class Period statements were misleading when made. The fraud involved Leslie's non-discretionary core product offerings, and specifically chemical products that made up over 45% of Leslie's sales. Further, the Individual Defendants, who held the top two executive positions at Leslie's – CEO and CFO – repeatedly professed on conference calls with investors their granular-level knowledge of: (a) industry factors affecting chlorine supply; (b) the Company's inventory levels and strategies for inventory management and procurement; (c) the predictable "annuity-like" nature of the pool and spa industry; and (d) consumer demand through the Company's close tracking of customer purchases.

8. The relevant truth concealed by Defendants' misrepresentations and omissions was revealed to investors on July 13, 2023, when Leslie's announced a 9% year-over-year sales decline and 18% drop in gross profits. On this news, Leslie's share price fell nearly 30%, from a closing price of $9.52 per share on July 13, 2023, to a closing price of $6.70 per share on July 14, 2023 and fell another 18% the following trading day to close at $5.46 per share, causing Plaintiffs and other investors to suffer significant losses.

## II. JURISDICTION AND VENUE

9. The claims alleged herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa).

11. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b)-(c) because Leslie's is headquartered in this District, and the statements by Defendants alleged herein to be actionable were prepared and reviewed in and disseminated from this District and were received by Leslie's shareholders in this District. As such, substantial acts in furtherance of the alleged misconduct have occurred in this District.

12. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce of the United States, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets. Among other acts, Defendants prepared, authorized, and issued statements and omissions in press releases, SEC filings, and conference calls that they knew or should have known would be relied on by U.S. investors.

## III. PARTIES

13. Lead Plaintiff manages over $120 billion in assets for the benefit of nearly one million active and retired public employees, including teachers, police officers, firefighters, and public servants throughout North Carolina. As set forth in its previously filed certification (ECF 18-2), North Carolina acquired Leslie's common stock at artificially inflated prices during the Class Period and were damaged thereby.

14. Plaintiff Macomb County Employees Retirement System is a retirement system based in Mount Clemens, Michigan with over $1 billion in assets. It provides retirement benefits to thousands of beneficiaries. Macomb County ERS purchased 172,317 shares of Leslie's stock during the Class Period as reflected in the attached schedule and was damaged thereby.

15. Defendant Leslie's is a national retailer of pool and spa supplies, equipment, and repair services incorporated under the laws of Delaware and headquartered in Phoenix, Arizona. Leslie's went public on the U.S. stock market on October 29, 2020, and the

Company's common stock trades in an efficient market on the Nasdaq Global Select Market (the "Nasdaq") under the ticker symbol "LESL."

16. Defendant Michael R. Egeck ("Egeck") is and was, at all relevant times, the Company's Chief Executive Officer ("CEO") and Director. He has served as the CEO since February 2020. For each of the 2021, 2022, and 2023 fiscal years, Egeck's base salary was $1,025,000. In connection with the Company's Initial Public Offering ("IPO"), Egeck was granted 2,535,064 restricted stock units ("RSUs") and 1,176,472 stock options – including performance-vesting stock options eligible to vest 50% on the Company's achievement of the adjusted net income target for fiscal year 2021 and 50% on the Company's achievement of the adjusted net income target for fiscal year 2022. He received proceeds of $19,221,045 from his sales of stock in the Company's secondary offering on February 16, 2021, and proceeds of $13,507,468 from his sales of stock in connection with the June 14, 2021 secondary offering. Egeck was also eligible to receive performance-based bonus compensation each year pursuant to the Company's achievement of EBITDA thresholds and target amounts, targeted at 100% of his base salary. Egeck's annual cash bonus earned was $1,534,512 for fiscal 2021 and $761,575 for 2022 but fell to zero for 2023.

17. Defendant Steven M. Weddell ("Weddell") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Executive Vice President. On July 13, 2023, together with its release of a revised fiscal 2023 outlook, Leslie's announced that Weddell would step down from his position as CFO effective August 7, 2023 and would serve as a Special Advisor to the Company until December 31, 2023. For each of the 2021, 2022, and 2023 fiscal years, Weddell's base salary was $570,000. In connection with the Company's IPO, Weddell was granted 234,587 RSUs and 735,295 stock options – including performance-vesting stock options eligible to vest 50% on the Company's achievement of the adjusted net income target for fiscal year 2021 and 50% on the Company's achievement of the adjusted net income target for fiscal year 2022. He received proceeds of $13,621,171 from his sales of stock in the Company's secondary offering on

February 16, 2021, and proceeds of $12,458,232 from his sales of stock in connection with the June 14, 2021 secondary offering. Weddell also received performance-based bonus compensation each year pursuant to the Company's achievement of EBITDA thresholds and target amounts, targeted at 100% of his base salary. Weddell's annual cash bonus earned was $840,165 for fiscal 2021 and $423,510 for 2022 but, like Egeck, fell to zero for 2023.

18. Defendants Egeck and Weddell are collectively referred to herein as the "Individual Defendants." The Individual Defendants and Leslie's are collectively referred to herein as the "Defendants."

19. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

## IV. FACTUAL BACKGROUND

20. Founded in 1963, Leslie's is the world's largest retailer of swimming pool and spa supplies, services, and repairs. Leslie's serves commercial, residential, and professional customers, and more than 80% of its product assortment comprises non-discretionary items, including chemicals and equipment necessary for proper maintenance

of pools and spas. Heading into 2020, Leslie's promotional material touted that the Company had over 55 years of consecutive growth because of its "highly predictable, recurring revenue model."

21. In February 2020, Egeck was hired to be Leslie's CEO. Shortly afterwards, the COVID-19 pandemic hit the United States. The pandemic and society's turn to at-home activities raised the tide on Leslie's predictable growth. New pool permit activity grew 32% through July 2020 compared to the same period in 2019. The industry forecast similar growth in pool installations through 2020 and 2021.

22. In the wake of this pool-building boom, on October 29, 2020, Leslie's conducted its IPO, listing its stock on the Nasdaq under the symbol "LESL." Forty million shares of stock were sold in the offering at $17.00 per share. The proceeds of the offering were intended to be used to pay $390 million in previously issued debt and pay down Leslie's term loan, which had $815.3 million outstanding as of June 2020.

23. In the offering documents, which were signed by Egeck and Weddell, Leslie's emphasized that each new pool and spa installation represented a predictable, "annuity-like stream of chemical, equipment, and service revenue" and stated, "[g]iven we play primarily in the aftermarket business, we have a highly predictable, recurring revenue model, which is evidenced by our 57 years of sales growth." The Company also identified that "[m]ore than 80% of our product sales are non-discretionary and recurring in nature" and "80% of our chemical sales are derived from proprietary brands and custom-formulated products, which allow us to create an entrenched consumer relationship [and] control our supply chain[s]."

24. The offering documents also identified Leslie's "consumer-centric integrated ecosystem" and touted that "[o]ver the last two years, we have invested in new capabilities, including global inventory visibility." Moreover, in 2014, Leslie's launched a loyalty membership program which, as of 2020, served more than 3.2 million customers who represented more than 70% of the Company's total sales. As a result, Defendants said in the offering documents, "[w]e track consumer preferences, order frequency, and pool

profiles in order to curate and enhance our recommendations and promotions, anticipate product demand, and track lifetime value to better incentivize our loyalty members."

25. In the late summer of 2020, a fire shut down the Louisiana manufacturing facility of the nation's second-largest maker of dry chlorine products, BioLab. Approximately 40% of the country's chlorine tablet supply was destroyed. Combined with the pandemic's impact on available labor and constraints on the global supply chain, the fire resulted in significant shortages in Trichlor – a chlorine-based chemical product used for pool maintenance. As a result of tightening supply, the market price for chlorine-based products, including Trichlor, skyrocketed.

26. Still riding the wave of its COVID success, Leslie's leveraged its relationships with suppliers to maintain strong Trichlor inventory levels in 2020 and into 2021. On February 4, 2021, during the Company's Q1 2021 earnings conference call, Egeck highlighted that "[d]espite widespread industry [chlorine] shortages, we are confident in our ability to both serve our existing consumers as well as a significant number of new consumers we are acquiring with our growth strategies." Egeck continued, "[w]e have a 30-year relationship and a history of superior performance with our primary supplier, and we have a contract in place that secures both volume and cost through 2025." Later on the call, after stating that Leslie's "will have supply of products that other retailers don't," Egeck emphasized that this benefit

> allows us to capture a sale, but more importantly, it's allowing us to capture new customers. And with the emphasis we put on consumer file growth, keeping customers with our loyalty program, wrapping our arms around them once we've got them in our system, we see this, this industry shortage situation, not just as us getting immediate sale, but us getting a new customer, which is much more durable.

27. Egeck also confirmed that Leslie's supply chain would remain resilient through the pandemic issues: "We're constantly managing our supply chain, both for efficiency and quantity. So we're certainly not just sitting here not looking at it closely, but we feel very good of where we're at."

28. The Company again reiterated its ability to manage its supply chain on the May 5, 2021 second quarter earnings call, with Egeck reiterating: "[W]e remain confident in our supply chain and in our ability to serve both our existing consumers as well as the new consumers we are acquiring with our growth initiatives."

29. Thus, the chlorine shortage and price increases served as a windfall for Leslie's, which has traditionally been able to pass its inflationary costs on to its customers. Defendants assured investors that the shortage was a growth opportunity for Leslie's. As Weddell described:

> We're seeing, based on some of the recent news around [chlorine] shortages, that we're attracting a lot of first-time consumers to Leslie's and getting introduced to the experience and what we have to offer. So the durability of the opportunity for us is really wrapping our arms around those consumers and showing them more than just the supply of chlorine in the current season.

30. Because of its ability to take advantage of the chlorine shortage impacting other pool supply companies, Leslie's stock price increased significantly. By the end of January 2021, the stock price had increased from the $17.00 per share IPO price to over $28.00 per share. By June of 2021, the stock was trading above $29.75 per share.

31. Taking advantage of Leslie's ability to maintain a steady flow of chlorine-based products and other inventory and the accompanying increased Company revenue and stock price, Defendants conducted secondary offerings of Leslie's stock in February, June, and September 2021. During the February 16, 2021 offering, 33,350,000 shares of stock were sold by Company insiders and investors at a price of $26.00 per share. Defendants Egeck and Weddell sold $19.2 million and $13.6 million of their stock, respectively, and the Executive Chairman of Leslie's, Michael Ortega ("Ortega"), sold another $20.8 million in stock. During the June 14, 2021 offering, investors and insiders sold another 24,500,000 shares of stock at a price of $27.64 per share. Once again, Egeck, Weddell, and Ortega sold millions of dollars of their stock: $13.5 million, $12.5 million, and $20.0 million, respectively. During the September 17, 2021 offering, investors and insiders sold another

15,820,000 shares of stock at a price of $22.00 per share. Leslie's did not receive proceeds from any of these offerings.

32. In the offering documents for the 2021 offerings, Defendants continued to assure investors about the predictable, "annuity-like" nature of Leslie's business and their ability to track and predict product demand. That included emphasizing, again, that "[g]iven we play primarily in the aftermarket business, we have a highly predictable, recurring revenue model" and "[w]e track consumer preferences, order frequency, and pool profiles in order to curate and enhance our recommendations and promotions, anticipate product demand, and track lifetime value to better incentivize our loyalty members."

33. But as 2021 was coming to a close, Defendants' prior ability to take advantage of the chlorine supply chain problems turned into a liability. The chlorine supply chain stabilized just as Leslie's was increasing inventory in Trichlor and other products in the hope that shortages would persist through 2022 and 2023. Moreover, in an effort to effectively corner the market on chlorine treatment products, Defendants had made purchase commitments in 2022 and into 2023 that added to Leslie's already bloated inventory. By the end of Q1 2022 (January 1, 2022),[3] Leslie's reported total inventory of $245,000,000, an increase of 40% ($70,000,000) from Q1 2021 and more than 23% ($46,000,000) from just October 2021. Throughout 2022, including during the key summer pool season when inventory levels historically decreased, Leslie's reported inventory continued to increase, from $345,000,000 at the end of Q2 2022, to $361,000,000 at the end of Q3 2022, to $362,000,000 at the end of Q4 2022. By the end of Q1 2023, December 31, 2022, reported inventory was $430,000,000, more than 75% higher than the Company's inventory at the end of Q1 2022.

34. Former Company employees confirm that Leslie's found itself with excess supplies of Trichlor and chemical treatment products just as the supply of chlorine was

[3] The Company's fiscal year ends on the Saturday closest to September 30th, thus the fiscal years for 2022 and 2021 ended on October 1, 2022 and October 2, 2021, respectively.

normalizing at the start of 2022 and that the inventory problems at the Company only got worse during 2022 and into 2023. In an effort to dump excess inventory, starting in late 2021, Defendants had letters sent to the Company's loyalty program members – customers who represented more than 70% of the Company's total sales. Despite Defendants' statements to investors about the strength of Leslie's supply chain and the "contract[s] in place that secures both volume and cost through 2025" for chlorine-based products, as well as the Company's burgeoning inventory levels and the end of the chlorine shortage, the letters urged customers to "purchase early prior to the pool season" and stock up on treatment products because "we [can't] guarantee product availability" later in the year. The letters and a campaign to have Leslie's stores push customers to buy more treatment products than were needed succeeded in boosting sales going into 2022, but at the cost of future sales. As Defendants knew, the product customers were sitting on at the end of 2022 – what became known as "garage and shed inventory" – would directly reduce the volume of treatment product that would be purchased for the 2023 season.

35. Former Company employees also confirm that, despite the efforts to unload excess inventory onto loyalty customers, Leslie's continued to pile up excess inventory of chemical pool treatment products. A former Leslie's allocations and planning analyst who was with the company from 2021 through early 2023 and had responsibility for overseeing the moving of inventory from Leslie's distribution centers to the Company's retail stores, confirmed that, by 2022, the Company's distribution centers had far too much inventory, which was being offloaded and pushed into stores even though the stores did not have the physical space to store the chemical inventory. The situation got so bad in 2022 that Leslie's stores were refusing to accept shipments of chlorine-based products and other pool supplies and were trying to send inventory back to Leslie's distribution centers. The former allocations and planning analyst said that, by late 2022, it was internally recognized that the Company's financial projections for 2023 were unachievable given that there was too much inventory in the distribution centers.

36. As a result of Leslie's management pushing excess inventory out to stores, chemical treatment products, including Trichlor, were being stored in closet space and outside at the stores in parking lots. Regional managers were forced to shift inventory from one store to another because the stores were overflowing with chlorine-based products and had nowhere safe to put it. One general manager recounted that, beginning in 2022, their store was receiving so much unplanned chemical inventory from Leslie's distribution centers that there was nowhere to store it all and still adhere to safety and fire codes. Yet, unlike in the past, there was no way for them to stop the shipments from coming to stores. Indeed, a former inventory planner who was with Leslie's through late 2023 said that, as a result of the Company's excess inventory, management's goal was to send more inventory out to stores than was actually needed.

37. According to a district manager who was with the Company from before the IPO to late 2022, Leslie's maintained records of customers' purchasing histories and knew whether they were sitting on excess supplies of products. Prior to the Class Period, at the height of the chlorine shortage, Leslie's used this information to discourage customers from purchasing too much Trichlor and related products. But, as described above, by 2022, Leslie's management was pushing stores to sell excess amounts of chemical products, and it was clear the Company was overselling pool treatment products, undercutting future sales. Nevertheless, this district manager confirmed, Leslie's inventory kept growing in 2022, resulting in the stores in his district being overstocked with chemical products to the point that they were in violation of fire codes and regulations regarding the storage of chemical products.

38. Ultimately in 2022 and 2023, as Leslie's distribution centers and stores became so overloaded with chemical treatment product inventory, Defendants were forced to retain the services of third party chemical logistics and storage companies. As Defendants later admitted in November 2023, the Company's excess chemical product inventory "required us to use several third-party off-site storage facilities with a lot of

movement of product between those facilities," incurring millions of dollars in incremental inventory adjustment costs.

## V. DEFENDANTS' MISLEADING STATEMENTS AND MATERIAL OMISSIONS

### A. Q1 2022 Earnings Report

39. On February 3, 2022, after the market closed, Leslie's issued a press release containing the Company's financial results for Q1 2022. The press release reported that, compared to the prior year period, sales increased 27.5% to $184.8 million, with comparable sales growth of 20.5%, and gross profit increased 30.2% to $67.3 million, with gross margins increasing 70 basis points. Adjusted EBITDA improved by $1.3 million to $1.1 million compared to a slight loss in the prior year period. On these positive results, Leslie's raised its guidance for fiscal 2022, increasing the outlook for sales by $20 million, gross profit by $10 million, and adjusted EBITDA by $5 million.

40. Egeck was quoted in the press release, stating that "***the competitive advantages derived from our integrated platform of physical and digital assets, and strong execution of our strategic growth initiatives drove record first quarter results***."

41. On February 3, 2022, Leslie's also held a conference call with analysts and investors, led by Defendants Egeck and Weddell, to discuss the Company's Q1 2022 results. On the conference call, Egeck emphasized that consumer demand for Leslie's products remained strong and the Company was "***benefiting from strong secular macro trends that are driving durable consumer demand and are showing no signs of slowing***."

42. On the conference call, Weddell reported that, while inventory conditions in the industry, particularly for chemicals and equipment, remained constrained, the Company's end-of-quarter inventory was up 40% to $245 million compared to $175 million at the end of the prior year quarter. Weddell gave investors assurance that they had "***an always-on procurement strategy at Leslie's. Our team continues to proactively work with our vendor partners to manage the flow of inventory, and we continue to identify***

***opportunities to strategically invest in inventory to meet heightened consumer demand and prepare for pool season***."

43. On February 4, 2022, the Company filed its Form 10-Q for the quarter ended January 1, 2022 with the SEC, signed by Weddell and attaching Sarbanes-Oxley Act certifications signed by Egeck and Weddell, reporting the Company's Q1 2022 results. The Q1 2022 Form 10-Q stated: "There have been no material changes from the risk factors disclosed in our Annual Report on Form 10-K for the year ended October 2, 2021," filed on December 10, 2021 ("FY 2021 Form 10-K"). Leslie's FY 2021 Form 10-K contained the following purported risk disclosure that was incorporated by reference in the Company's Q1 2022 Form 10-Q, as well as the Company's Forms 10-Q filed on May 6, 2022 (Q2 2022) and August 5, 2022 (Q3 2022):[4]

> ***We may not be able to successfully manage our inventory to match consumer demand, which could have a material adverse effect on our business, financial condition, and results of operations***.
>
> We base our inventory purchases, in part, on our sales forecasts. ***If our sales forecasts overestimate consumer demand, we may experience higher inventory levels, which could result in the need to sell products at lower than anticipated prices, leading to decreased profit margins***. Conversely, if our sales forecasts underestimate consumer demand, we may have insufficient inventory to meet demand, leading to lost sales, either of which could materially adversely affect our financial performance.

**B. Q2 2022 Earnings Report**

44. On May 5, 2022, Leslie's issued a press release containing the Company's financial results for the second quarter ended April 2, 2022. The press release reported that, compared to the prior year period, sales increased 18.5% to $228.1 million, with comparable sales growth of 13.3%, and gross profit increased 19.5% to $85.6 million, with gross margins increasing 30 basis points. Adjusted EBITDA for the quarter was $8.7 million compared to $9.5 million in the prior year period. With this announcement, the

[4] Leslie's May 6, 2022 and August 5, 2022 Form 10-Q filings were also signed by Weddell and included Sarbanes-Oxley Act certifications signed by Egeck and Weddell.

Company substantially raised its guidance again for fiscal 2022, increasing its outlook for sales by $85 million, gross profit by $38 million, and adjusted EBITDA by $18 million.

45. The press release quoted Egeck stating that "non-discretionary, recurring nature of after-market pool industry demand, ***our team's strong execution against our strategic growth initiatives, and an advantaged inventory position were all key drivers of our performance***," and that Leslie's was entering the 2022 pool season "ready to meet the needs of our customers."

46. On May 5, 2022, Leslie's also held a conference call with analysts and investors, led by Defendants Egeck and Weddell, to discuss the Company's Q2 2022 results. On the conference call, Egeck reported that the industry was still facing constrained supply conditions, stating "***[w]ith regard to chlorine tabs, supply remains constrained***," and "***domestic Trichlor capacity is tight and falling short of elevated consumer demand***." But with respect to Leslie's, Egeck told investors:

> ***I'm going to say we're happy with our current supply, though the flow of it could be a little more front loaded, still pleased with the supply. We're in line to buy even more next year, need to feed the machine we've created for chemical consumption and the [Company's] growing consumer profile***.

47. On the conference call, Weddell repeated that Leslie's "***continue[d] to expect inventory conditions in the industry to remain tight throughout fiscal 2022, particularly for chemical***," and that the Company ended the quarter with inventory of $345 million, up 24% compared to $278 million at the end of the prior year same quarter. Also, Weddell told investors that the Company "continues to proactively work with our vendor partners to manage the flow of inventory and ***we continue to identify opportunities to strategically invest in inventory to meet heightened consumer demand and prepare for pool season***."

48. During the conference call, analysts asked Egeck and Weddell about customer purchasing behavior, specifically if the Company was seeing its customers making non-discretionary purchases earlier than usual ("pull-forward" purchases):

> [William Blair & Co. L.L.C.:] So have you tried to calculate a potential pull-forward estimate or is this just not your view because of the macro drivers and share gain in price?
>
> [Egeck:] . . . ***I would say it's not our view, both for the reasons you stated. And also, due to the fact that we track [sales] very carefully***. We're able to see by consumer what they purchased prior years versus what they've purchased year-to-date. It's one of the things that we try to pay a lot of attention to. ***And we just haven't seen any indication of any meaningful pull-forward***.
>
> * * *
>
> [Egeck:] ***I started with the first question saying we don't see any evidence of any significant pull-forward. And in fact, with [unit per transaction], I think we're seeing kind of just the opposite people buying more items but perhaps smaller quantities***.

49. In response to another analyst question to Egeck and Weddell concerning whether they were seeing any customer "trade down or pull back" in purchases, Egeck responded "***I think what you're seeing in our business is nondiscretionary nature of the vast majority of it and recurring demand. . . . [A]nd in the core businesses of chemicals and equipment and parts and repair and maintenance, we have not seen any indication of a decrease in demand***."

### C. June 6 and 7, 2022 Analyst Conference Calls

50. On June 6, 2022, Weddell spoke at an analyst conference call hosted by Robert W. Baird. During the conference call, Weddell responded to a question about Leslie's inventory given the flow of business:

> [Analyst:] And I guess the other question would just be maybe on inventory. So I mean, inventory has been a popular topic in retail for the last couple of weeks. How does inventory look for you guys? How do you feel about that given the flow of business?
>
> [Weddell:] Sure. Yes. We took a strategic – we've made a strategic decision last year to heavily invest in inventory. If you remember, most of the inventory that we have is nondiscretionary. It's not something fashion risk or obsolescence. If you look at the end of Q2, our fiscal Q2, effectively at the end of March, up $70 million or up 25%. ***So we worked very hard and closely with our vendors to procure effectively as much inventory as we can***

> ***to meet the heightened demand that we see today, and it's a competitive advantage***.
>
> ***So I feel very good with our inventory position today***.

51. The next day, on June 7, 2022, Weddell spoke at an analyst conference call hosted by William Blair. During the conference call, Weddell was again asked about Leslie's inventory and whether the Company had all it needed. He responded: "***I think at this point, we wish we had more. So we believe this year, we will still not have all the inventory that we need to meet all the demand that's out there, but certainly feel better about the inventory position today than in prior years***."

**D. Q3 2022 Earnings Report**

52. On August 5, 2022, Leslie's issued a press release containing the Company's financial results for the third quarter ended July 2, 2022. The press release reported that financial performance in the quarter was adversely impacted by "execution issues" at the Company's New Jersey distribution center. The press release highlighted that, even with the logistical problems, sales increased 12.9% to $673.6 million, compared to the prior year period, with a comparable sales increase of 7.4%. Although gross profit increased 7% to $303.6 million during the quarter, gross margins decreased by 250 basis points, "primarily due to shifts in business mix, decreased product margin and higher distribution expenses." Additionally, adjusted EBITDA increased 2% compared to the prior year period to $182.9 million. The operational setback caused Leslie's to reduce its guidance for fiscal 2022, lowering the sales outlook to $1,550 to $1,570 million (from $1,575 to $1,610 million), the gross profit outlook to $655 to $670 million (from $700 to $715 million), and the adjusted EBITDA outlook to $287 to $297 million (from $315 to $330 million).

53. On August 5, 2022, Leslie's also held a conference call with analysts and investors, led by Defendants Egeck and Weddell, to discuss the Company's Q3 2022 results. During the conference call, Weddell confirmed that "***demand for [Leslie's] core nondiscretionary product remains solid***," and Egeck reiterated that "***demand, we think, is very much alive and stable***."

54. During the conference call, Weddell also spoke about Leslie's inventory. He reported that Leslie's ended the quarter with $361 million in inventory, up 61% from $224 at the end of Q3 2022. Weddell stated: "***[W]e view our current inventory position as appropriate given the uncertainty of supply for the balance of the year and into fiscal 2023***."

55. During the conference call, analysts asked about the Company's inventory levels and what investors could expect at the end of the 2022 pool season (Q4 2022). Weddell responded that the Company expected inventory to remain elevated, but stated "***we're in a much better position from a Trichlor perspective across our network, both -- all stages, raw materials, produced goods, in our DCs and in our stores***." Weddell added that:

> ***[I]f the choice is to take inventory at a little bit higher level today, going into the end of the year and to start off next year in a better position versus try to run leaner. We will take the former in the current environment. So it's something we expect to actively manage in the year-end and through next year, don't necessarily view these levels as permanent increases. But in the current environment, it's the appropriate level of inventory***.

56. Egeck also noted on the conference call that "***Trichlor inventory is in good shape***."

### E. Q4 2022 and FY 2022 Earnings Report and Investor Day Conference

57. On November 30, 2022, Leslie's issued a press release containing the Company's financial results for the fourth quarter and fiscal year ended October 1, 2022. The press release reported that, compared to fiscal 2021, sales for the year had increased 16.3% to $1,562.1 million, with a comparable sales growth of 10.6%, while gross profit also increased 13.2% to $673.7 million, with a gross margin of 43.1%. Additionally, adjusted EBITDA increased 8% compared to the prior year period to $292.3 million. Leslie's also offered its first guidance for fiscal 2023 in the press release, projecting the outlook for sales to be between $1,560 to $1,640 million, and gross profit to be between $667 to $708 million, and adjusted EBITDA to be between $280 and $310 million.

58. Egeck was quoted in the press release, stating:

> Looking ahead, while we anticipate a challenging macro-economic backdrop for Fiscal 2023, ***we remain focused on delivering against our long-term objectives supported by the recurring non-discretionary demand of the aftermarket pool industry, the competitive advantages of our integrated network of physical and digital assets and the execution of our strategic growth initiatives***.

59. On November 30, 2022, Leslie's also held an Investor Day and Q4 2022 earnings call with analysts and investors, led by Defendants Egeck and Weddell, to discuss the Company's Q4 2022 and fiscal year results, as well as the drivers of the Company's fiscal year 2022 performance, fiscal year 2023 guidance, and the Company's growth opportunities. During Egeck's prepared comments, he made a point of noting that, while the Company was being conservative on its 2023 guidance, Defendants "***do not see a scenario where we give back significant portions of the gains over the last 3 years.***"

60. During the conference call, Weddell reported $362 million in inventory at end of fiscal year 2022, an 82% increase compared to $199 million in inventory at the end of fiscal year 2021. Weddell told investors that the inventory increase related to non-discretionary product, stating that "[b]oth, the equipment and chemical product categories, are nondiscretionary in nature and are not subject to technology or fashion risk. ***We view our current elevated inventory position as appropriate given the uncertainty of supply going into fiscal 2023***."

61. Weddell added that "***when we feel we can adequately meet consumer demand and we see an improvement in supply chains, then we will pursue opportunities to reduce inventory***." Later during the conference call, Weddell reiterated the same, stating:

> And as a reminder, we primarily sold nondiscretionary products. And most of the incremental inventory falls into the chemical and equipment categories that are not subject to technology or fashion risk. ***When we believe we have sufficient inventory to meet consumer demand through season and after we see supply chains across the industry become more predictable, then we will strategically manage inventory levels down to recoup some of the investments we have made in working capital over the last few years***.

62. On November 30, 2022, the Company also filed its Form 10-K for year ended October 1, 2022 ("FY 2022 Form 10-K") with the SEC reporting the Company's FY 2022 results. The FY 2022 Form 10-K was signed by Egeck and Weddell and included Sarbanes-Oxley Act certifications, signed by Egeck and Weddell. The FY 2022 Form 10-K identified the following purported risk factor with regard to Leslie's business:

> ***We may not be able to successfully manage our inventory to match consumer demand, which could have a material adverse effect on our business, financial condition, and results of operations***.
>
> We base our inventory purchases, in part, on our sales forecasts. ***If our sales forecasts overestimate consumer demand, we may experience higher inventory levels, which could result in the need to sell products at lower than anticipated prices, leading to decreased profit margins***. Conversely, if our sales forecasts underestimate consumer demand, we may have insufficient inventory to meet demand, leading to lost sales, either of which could materially adversely affect our financial performance.

**F. Q1 2023 Earnings Report**

63. On February 2, 2023, Leslie's issued a press release containing the Company's financial results for the first quarter ended December 31, 2022. The press release reported that, compared to the prior year period, first quarter sales increased 5.6% to $195.1 million but noted that the poor weather in the quarter caused a 4% decrease in comparable sales. For gross profit, the press released noted a 3.0% decrease to $65.3 million compared to the prior year period, and gross margin was 33.5%, down 290 basis points year-over-year. Additionally, adjusted EBITDA decreased to an $11.9 million loss, compared to a $1.1 million gain in the same quarter the prior year.

64. On February 2, 2023, Leslie's also held a conference call with analysts and investors, led by Defendants Egeck and Weddell, to discuss the Company's Q1 2023 results. During the conference call, Egeck noted in his prepared remarks that the Company saw decreased consumer confidence in the quarter, including consumer demand for Trichlor and Cal-Hypo. When analysts raised concerns about this topic, Egeck addressed them, stating:

> ***I think the way to think about demand is to keep in mind, it's a very small quarter, right, for the whole industry. And I know we've said that a lot. But again, trying to extrapolate trends from this first quarter, which is: a, small; and b, had a really outsized weather impact, I just think that's tricky*.
>
> * * *
>
> ***[A]gain, super small quarter, upsized weather impact being very careful not to draw any trends for the full year from it. And we didn't see anything despite those 2 factors that would tell us we need to*.**

65. During the conference call, Weddell reported that the Company had $430 million in inventory at the end of the quarter, an increase of 76% compared to $245 million at the end of the prior year quarter. Weddell told investors that "our first priority is to put the company in a position to meet consumer demand for the season. ***In furtherance of that objective, we continue to view our current elevated inventory position as appropriate and sensible given the uncertainty of supply*.**" Weddell added that "***[w]hen we believe we have sufficient inventory to meet consumer demand through season, and after we see supply chains across the industry become more predictable, then we will strategically manage inventory levels down*.**"

66. During the conference call, several analysts raised concerns about Leslie's increased inventory levels. Specifically, on the call, a William Blair & Co. research analyst asked about inventory:

> [William Blair & Co.:] Can we start with inventory, Mike? The inventory kind of pops off the page and up a bit sequentially. How much is safety stock? And when do you see inventory normalizing?
>
> [Weddell:] . . . ***[T]here's 2 key reasons that inventory is up, one is sales growth over the last year – last few years. And then importantly, the strategic decision that we made to intentionally pull forward 2023 receipts in advance of season*.**
>
> . . . ***So the pull forward allows us to load our stores with more product and facilitate the replacement cycle during the early part of our season*.**
>
> . . . ***But again, the inventory that we're procuring today is for this season. And it's inventory that is being brought in earlier in preparation for season. It's not stocking up for kind of longer-term needs*.**

67. Weddell also addressed analyst concerns about Trichlor inventory and inventory growth in Q1 2023, stating:

> ***We feel good about the inventory that we have in our facilities and in our stores. Again, when you think about that composition of product that we're bringing in early, it's high-turn product, top SKUs that we know we need for full season and where last year we talked a lot about kind of getting behind the curve and replenishment cycle*.**
>
> . . . ***So I feel good with the position we have in inventory today***.

68. During the conference call, Egeck also addressed analysts' concerns about Leslie's Trichlor inventory levels. When asked about his thoughts on the risk of Leslie's competitors sitting on too much Trichlor inventory, Egeck responded:

> ***[I]n Trichlor [inventory], that's really us, and we control most of that supply chain now, particularly with our – particularly with our investment in stellar tableting***.
>
> ***So we feel good about where we are with Trichlor, but we've also bulked up the inventory there as well, with the idea that we're going to preposition a much higher percentage of it into the stores themselves***.

69. On February 3, 2023, the Company filed its Form 10-Q for the quarter ended December 31, 2022 with the SEC, which was signed by Weddell and included Sarbanes-Oxley Act certifications signed by Egeck and Weddell, reporting the Company's Q1 2023 results. The Q1 2023 Form 10-Q stated: "There have been no material changes from the risk factors disclosed in our Annual Report on Form 10-K for the year ended October 1, 2022," filed on November 30, 2022. Leslie's FY 2022 Form 10-K contained the following purported risk disclosure that was incorporated by reference in the Company's Q1 2023 Form 10-Q, as well as the Company's Form 10-Q filed on May 5, 2023 (Q2 2023):[5]

> ***We may not be able to successfully manage our inventory to match consumer demand, which could have a material adverse effect on our business, financial condition, and results of operations***.

---

[5] The May 5, 2023 Form 10-Q was signed by Weddell and included Sarbanes-Oxley Act certifications signed by Egeck and Weddell.

> We base our inventory purchases, in part, on our sales forecasts. ***If our sales forecasts overestimate consumer demand, we may experience higher inventory levels, which could result in the need to sell products at lower than anticipated prices, leading to decreased profit margins***. Conversely, if our sales forecasts underestimate consumer demand, we may have insufficient inventory to meet demand, leading to lost sales, either of which could materially adversely affect our financial performance.

**G. Q2 2023 Earnings Report**

70. On May 3, 2023, Leslie's issued a press release containing the Company's financial results for the second quarter ended April 1, 2023. The press release reported that sales for the quarter decreased 6.7% and comparable sales decreased 13.5%, which Defendants attributed to "***the impact of the normalization of the seasonal purchasing cycle to pre-pandemic patterns and adverse weather***." Additionally, compared to the prior year, gross profit decreased 16.9%, and gross margins fell 410 basis points to 33.4% for the quarter, while adjusted EBITDA came in at a $8.4 million loss compared to a $8.7 million gain the prior year.

71. The press release quoted Egeck stating that results were due to "the industry and ***Leslie's experienc[ing] comparable sales headwinds related to the normalization of the seasonal purchasing cycle to pre-pandemic patterns, as well as adverse weather in key markets***," but that "***[u]nderscoring these results was the strong execution of our diversified growth initiatives by our teams which helped to drive continued market share gains and position us well to deliver against our objectives as we head into the all-important pool season***."

72. On May 3, 2023, Leslie's also held a conference call with analysts and investors, led by Defendants Egeck and Weddell, to discuss the Company's Q2 2023 results. During the conference call, Egeck assured investors that the Company's lower-than-expected Q2 results were a temporary issue, stating:

> ***[W]e believe we are seeing a return to a more normalized pre-pandemic revenue contribution breakdown with 25% in the first half of the year and 75% in the second half. To be clear, we believe this change in seasonal***

> ***consumer purchasing behavior is a timing shift and not a reduction in underlying demand for the year.***

73. Weddell further assured investors about demand and that customers were just reverting back to seasonal buying patterns, adding, "***we believe consumers are more closely aligning their purchases with their need for product during the primary pool season, which runs from May to September***," and "***[i]t's important to note that we believe this behavior impacts the timing of sales, not the absolute dollars expected to be generated this year***."

74. During the conference call, Egeck also acknowledged, for the first time, that higher sales in Q2 2022 (prior year same quarter), had been driven by a letter Defendants sent to Leslie's customers warning them of purported limited chemical supply and encouraging them to make purchases early and out of season. Egeck stated:

> [W]e, at one point last year in the first quarter, actually sent a letter to our loyalty file, saying we couldn't guarantee product availability in the second half and encouraged them to purchase early prior to the pool season. And whether on their own or because of that letter, we saw a lot of that. And that was that 210 to 260 basis points increase in last year's Q2 in terms of the total year's contribution.

75. However, as set forth below in ¶77, Defendants failed to disclose that the real purpose of the letter was to rid the Company of excess inventory that had begun piling up at the end of 2021 as Leslie's inventory of chemical products, specifically chlorine-based products, exceeded the volumes necessary to satisfy predicted demand during the Class Period.

76. During the call, analysts again raised concerns about Leslie's Trichlor inventory and asked Egeck and Weddell if they had a sense of whether customers were currently sitting on inventory:

> [Jeffries LLC:] Do you have a sense of how much safety stock your PRO customers have to run through before they need to purchase in greater quantities? And I guess, similar question for the homeowner, although I presume safety stock is less of a relevant concept here. But just trying to get a sense of kind of it sounds like this is going to be the peak for inventory and

> you're going to kind of focus on working down that inventory and convert to cash flow. So just trying to get some sense around that dynamic.
>
> * * *
>
> [Weddell:] ***We feel very good with where we're at going into season if you look at the year-on-year change in Q2, primarily around chemicals. . . . So at this point, going into season, heaviest use from a chemical perspective, we feel very good with our current inventory balances***.
>
> ***The top 2 contributors, the inventory increase were still the chemical and equipment categories, which we've talked a lot about being nondiscretionary in nature. So we feel good with where we're at. And as you stated, I absolutely believe that we're at peak and we have an opportunity to materially decrease our inventory levels into year-end and beyond***.

77. Defendants' statements set forth in ¶¶40-43, 45-51, 53-56, 58-62, 64-73, 76 were materially false and/or misleading at the time they were made because they failed to disclose the following material adverse facts that were known to Defendants or recklessly disregarded by them about Leslie's excess inventory of chlorine-based products and the excess inventory of these products that had been purchased and were held by Leslie's customers:

(a) Leslie's inventory of chlorine-based products exceeded the volumes necessary to satisfy predicted demand during the Class Period.

(b) By the start of the Class Period, Leslie's inventory of chlorine-based products had ballooned to the point that some of the Company's distributions centers had reached capacity and retail stores were being forced to take the excess inventory, turning them into makeshift warehouses. However, the retail stores did not have the physical space to store the excess inventory that was being sent to them, which created serious fire hazards due to the flammable nature of chlorine combined with lack of proper storage space. Many retail stores were storing the excess inventory outside of the stores, including in store parking lots, to manage these conditions. Regional retail store managers were also personally moving inventory from one store to another because stores were overflowing

with chlorine-based products. Ultimately, in 2022 and into 2023, the Company had to retain third party chemical storage companies to store the excess inventory.

(c) To manage this excess inventory, during the last quarter of 2021 and into 2022, retail store managers and employees were being directed to encourage customers to stock up on chlorine-based products to alleviate the excess inventory. Defendants also had the Company send letters to Leslie's loyalty customers beginning in late 2021 "encouraging them to purchase [chlorine products] early prior to the pool season," which artificially inflated sales in 2022. However, these attempts to offload the excess inventory to customers undercut demand for Leslie's chlorine-based products in 2023 as the Company's customers became oversaturated with chlorine-based products, which Defendants referred to as "garage and shed inventory."

(d) Leslie's inventory buildup drove down gross margin, as it was stuck with over-priced and over-transported inventory at a time when it was "unable to successfully maintain [the prior years'] higher pricing levels." In addition, Leslie's logistics crisis led to "larger than expected inventory adjustments made after the completion of [Leslie's] annual physical inventory count" at the end of FY 2023, when the Company identified a material weakness related to controls over the performance of fiscal inventories.

## VI. DISCLOSURE OF THE TRUTH AND POST CLASS PERIOD EVENTS

78. On July 13, 2023, after the market closed, Leslie's issued a press release and filed a Form 8-K with the SEC, signed by Weddell, announcing preliminary Q3 2023 financial results (for the quarter ended July 1, 2023) and the departure of Weddell effective August 7, 2023. In the press release, Leslie's reported preliminary Q3 2023 earnings that were well below market expectations and announced that the Company was significantly cutting full year fiscal 2023 guidance by nearly 60%. The press release explained that demand for the Company's chemical products in the quarter decreased because many of

the Company's customers had larger than normal chemical inventories entering into the 2023 pool season.

79. Specifically, in the press release, Egeck stated:

> Our fiscal third quarter results were well below our expectations as low double digit traffic declines in our Residential and Pro businesses drove negative comps across both discretionary and non-discretionary categories. While abnormal weather continued to pressure traffic levels, customer surveys conducted towards the end of the quarter also indicated increased price sensitivity and that consumers entered the pool season with a greater than normal amount of chemicals leftover from last year.

80. The press release also disclosed that lower demand in Q3 2023 resulted in an inability to pass through cost increases, which negatively impacted gross margins. The press release also stated that gross margins were impacted by higher inventory-related expenses, including higher distribution expenses. In the press release, Egeck stated:

> Our third quarter gross margins were down year-over-year due to higher product costs that we could not pass through to consumers, the impact of higher distribution-related expenses and capitalized costs as we reduce inventory from peak levels, and fixed cost deleverage. . . . We also continue to aggressively manage our inventory balances . . . .

81. As a result of Defendants' disclosures, the price of Leslie's stock dropped nearly 30%, from a closing price of $9.52 per share on July 13, 2023, to a closing price of $6.70 per share on July 14, 2023. Leslie's stock price continued to fall another $1.24 per share the following trading day, or over 18%, closing at $5.46 per share on July 17, 2023.

82. After the end of the Class Period, on August 2, 2023, Leslie's issued a press release announcing its financial results for the third quarter of 2023 ended July 1, 2023. The Company reported the same results given in its preliminary release and hosted an earnings conference call with investors to provide further color on the factors impacting its financial results. During the conference call, Egeck explained "that a portion of our customers had a greater-than-normal amount of chemicals left over from last year . . . validated by 2 separate consumer surveys," stating that this "consumer behavior is not something we have seen before." Egeck added that "the lack of [loyalty] file growth, . . .

has a lot to do with the 2 surveys that we ran, which showed a larger-than-normal amount of product left over in the industry in the consumers' hands. We've turned to calling it the garage and shed inventory internally."

83. During the conference call, Egeck also stated that the costs associated with Leslie's build-up of chemical inventory were the primary cause of gross margin erosion in the quarter, stating: "[G]ross margins were impacted by 4 primary factors. First, incremental distribution expenses, including those related to capitalized distribution costs and investments in labor, offsite storage and transportation costs, lowered gross margin by 150 basis points." Later on the call, Egeck added: "Obviously, the inventory buildup and the associated costs with that, offsite storage, additional labor, increased transportation, those costs are in our margin, though those were flexed up given a rather extraordinary inventory levels we took to ensure supply."

84. Egeck also told investors that the Company experienced higher product costs in Q3 2023 and Leslie's had to lower chemical prices in the face of lower demand, which negatively impacted gross margins in the quarter. Egeck stated: "While we experienced higher product costs across categories, the largest impact was in our chemicals categories. We initially increased our selling prices for chemicals at the start of the season, but we were unable to successfully maintain those higher pricing levels."

85. On the conference call, Egeck also acknowledged that Leslie's retail stores had been providing feedback to Defendants about customers putting off chemical purchases because of stockpiled inventory. Egeck stated:

> We've got some feedback from our stores. They were hearing that from customers as they were coming in, particularly with regards to our water tests [AccuBlue]. Even in a down quarter, we ran more water tests than the prior year's period, but the conversion of those tests was lower. And what we were hearing from the stores when we questioned it was that they were hearing that people had – already had those chemicals.
>
> So it's a highly unusual situation when we think of what the duration might be.

86. On November 28, 2023 Leslie's issued a press release announcing its financial results for Q4 2023 and also hosted a conference call with investors to discuss the results. In the press release, Leslie's reported that sales decreased 9.1% compared to the prior year same quarter and comparable sales decreased 11.0% compared to the prior year same quarter. Leslie's also reported in the press release that gross profit decreased 26.3% compared to the prior year period due in part to inventory-related expenses, including a larger-than-expected adjustment that had to be taken after completion of the Company's year-end physical inventory count, and the expensing of capitalized distribution costs associated with the reduction of inventory.

87. During the conference call, Egeck acknowledged that "customer stockpiling" of chlorine-based products was still plaguing demand for Leslie's products. Also, both Egeck and the new CFO (Scott Bowman ("Bowman")) discussed the inventory adjustment that impacted gross margin in the quarter. Bowman stated:

> [W]e incurred unexpected incremental inventory adjustment costs [that] resulted in a 260 basis point headwind in the quarter. This increase was mainly due to excess shrink and scrap [due to] higher levels of inventory and third-party storage locations, higher movement of goods between facilities and higher levels of [unsellable] returns.

88. Bowman added that, in addition to the inventory adjustment, the Company identified a material weakness in internal controls over financial reporting related "to controls over the performance of physical inventories[]. As a result, we are designing and implementing new processes [and] enhanced controls to address the underlying causes of the material weakness in fiscal 2024."

89. During the November 28, 2023 conference call, analysts asked about the Q4 2023 inventory adjustment, including:

> [Morgan Stanley:] [Y]ou said that the biggest gap in the guidance you gave was the inventory adjustments. Can you talk about why those were not observable in July?
>
> [Bowman:] . . . The main reason is, as we kind of step back and look at the issue on inventory adjustments. The main issue, which is having too much

> inventory. We [peaked] close to $500 million, [then it] start[ed] to come down, but it's more inventory than we've had. In the past, I mean that required us to use several third party off-site storage facilities with a lot of movement of product between those facilities. We had some higher and sellable return[s]. So, it just created a lot of movement of goods [and] goods not in our – inside our four walls.
>
> And so, that is the root of the problem . . . .

90. On November 29, 2023, the Company filed its Form 10-K for the year ended September 30, 2023 ("FY 2023 Form 10-K") with the SEC, reporting the Company's FY 2023 results. The FY 2023 Form 10-K also discussed the inventory adjustment and associated material weakness, stating:

> In connection with our year-end assessment of internal control over financial reporting as part of this Annual Report on Form 10-K, we determined that, as of September 30, 2023, we did not maintain effective internal control over financial reporting because of material weaknesses related to the design and/or operation of controls that were not performed at a sufficient level of precision with respect to (i) the performance of physical inventories and the validation of data utilized in inventory costing for a subset of our inventory . . . .

91. In the Management's Report on Internal Control over Financial Reporting section, the FY 2023 Form 10-K further stated:

> We identified a material weakness in the Company's internal control over financial reporting related to the operation of controls over the performance of a subset of the Company's physical inventories held at certain locations to validate inventory existence and the completeness and accuracy of data used in validating the appropriateness of inventory costing for a subset of the Company's inventories and inventory reserves.

92. The FY 2023 Form 10-K also outlined Defendants' remediation efforts related to the Company's material weakness in internal controls over financial reporting with regard to inventory management, including: "[E]nhancement of the procedures over certain of our annual physical inventory counts, including the augmentation of training and validation of system generated reports utilized in performing certain annual physical counts and clear instruction as to the process for the recording of adjustments to inventory as a result of physical counts and validation of data used in inventory costing" and "examination

and enhancement of the procedures over the completeness and accuracy of data utilized in computing inventory reserves."

## VII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' KNOWLEDGE AND ACCESS TO INFORMATION

### A. The Fraud Involved Leslie's Core Business and the Individual Defendants Are the Company's Senior Executives Who Were Directly Involved in or Informed of the Company's Operations and Performance Metrics

93. As the CEO and Director and Executive Vice President and CFO, respectively, Individual Defendants Egeck and Weddell occupied Leslie's highest executive positions and were responsible for, and remained well-informed of, issues critical to the Company's success.

94. The fraud alleged herein involves one of Leslie's core product offerings – chlorine-based chemicals. Thus, a strong inference arises that Defendants were aware of, or recklessly disregarded, the true facts contradicting their false and misleading statements. Approximately 80% of the Company's product assortment is comprised of non-discretionary products required for proper maintenance of pools and spas. Chemicals represent a large portion of this product mix, and its "core sanitizer" products include Trichlor, Cal Hypo, acid, and liquid bleach.

95. Forty-five percent of Leslie's sales are chemicals, and Trichlor alone contributes approximately 15% of total Company sales. Further, leading up to and during the Class Period, the Company and its officers were paying particular attention to the Trichlor contribution as it constituted an increasing percentage of the Company's year-over-year growth. For example, Egeck reported during Leslie's Q2 2022 earnings call that Trichlor sales had increased 96% in the quarter and, over a 2-year period, had increased 159%.

### B. Market Research Analysts Frequently Asked Questions About, and Defendants Frequently Evinced Personal Knowledge by Commenting on, Leslie's Sales, Demand, and Inventory

96. On quarterly earnings calls with analysts and investors, Egeck and Weddell frequently discussed and held themselves out as knowledgeable about Leslie's inventory

levels and, more specifically, the factors affecting supply of and demand for chlorine-based products, including Trichlor. Indeed, Defendants provided updates on the market for Trichlor and Leslie's inventory levels on ***every*** earnings call during the Class Period – both in their prepared remarks and in response to analysts' questions. Buttressing these assertions were Defendants' own assurances that they carefully tracked sales and closely monitored consumer behavior.

97. For example, Egeck responded to analysts' questions regarding chlorine pricing dynamics in both Q1 and Q2 2022 with granular-level detail:

- "[W]hat will happen is the factory that was taken down by the hurricane will come back online. The volume that comes out of that plant will replace the domestic import volume that had come in to make up the gap. It should – it will be at a lower price than the imports. But I think most importantly, what the industry has seen is that the current prices on chlorine have not decreased demand at all. So we're not expecting any kind of reversion to pre-2020 pricing. There's a potential that we might see some reduction in prices, but I think the most likely scenario is a stabilized price environment for the industry on chlorine at these new higher levels." (February 3, 2022 conference call);

- "With regard to chlorine tabs, supply remains constrained and retail prices elevated. Over the last 2 years, our retail price for a 35-pound bucket tabs has increased from $99 to $199. We get a lot of questions about what happens if chlorine tab pricing reverses and we have price deflation. We do not believe that is likely in the near or medium term. And let me explain why. What consumers commonly referred to as chlorine tabs are actually Trichlor tabs. Trichlor is manufactured by combining chlorine, caustic soda and urea. That combination creates Trichlor granules, which are then compacted into [a] tab. While domestic Trichlor capacity was impacted in 2020 and 2021 by the much discussed plant fire. The industry is also facing very tight chlorine supply conditions, which have created corresponding cost increases. Shortage in chlorine has 2 drivers. The first is structural. In the last 16 months, chlorine capacity in North [[America has been reduced by about 7%. The second factor is that chlorine is a key component of PVC. Chlorine used in PVC]] has a higher value than chlorine used and Trichlor manufacturing. The reduction in total chlorine capacity and the growth in PVC manufacturing has caused the amount of North American sourced chlorine available to U.S. Trichlor manufacturers to decrease by about 20%. The result is that domestic Trichlor capacity is tight and falling short of elevated consumer demand." (May 5, 2022 conference call); and

- "And as we've said in the past, some Trichlor imports could come down when additional Trichlor capacity comes up in the U.S. but the kind of newer information that we have is what I went through in the script that the chlorine input from North America is now a limiting factor and chlorine imports from China, which is the biggest exporter or Spain or tough economics. So what I would say is that the current pricing in the market reflects where people have become comfortable with margins at those higher imported prices. So I think when we look out to next year, supply will continue to be tight inputs will continue to be high. They could potentially go higher, but we certainly don't see them coming down. Yes. Dan, the one thing I'll add because we sometimes get this question as well, what if just more chlorine manufacturing capacity comes online globally. And from what we understand, it takes about 4 years and $1 billion to build a core alkaline plant. So I'm sure there's some in the design phase, potentially domestic, but we don't know of any. But I would say probably overseas, but it takes time. There's no quick remedy to the supply side." (May 5, 2022 conference call).

98. Weddell confirmed the executives' harmonious understanding during his prepared remarks on the Q2 2022 earnings call, reporting: "On inventory, we continue to expect inventory conditions in the industry to remain tight throughout fiscal 2022, particularly for chemicals and equipment."

99. Egeck and Weddell also consistently reassured investors that Leslie's business has "nondiscretionary recurring annuity-like demand because once a pool is built, it has to be maintained." As a result, Leslie's could be relied upon for providing "predictable growth."

100. Not only did they evaluate industry conditions, but Egeck and Weddell repeatedly assured investors of their knowledge and management of Leslie's inventory levels – including its strategy for front-loading inventory purchases. In fact, the Company's inventory levels became such a significant metric for investors that analysts asked Egeck and Weddell for explanations about it on ***every*** earnings call during the Class Period. For example, in Q1 2023, an analyst started off the question and answer session with a question about Leslie's inventory, observing that it "pops off the page." In response, Weddell again confirmed his knowledge of the Company's inventory situation:

> Yes. It's a great question, Ryan. And as we think about our inventory growth, I mean there's 2 key reasons that inventory is up, one is sales growth over the last year – last few years. And then importantly, the strategic decision that we made to intentionally pull forward 2023 receipts in advance of season.
>
> We believe that pull forward is appropriate. . . . So the pull forward allows us to load our stores with more product and facilitate the replacement cycle during the early part of our season.
>
> . . . But again, the inventory that we're procuring today is for this season. And it's inventory that is being brought in earlier in preparation for season. It's not stocking up for kind of longer-term needs.

101. On the Q2 2022 earnings call, in response to an analyst's question about Leslie's ability to secure Trichlor volumes in the midst of inflated prices, Egeck responded: "We're in line to buy even more next year, need to feed the machine we've created for chemical consumption and the growing consumer profile."

102. In response to analyst questions about how they should be thinking about inventory levels going forward, Weddell responded during the Q3 2022 earnings call:

> And if the choice is to take inventory at a little bit higher level today, going into the end of the year and to start off next year in a better position versus try[ing] to run leaner[,] [w]e will take the former in the current environment. So it's something we expect to actively manage in the year-end and through next year, don't necessarily view these levels as permanent increases. But in the current environment, it's the appropriate level of inventory.

He further clarified that he analyzed inventory at a granular level, stating: "[M]ost of the inventory growth is in Trichlor as well as equipment, but not all equipment, some equipment."

103. Egeck confirmed on the same call that he also had confidence in inventory levels, stating: "Trichlor inventory is in good shape."

104. During the Q1 2023 earnings call, in response to an analyst's question about Leslie's bringing in "a lot" of inventory, Egeck responded:

> [I]n Trichlor, that's really us, and we control most of that supply chain now, particularly with our – particularly with our investment in stellar tableting.

> So we feel good about where we are with Trichlor, but we've also bulked up the inventory there as well, with the idea that we're going to preposition a much higher percentage of it into the stores themselves.

105. During the same call, when an analyst expressed concern about inventory growth, Weddell reassured investors:

> We feel good about the inventory that we have in our facilities and in our stores. Again, when you think about that composition of product that we're bringing in early, it's high-turn product, top SKUs that we know we need for full season and where last year we talked a lot about kind of getting behind the curve and replenishment cycle.

He doubled down on his guarantee "[s]o I feel good with the position we have in inventory today."

106. Defendants further demonstrated their continual knowledge and awareness of Leslie's inventory levels and associated consumer demand throughout the Class Period by renewing assurances that Leslie's would appropriately match inventory to consumer needs. For example, on each of the Q4 2022, Q1 2023, and Q2 2023 earnings calls, Weddell confirmed that he and Egeck monitored Leslie's inventory:

- "And most of the incremental inventory falls into the chemical and equipment categories that are not subject to technology or fashion risk. When we believe we have sufficient inventory to meet consumer demand through season and after we see supply chains across the industry become more predictable, then we will strategically manage inventory levels down to recoup some of the investments we have made in working capital over the last few years." (November 30, 2022 conference call);

- "[W]e continue to view our current elevated inventory position as appropriate and sensible given the uncertainty of supply. . . . When we believe we have sufficient inventory to meet consumer demand through season, and after we see supply chains across the industry become more predictable, then we will strategically manage inventory levels down." (February 2, 2023 conference call); and

- "We feel very good with where we're at going into season if you look at the year-on-year change in Q2, primarily around chemicals. . . . So at this point, going into season, heaviest use from a chemical perspective, we feel very good with our current inventory balances. The top 2 contributors, the inventory increase were still the chemical and equipment categories, which

> we've talked a lot about being nondiscretionary in nature. So we feel good with where we're at. And as you stated, I absolutely believe that we're at peak and we have an opportunity to materially decrease our inventory levels into year-end and beyond." (May 3, 2023 conference call).

107. Egeck bolstered the reliability of Defendants' statements on calls and responses to analysts by detailing, prior to and during the Class Period, their personal monitoring of consumer behavior and the Company's ability to track demand:

- "We're constantly managing our supply chain, both for efficiency and quantity. So we're certainly not just sitting here not looking at it closely, but we feel very good of where we're at." (February 4, 2021 conference call); and

- "We also track new homeownership that has pools . . . we know where all the pools are, we know where all the new pools are being built, and we know when somebody moves from a home with a pool or moves into a home with a pool." (December 21, 2020 conference call).

108. And, in the first question of the question-and-answer portion of the May 5, 2022 conference call for Q2 2022 earnings, a William Blair analyst specifically asked Egeck to "address the pull-forward question again, because from a high level, it looks like your COVID winner" and asked if Defendants had "tried to calculate a potential pull-forward estimate or is this just not your view because of the macro drivers and share gain in price?" Egeck responded:

> I would say it's not our view, both for the reasons you stated. And also, due to the fact that we track [sales] very carefully. We're able to see by consumer what they purchased prior years versus what they've purchased year-to-date. It's one of the things that we try to pay a lot of attention to. And we just haven't seen any indication of any meaningful pull-forward.

In his report, the analyst distilled his understanding of Defendants' knowledge from this exchange: "Management believes it is better prepared to deal with a consumer downturn than ever before given traction with initiatives and ability to react to data in the customer file."

109. Egeck and Weddell admitted that "day-to-day" visibility into consumer demand provided them detailed insight into the level of inventory necessary to meet that

demand, supporting a strong inference that they issued the false and misleading statements alleged above with scienter. Further, if Egeck and Weddell did not have detailed, up-to-date knowledge of consumer demand and inventory needs, then they acted recklessly in holding themselves out as knowledgeable about these issues and in discussing them in communications with investors.

### C. Egeck and Weddell Signed Sarbanes-Oxley Act Certifications Attesting that They Personally Supervised Leslie's Controls and Procedures

110. The Sarbanes-Oxley Act certifications[6] signed by Egeck and Weddell further evidence scienter. As set forth above in ¶¶43 & n.4, 62, 69 & n.5, Egeck and Weddell signed Sarbanes-Oxley Act certifications filed with Leslie's 2022 10-Qs, 2022 10-K, and 2023 10-Qs representing that they were both "responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting" and that the Company's financial disclosures fairly and accurately presented its financial condition. In Leslie's quarterly and annual SEC filings, the "Controls and Procedures" section states:

> Our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e)) are designed to ensure that information required to be disclosed by us in reports we file or submit under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized, and reported within the appropriate time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely discussions regarding required disclosure.

111. Certifications pursuant to Sarbanes-Oxley Act are not directed solely at ensuring numerical accuracy and preventing dishonest accounting practices, and any interpretation restricting the statute's scope to these purposes would be artificially narrow

---

[6] Exchange Act Rules 13a-14(a) and 15(d)-14(a), as adopted pursuant to §302 of the Sarbanes-Oxley Act of 2002, require an issuer's principal executive and financial officers to certify that: (a) the information contained in the issuer's annual reports is accurate and reliable; and (b) they have taken certain actions with respect to establishing and maintaining disclosure controls and procedures for the collection and reporting of financial and other information.

and inconsistent with the remedial purpose of the statute. The SEC interprets the fair presentation of companies' financial results to include any additional disclosure necessary to provide investors with a materially accurate and complete picture of an issuer's financial condition. Here, the inference of Egeck's and Weddell's scienter is enhanced by the certifications they signed, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Leslie's was made known to them and that the Company's disclosure-related controls were operating effectively.

## VIII. LOSS CAUSATION

112. The market for Leslie's common stock was open, well-developed, and efficient during the Class Period. Throughout the Class Period, Leslie's common stock traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiffs and other members of the Class purchased or otherwise acquired Leslie's common stock relying upon the integrity of the market price of Leslie's common stock and market information relating to the Company, and have been damaged thereby.

113. When the relevant truth and its impact on Leslie's financial results and prospects entered the market, the price of Leslie's common stock dropped sharply, as the artificial inflation came out of the stock price over time. As a result of their purchases of Leslie's common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss (*i.e.*, damages), under the federal securities laws.

114. The disclosures that corrected the market price of Leslie's common stock are detailed below. The stock price decline that followed was due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific, non-fraud factors.

115. As set forth above in ¶¶78-81, on July 13, 2023, after the market closed, Leslie's issued a press release and filed a Form 8-K with the SEC, signed by Weddell,

announcing preliminary Q3 2023 financial results and the departure of Weddell effective August 7, 2023. The pre-release announcement revealed that Leslie's was expecting a significant decline in sales for the quarter, down 9% year-over-year, including a comparable sales decline of 12%, and that gross profits were expected to fall nearly 18% to a range of $249 to $251 million, with gross margin at 41%, dropping from 45.1% in the prior year period. Adjusted EBITDA for the quarter was also expected to decline over 30%, falling in the range of $124 to $128 million. As a result of these declines, the Company also drastically lowered its fiscal 2023 outlook, reducing net sales to a range of $1,430 to $1,450 million (down from $1,560 to $1,640 million), gross profit to a range of $549 to $559 million (down from $667 to $708 million), and adjusted EBITDA to a range of $170 to $180 million (down from $280 to $310 million).

116. The press release quoted Egeck, stating:

> Our fiscal third quarter results were well below our expectations as low double digit traffic declines in our Residential and Pro businesses drove negative comps across both discretionary and non-discretionary categories. While abnormal weather continued to pressure traffic levels, customer surveys conducted towards the end of the quarter also indicated increased price sensitivity and that consumers entered the pool season with a greater than normal amount of chemicals left []over from last year.

117. In the press release, Egeck added:

> Our third quarter gross margins were down year-over-year due to higher product costs that we could not pass through to consumers, the impact of higher distribution-related expenses and capitalized costs as we reduce inventory from peak levels, and fixed cost deleverage. . . . We also continue to aggressively manage our inventory balances . . . .

118. Analysts began downgrading their rating for Leslie's that same day, calling the Company's pre-announcement "shocking" and "Well Below Street." For example, analysts at William Blair downgraded its rating of Leslie's because of "the lack of visibility into improving sales," noting that the "pull-forward of chemical needs due to shortages last year" was one of "the big issues." The analysts further cautioned investors that they "lack confidence in [their] model and believe it will take several quarters to right the ship."

Similarly, analysts at Piper Sandler downgraded Leslie's and warned that they "simply don't see a rebound in shares on the horizon," citing "Company-driven survey work" which "found that consumers weren't buying due to . . . [e]levated chemical supply from last year's stock-up activity." Analysts at Jefferies also downgraded Leslie's stock until "1) visibility into the unwind of chemical carryover from '23 is clear, and 2) comfort is established w/ the incoming CFO following a 60% guidance cut." Jefferies explained that the "image" of Leslie's purported "loyal customers . . . is blurred now by prior-year stock-up activity" with "implications" that "[g]o-forward demand will look worse than previously expected due to lower transactions."

119. As a direct result of the July 13, 2023 corrective disclosures and as shown in the charts below, Leslie's stock price dropped nearly 30%, from a closing price of $9.52 per share on prior trading day of July 13, 2023 to a closing price of $6.70 per share on July 14, 2023, on a volume of almost 41.5 million shares traded, the second highest volume day since the Company's IPO in October 2020. The NASDAQ Global Composite Index (identified as one of Leslie's comparative market indices in the Company's Form 10-K), was essentially unchanged. Leslie's stock price continued to fall over 18% on the following trading day, July 17, 2023, closing at $5.46 per share. As shown in the second chart below, while Leslie's stock price declined significantly, the NASDAQ Global Composite Index increased overall during the same trading period. The new Company-specific material information released on July 13, 2023 after the market closed, concerning reduced demand for Leslie's chemical (chlorine-based) products because of customer stockpiling, and eroding gross margins because of reduced demand and increased inventory expense, was directly related to the false and/or misleading statements and omissions previously made by Defendants.


Leslie's Stock Price Performance
July 12, 2023 – July 17, 2023
$11
$10
$9
$8
$7
$6
$5
$4
Share Price
July 12, 2023 Close
3,502,200 Shares
July 13, 2023 Close
4,755,800 Shares
July 14, 2023 Close
41,484,000 Shares
July 17, 2023 Close
25,497,500 Shares
Volume:


LESL vs NASDAQ Global Composite
July 12, 2023 – July 17, 2023
110
100
90
80
70
60
50
July 12, 2023 = 100
Leslie's
Nasdaq Composite
7/12/2023
7/13/2023
7/14/2023
7/17/2023

## IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE

120. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Leslie's common stock traded in an efficient market;
- the Company's common stock was liquid and heavily traded during the Class Period;
- Leslie's common stock traded on the Nasdaq and was covered by multiple analysts; and
- Plaintiffs and members of the Class purchased, acquired, and/or sold Leslie's common stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

121. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

122. Plaintiffs and the members of the Class are also entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## X. CLASS ACTION ALLEGATIONS

123. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Leslie's common stock during the Class Period (the "Class") and were damaged thereby. Excluded from the Class are Defendants, officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

124. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Leslie's common stock was actively traded

on the Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Leslie's or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

125. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

126. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

127. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, prospects, and/or management of Leslie's;
- whether statements made by Defendants to the investing public during the Class Period omitted material facts necessary to make the statements made neither false nor misleading;
- whether Defendants acted knowingly or with reckless disregard for the truth;
- whether the price of Leslie's common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

128. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively

small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. CAUSES OF ACTION

### COUNT I
### For Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

129. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

130. This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder.

131. Pursuant to the above wrongful course of conduct, Leslie's, Egeck, and Weddell participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other documents described above, such as statements made to securities analysts and the media that were designed to influence the market for Leslie's common stock. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Leslie's finances and business prospects.

132. By virtue of their ownership and/or positions at Leslie's, Egeck and Weddell had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the false and misleading nature of the statements made, although such facts were readily available to them. Said acts and omissions were committed willfully or with reckless disregard for the truth.

133. Information showing that Egeck and Weddell acted knowingly or with reckless disregard for the truth is peculiarly within Egeck's and Weddell's knowledge and control. As executive officers of Leslie's, Egeck and Weddell had knowledge of the details of Leslie's internal affairs.

134. Leslie's, Egeck, and Weddell are directly and indirectly liable for the wrongs complained of herein. Because of their positions of control and authority, Egeck and Weddell were able to and did, directly or indirectly, control the content of the statements of Leslie's. As officers of a publicly held company, Egeck and Weddell had a duty to disseminate timely, accurate, and truthful information with respect to Leslie's businesses, operations, future financial condition, and future prospects. As a result of Leslie's, Egeck's, and Weddell's misconduct, the market price of Leslie's common stock was artificially inflated throughout the Class Period. Unaware of the adverse facts concerning Leslie's business and financial condition which were concealed by Leslie's, Egeck, and Weddell, Plaintiffs and other members of the Class purchased or otherwise acquired Leslie's common stock at artificially inflated prices and in doing so relied upon the price of the common stock, the integrity of the market for the common stock, and/or upon statements disseminated by Leslie's, Egeck, and Weddell, and were damaged thereby.

135. During the Class Period, Leslie's common stock was traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Leslie's, Egeck, and Weddell made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Leslie's common stock at prices artificially inflated by Leslie's, Egeck's, and Weddell's wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said Leslie's common stock, or would not have purchased or otherwise acquired them at the inflated prices paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Leslie's common stock was substantially lower than the prices paid

by members of the Class. The market price of Leslie's common stock declined upon public disclosure of the facts alleged herein to the injury of Plaintiffs and other Class members.

136. By reason of the conduct alleged herein, Leslie's, Egeck, and Weddell knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder.

137. As a direct and proximate result of Leslie's, Egeck's, and Weddell's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and/or sales of Leslie's common stock during the Class Period, as the truth about Leslie's operations and prospects began to be disclosed to the investing public.

## COUNT II
## For Violation of §20(a) of the Exchange Act Against All Defendants

138. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

139. During the Class Period, the Individual Defendants participated in and oversaw the operation and management of Leslie's, and conducted and participated, directly and indirectly, in the conduct of Leslie's business affairs. The Individual Defendants exercised control over Leslie's operations and possessed the power to control, and did control, the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

140. The Individual Defendants acted as controlling persons of Leslie's within the meaning of §20(a) of the Exchange Act. By virtue of their senior management positions as officers and/or directors of Leslie's, their participation in and awareness of the Company's operations, and their personal knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these Defendants had the power to influence and control and did influence and control, directly or indirectly, Leslie's decision-making, including the content and dissemination of the allegedly false and misleading statements and other acts in furtherance of a fraudulent scheme.

141. In particular, as CEO and CFO, the Individual Defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular business and/or operating practices and expenditures and deficient control environment giving rise to the securities violations alleged in Count I, and exercised that power.

142. Leslie's had the power to control and influence the Individual Defendants and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations. By virtue of the foregoing, Leslie's had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Individual Defendants including the content of their public statements.

143. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases and/or acquisitions of Leslie's common stock during the Class Period when the relevant truth was revealed.

144. By reason of the foregoing, Defendants violated §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

1. Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class Representatives and Robbins Geller Rudman & Dowd LLP as Class Counsel;

2. Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' fees, accountants' fees, and experts' fees, and other costs and disbursements; and

4. Awarding Plaintiffs and other members of the Class such other injunctive or equitable relief, including disgorgement and/or the imposition of a constructive trust, that may be deemed just and proper by the Court.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

DATED: February 20, 2024

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS (admitted *pro hac vice*)
TOR GRONBORG (admitted *pro hac vice*)
LAURIE L. LARGENT (admitted *pro hac vice*)
SARAH A. FALLON (admitted *pro hac vice*)

s/ LAURIE L. LARGENT
LAURIE L. LARGENT

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
drobbins@rgrdlaw.com
torg@rgrdlaw.com
llargent@rgrdlaw.com
sfallon@rgrdlaw.com

*Lead Counsel for Plaintiffs*

VANOVERBEKE, MICHAUD
& TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313-578-1201 (fax)
tmichaud@vmtlaw.com

*Counsel for Macomb County Employees' Retirement System*

ZIMMERMAN REED, LLP
HART L. ROBINOVITCH
14648 N. Scottsdale Road, Suite 130
Scottsdale, AZ 85254
Telephone: 480/348-6400
480/348-6415 (fax)
hart.robinovitch@zimmreed.com

*Local Counsel for Plaintiffs*

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

Macomb County Employees' Retirement System ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5. (a) Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*Kangas v. Illumina, Inc.,* No. 3:23-cv-02082 (S.D. Cal.)
*McAlice v. The Estee Lauder Companies, Inc.*, No. 1:23-cv-10669 (S.D.N.Y.)

(b) Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*City of Hollywood Police Officers' Retirement System v. Citrix Systems, Inc.*, No. 0:21-cv-62380 (S.D. Fla.)
*Collinsville Police Pension Board v. Discovery, Inc.*, No. 1:22-cv-08171 (S.D.N.Y.)
*Schaeffer v. Signature Bank*, No. 1:23-cv-01921 (E.D.N.Y.)

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of February, 2024.

Macomb County Employees' Retirement System

By: ______________________________
Mark Deldin, Chairman

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 02/04/2022 | 22,315 | $19.27 |
| 02/07/2022 | 14,555 | $19.45 |
| 05/05/2022 | 11,155 | $19.28 |
| 06/16/2022 | 19,705 | $13.98 |
| 12/09/2022 | 14,109 | $12.02 |
| 12/12/2022 | 3,390 | $12.13 |
| 12/13/2022 | 6,185 | $12.23 |
| 12/14/2022 | 1,996 | $12.04 |
| 12/15/2022 | 12,488 | $11.96 |
| 12/16/2022 | 1,999 | $11.96 |
| 12/19/2022 | 8,768 | $12.04 |
| 12/20/2022 | 9,543 | $12.00 |
| 12/22/2022 | 3,357 | $11.96 |
| 12/23/2022 | 823 | $12.00 |
| 12/28/2022 | 8,436 | $11.99 |
| 12/30/2022 | 6,906 | $12.11 |
| 05/12/2023 | 556 | $10.24 |
| 05/15/2023 | 543 | $10.10 |
| 05/16/2023 | 2,585 | $10.11 |
| 05/19/2023 | 340 | $10.10 |
| 05/22/2023 | 373 | $10.09 |
| 05/22/2023 | 13,603 | $10.12 |
| 05/23/2023 | 6,000 | $10.22 |
| 05/26/2023 | 775 | $9.10 |
| 07/05/2023 | 701 | $9.22 |
| 07/06/2023 | 1,111 | $9.16 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 02/22/2023 | 2,015 | $13.07 |

Prices listed are rounded to two decimal places.