**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| West Palm Beach Police Pension Fund, et al., | No. CV-23-01887-PHX-SHD |
| Plaintiffs, | **ORDER** |
| v. | |
| Leslie's Incorporated, et al., | |
| Defendants. | |

Pending before the Court is the Motion to Dismiss (the "Motion") filed by Defendants Leslie's, Inc. ("Leslie's"), Michael Egeck, and Steven Weddell (collectively, "Defendants"). (Doc. 34.) Lead Plaintiff Treasurer of the State of North Carolina (the "Treasurer") opposes the Motion. (Doc. 37.) For the following reasons, the Court **grants** the Motion and dismisses the Consolidated Complaint with leave to amend.[1]

## I.    FACTUAL BACKGROUND

In 2020, significant events caused the price of chlorine-based products to "skyrocket": first, the COVID-19 pandemic, during which more individuals installed and used home swimming pools; and, second, a Louisiana fire, which destroyed approximately 40% of the country's chlorine tablet supply. Seeing an opportunity, Leslie's—a national pool and spa retail company—drastically increased its supply of chlorine-based products between 2021 and 2023, communicating to shareholders its belief that the increase would be necessary to sustain both the existing heightened demand, as well as expected future

---

[1]    The parties did not request oral argument, so the Court decides this Motion without holding a hearing. *See* LRCiv 7.2(f).

1    demand.  Unfortunately for Leslie's and its shareholders, the heightened demand for the

2    historically higher inventory fizzled out, and future demand did not materialize.  Customers

3    had stockpiled chlorine-based products, reducing demand and Leslie's earnings, which

4    ultimately resulted in Leslie's announcing it was adjusting its fiscal outlook for 2023.

5    Leslie's stock price dropped after the announcement, and this suit followed.

6          **A.    The Parties**

7          This is a securities class action brought by the Treasurer and others against

8    Defendants on behalf of "those who purchased or otherwise acquired Leslie's common

9    stock between February 3, 2022 and July 13, 2023" (the "Class Period").  (Doc. 30 ¶ 1.)[2]

10   The Treasurer "manages over $120 billion in assets for the benefit of nearly one million

11   active and retired public employees, including teachers, police officers, firefighters, and

12   public servants throughout North Carolina"—assets that included Leslie's common stock

13   during the class period.  (*Id.* ¶ 13.)  Defendant Leslie's is "a national retailer of pool and

14   spa supplies, equipment, and repair services," and its stock is traded on the U.S. stock

15   market under the symbol "LESL."  (*Id.* ¶ 15.)  Defendants Egeck and Weddell were at all

16   relevant times Leslie's Chief Executive Officer and Chief Financial Officer, respectively.

17   (*Id.* ¶¶ 16–17.)  Weddell stepped down from this position in August 2023.  (*Id.* ¶ 17.)  The

18   Treasurer alleges both individuals, among other things, "directly participated in" Leslie's

19   management; were "directly involved in the day-to-day operations of [Leslie's] at the

20   highest levels"; were "privy to confidential proprietary information concerning [Leslie's]

21   and its business and operations"; were involved to some degree "in the oversight or

22   implementation of [Leslie's] internal controls"; and were involved to some degree with the

23   allegedly false and misleading statements and information that purportedly violated

24   securities laws.  (*Id.* ¶ 19.)

25         **B.    Broad-Level Overview of Events**

26         In 2020, Leslie's boasted sales growth during the COVID-19 pandemic.  For

27   example, its "[n]ew pool permit activity grew 32% through July 2020 compared to the

28   
_____

[2]      The Consolidated Complaint (Doc. 30) is the operative complaint.  (*See* Doc. 26.)

same period in 2019." (*Id.* ¶ 21.)  Also in 2020, Leslie's conducted its Initial Public Offering ("IPO"), selling 40 million shares at $17.00 per share. (*Id.* ¶ 22.)  In the offering documents, Leslie's referred to its pool and spa installations as a "predictable, 'annuity-like stream of chemical, equipment, and service revenue.'" (*Id.* ¶ 23.)  Leslie's also stated that it "play[s] primarily in the aftermarket business," and has "a highly predictable, recurring revenue model" in which over "80% of [its] product sales are non-discretionary and recurring in nature." (*Id.*)  Eighty percent of Leslie's chemical sales, too, were touted as "derived from proprietary brands and custom-formulated products, which allow[s] [Leslie's] to create an entrenched consumer relationship" and "control [its] supply." (*Id.*)

In the summer of 2020, however, "a fire shut down the Louisiana manufacturing facility of the nation's second-largest maker of dry chlorine products," which resulted in "[a]pproximately 40% of the country's chlorine tablet supply [being] destroyed." (*Id.* ¶ 25.)  The fire caused "significant shortages in Trichlor – a chlorine-based chemical product used for pool maintenance," which in turn caused the "market price for chlorine-based products, including Trichlor, [to] skyrocket[]." (*Id.*)

Leslie's, for its part, "leveraged its relationships with suppliers to maintain strong Trichlor inventory levels in 2020 and into 2021." (*Id.* ¶ 26.)  During a February 2021 earnings conference call, Egeck addressed the effects of the chlorine shortages, stating that Leslie's would "have supply of products that other retailers don't," which would allow Leslie's to not only "capture a sale, but more importantly, . . . capture new customers." (*Id.*)  During this call and again in a May 2021 earnings call, Egeck stated that Leslie's was "confident in" and "constantly managing" its supply chain. (*Id.* ¶¶ 27–28.)

The Treasurer alleges the "chlorine shortage and price increases served as a windfall for Leslie's." (*Id.* ¶ 29.)  "By the end of January 2021, [Leslie's] stock price had increased from the $17.00 per share IPO price to over $28.00 per share" and by June 2021, "the stock was trading above $29.75 per share." (*Id.* ¶ 30.)  In February, June, and September 2021, Leslie's "conducted secondary offerings of . . . stock." (*Id.* ¶ 31.)  In each of these secondary offerings, "[c]ompany insiders and investors," including Egeck and Weddell,

sold millions of dollars' worth of stock. (*Id.*) "Leslie's did not receive proceeds from any of these offerings." (*Id.*) In the offering documents for these secondary offerings, Leslie's again promoted its "annuity-like," "highly predictable, recurring revenue" business model. (*Id.* ¶ 32.)

Towards the end of 2021, however, the "chlorine supply chain stabilized just as Leslie's was increasing inventory in Trichlor and other products." (*Id.* ¶ 33.) For example, by January 2022 (the end of the first fiscal quarter of 2022), Leslie's inventory value increased 40% year over year from FQ1 of 2021,[3] and "[b]y the end of [FQ1 of] 2023 . . . reported inventory was . . . more than 75% higher than [Leslie's] inventory at the end of [FQ1 of] 2022." (*Id.*) "[B]y 2022, [Leslie's] distribution centers had far too much inventory, which was being offloaded and pushed into stores even though the stores did not have the physical space to store the chemical inventory," such that "Leslie's stores were refusing to accept shipments of chlorine-based products and other pool supplies and were trying to send inventory back to Leslie's distribution centers." (*Id.* ¶ 35.) "[C]hemical treatment products, including Trichlor, were being stored in closet space and outside at the stores in parking lots." (*Id.* ¶ 36.) Eventually, Leslie's had to "use several third-party off-site storage facilities" to store the excess product, "incurring millions of dollars in incremental inventory adjustment costs." (*Id.* ¶ 38.)

"[S]tarting in late 2021," Leslie's "had letters sent to [its] loyalty program members – customers who represented more than 70% of [Leslie's] total sales," which "urged customers to 'purchase early prior to the pool season' and stock up on treatment products because [Leslie's could not] 'guarantee product availability' later in the year." (*Id.* ¶ 34.) The "letters and a campaign to have Leslie's stores push customers to buy more treatment products than were needed succeeded in boosting sales going into 2022, but at the cost of future sales," because the "product customers were sitting on at the end of 2022 . . . would directly reduce the volume of treatment product that would be purchased for the 2023

---

[3]      Leslie's "fiscal year ends on the Saturday closest to September 30th," so its fiscal years ended on October 2, 2021 for 2021 and October 1, 2022 for 2022. (Doc. 30 ¶ 33 & n.3.) Accordingly, the end of Leslie's first quarter for the fiscal year in 2022 was in January 2022. (*See id.*) The Court uses "fiscal" or "FQ" to describe Leslie's fiscal quarters.

season." (*Id.*)  The Treasurer cites, for example, a former Leslie's "allocations and planning analyst" who stated "that, by late 2022, it was internally recognized that [Leslie's] financial projections for 2023 were unachievable given that there was too much inventory in the distribution centers." (*Id.* ¶ 35.)

### C.    Class Period Events

#### 1.    The Fiscal Q1 2022 Earnings Report, Conference Call, and Form 10-Q

On February 3, 2022, Leslie's issued a press release stating that, "compared to the prior year period, sales increased 27.5% to $184.8 million, with comparable sales growth of 20.5% and gross profit increased 30.2% to $67.3 million, with gross margins increasing 70 basis points." (*Id.* ¶ 39.)  Quoting Egeck, the press release stated Leslie's "strong execution of [its] strategic growth initiatives drove record first quarter results." (*Id.* ¶ 40 (emphasis omitted).)  On a conference call the same day, Egeck stated that Leslie's was "benefiting from strong secular macro trends that are driving durable consumer demand and are showing no signs of slowing." (*Id.* ¶ 41 (emphasis omitted).)  Weddell "reported that, while inventory conditions in the industry, particularly for chemicals and equipment, remained constrained, [Leslie's] end-of-quarter inventory was up 40% to $245 million compared to $175 million at the end of the prior year quarter." (*Id.* ¶ 42.)

The next day, Leslie's filed its Form 10-Q for the fiscal quarter with the Securities and Exchange Commission ("SEC"), and the Form 10-Q stated that there were "no material changes from the risk factors disclosed in [its] Annual Report on Form 10-K for the year ended October 2, 2021." (*Id.* ¶ 43.)  The referenced Annual Report stated in its risk disclosures that Leslie's "may not be able to successfully manage [its] inventory to match consumer demand, which could have a material adverse effect on [the] business, financial condition, and results of operations." (*Id.* (emphasis omitted).)  It also disclosed that, if Leslie's "sales forecasts overestimate consumer demand, [Leslie's] may experience higher inventory levels, which could result in the need to sell products at lower than anticipated prices, leading to decreased profit margins." (*Id.* (emphasis omitted).)  Weddell signed the

Form 10-Q, and a certification signed by Weddell and Egeck was attached.  (*Id.*)

### 2.    The Fiscal Q2 2022 Earnings Report and Conference Call

On May 5, 2022, Leslie's issued a press release stating that, "compared to the prior year period, sales increased 18.5% to $228.1 million, with comparable sales growth of 13.3%, and gross profit increased 19.5% to $85.6 million, with gross margins increasing 30 basis points." (*Id.* ¶ 44.)  Quoting Egeck, the press release stated that the "non-discretionary, recurring nature of after-market pool industry demand, [Leslie's] strong execution against [its] strategic growth initiatives, and an advantaged inventory position were all key drivers of [its] performance." (*Id.* ¶ 45 (emphasis omitted).)

The same day, Leslie's held a conference call with analysts and investors, in which Egeck told listeners that "the industry was still facing constrained supply conditions" concerning chlorine tabs and Trichlor.  (*Id.* ¶ 46.)  As for Leslie's, however, it was "happy with [its] current supply, though the flow of it could be a little more front loaded," and it was "in line to buy even more next year" to "feed the machine [it] created for chemical consumption and [Leslie's] growing consumer profile."  (*Id.* (emphasis omitted).) Weddell, for his part, stated that Leslie's "continue[d] to proactively work with [its] vendor partners to manage the flow of inventory" and "identify opportunities to strategically invest in inventory to meet heightened consumer demand and prepare for pool season." (*Id.* ¶ 47 (emphasis omitted).)  And, in response to questions about whether Leslie's was "seeing its customers making non-discretionary purchases earlier than usual," Egeck said that Leslie's sales tracking did not show "any indication of any meaningful pull-forward" or "any indication of a decrease in demand." (*Id.* ¶¶ 48–49 (emphases omitted).)

### 3.    The June 2022 Analyst Conference Calls

At an analyst conference call on June 6, 2022, Weddell stated that Leslie's "made a strategic decision last year to heavily invest in inventory," so it "worked very hard and closely with [its] vendors to procure effectively as much inventory as [it could] to meet the heightened demand that [it saw]." (*Id.* ¶ 50.)  The next day, at a different analyst conference call, Weddell stated that he "wish[ed] [Leslie's] had more" inventory, and that Leslie's

would "still not have all the inventory that [it] need[ed] to meet all the demand that[] [was] out there."  (*Id.* ¶ 51.)

### 4.    The Fiscal Q3 2022 Earnings Report

On August 5, 2022, Leslie's issued a press release stating that its financial performance in that quarter was "adversely impacted by 'execution issues' at [its] New Jersey distribution center," but that even so, "sales increased 12.9% to $673.6 million, compared to the prior year period, with a comparable sales increase of 7.4%."  (*Id.* ¶ 52.) Although "gross profit increased 7%," "gross margins decreased by 250 basis points, 'primarily due to shifts in business mix, decreased product margin and higher distribution expenses."  (*Id.*)  Leslie's adjusted its sales outlook, gross profit outlook, and adjusted Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") outlook for 2022 accordingly.  (*Id.*)

The same day, Leslie's held a conference call with analysts and investors, in which Weddell stated that "demand for [its] core nondiscretionary product remain[ed] solid" and Egeck stated demand was "very much alive and stable."  (*Id.* ¶ 53 (emphasis omitted).) Concerning inventory, Weddell stated that "Leslie's ended the quarter with $361 million in inventory, up 61% [year over year]," which he believed "appropriate given the uncertainty of supply for the balance of the year and into fiscal 2023."  (*Id.* ¶ 54 (emphasis omitted).)

### 5.    The Fiscal Q4 2022 and Fiscal Year 2022 Earnings Report and Investor Day Conference, and the Form 10-K

On November 30, 2022, Leslie's issued a press release stating that, "compared to fiscal [year] 2021, sales for the year had increased 16.3%" and "gross profit also increased 13.2%," with a "gross margin of 43.1%."  (*Id.* ¶ 57.)  The press release quoted Egeck, who stated that Leslie's "remain[ed] focused on delivering against [its] long-term objectives supported by the recurring non-discretionary demand of the aftermarket pool industry, the competitive advantages of [its] integrated network of physical and digital assets and the execution of [its] strategic growth initiatives."  (*Id.* ¶ 58 (emphasis omitted).)

The same day, Leslie's held an earnings call, during which Egeck stated that Leslie's did "not see a scenario where [it gave] back significant portions of the gains over the last 3 years." (*Id.* ¶ 59 (emphasis omitted).)  Weddell, in turn, reported that Leslie's increased its inventory by 82% over the past fiscal year, which he said was "appropriate given the uncertainty of supply going into fiscal [year] 2023." (*Id.* ¶ 60 (emphasis omitted).) Leslie's would "pursue opportunities to reduce inventory" once it saw "an improvement in supply chains." (*Id.* ¶ 61 (emphasis omitted).)

Leslie's also filed its fiscal year 2022 Form 10-K with the SEC, where it identified as a risk factor that it "may not be able to successfully manage [its] inventory to match consumer demand, which could have a material adverse effect on [its] business, financial condition, and results of operations." (*Id.* ¶ 62 (emphasis omitted).)  If Leslie's were to overestimate demand, it could "experience higher inventory levels, which could result in the need to sell products at lower than anticipated prices, leading to decreased profit margins." (*Id.* (emphasis omitted).)  Egeck and Weddell signed the Form 10-K and its certifications. (*Id.*)

### 6.    The Fiscal Q1 2023 Earnings Report and Form 10-Q

On February 2, 2023, Leslie's issued a press release, which stated that "sales increased 5.6% to $195.1 million" year over year, but "poor weather in the quarter caused a 4% decrease in comparable sales." (*Id.* ¶ 63.)  It also "noted a 3.0% decrease [in gross profit] . . . compared to the prior year period, and gross margin was 33.5%, down 290 basis points year-over-year." (*Id.*)

The same day, on a conference call with analysts and investors, Egeck stated that Leslie's "saw decreased consumer confidence in the quarter, including consumer demand for Trichlor." (*Id.* ¶ 64.)  He explained that it was a "super small quarter" with "upsized weather impact," so all should be "very careful not to draw any trends for the full year from it." (*Id.* (emphases omitted).)  Weddell announced that Leslie's increased its inventory 76% year over year, stating that when Leslie's "believe[d] [it had] sufficient inventory to meet consumer demand through season, and after [it saw] supply chains across the industry

become more predictable," it would "strategically manage inventory levels down." (*Id.* ¶ 65 (emphasis omitted).) In response to questions about why the inventory "kind of pop[ped] off the page," Weddell stated that inventory was up because of "sales growth over the last . . . few years," and because Leslie's made "the strategic decision . . . to intentionally pull forward 2023 receipts in advance of season." (*Id.* ¶ 66 (emphases omitted).) Weddell denied that the inventory was "stocking up for kind of longer-term needs." (*Id.* (emphasis omitted).)

The next day, Leslie's filed its Form 10-Q for the fiscal quarter, which denied any "material changes from the risk factors disclosed in its" fiscal year 2022 10-K. (*Id.* ¶ 69.) Weddell signed the Form 10-Q and both Weddell and Egeck signed its certifications. (*Id.*)

### 7.   The Fiscal Q2 2023 Earnings Report

On May 3, 2023, Leslie's issued a press release, which stated that "sales for the quarter decreased 6.7% and comparable sales decreased 13.5%," gross profit decreased 16.9%, and "gross margins fell 410 basis points to 33.4% for the quarter." (*Id.* ¶ 70.) Leslie's attributed the decrease in sales to the "impact of the normalization of the seasonal purchasing cycle to pre-pandemic patterns and adverse weather." (*Id.* (emphasis omitted).)

The same day, in a conference call with analysts and investors, Egeck stated that Leslie's "believe[d] [it was] seeing a return to a more normalized pre-pandemic revenue contribution breakdown," which was a "timing shift" rather than a "reduction in underlying demand for the year." (*Id.* ¶ 72 (emphases omitted).) Egeck also, for the first time, stated that the previous year, Leslie's "sent a letter to [its] loyalty [program customers] saying [it] couldn't guarantee product availability in the second half and encouraged them to purchase early prior to the pool season." (*Id.* ¶ 74.) The Treasurer alleges that Defendants did not disclose that "the real purpose of the letter was to rid [Leslie's] of excess inventory that had begun piling up at the end of 2021 as Leslie's inventory of chemical products . . . exceeded the volumes necessary to satisfy predicted demand." (*Id.* ¶ 75.)

### D.   Allegations of Falsity/Misleading Nature

The Treasurer alleges that many of Defendants' statements were "materially false

and/or misleading at the time they were made because they failed to disclose . . . material adverse facts . . . about Leslie's excess inventory of chlorine-based products and the excess inventory of these products that had been purchased and were held by Leslie's customers." (*Id.* ¶ 77.)  These four omitted facts include that (1) "Leslie's inventory of chlorine-based products exceeded the volumes necessary to satisfy predicted demand" and (2) to manage this excess inventory, Leslie's had to retain chemical storage companies and directed employees to "encourage customers to stock up on chlorine-based products," including through "letters to loyalty customers."  (*Id.*)  This allegedly resulted in a reduced demand for chlorine-based products "as [Leslie's] customers became oversaturated with chlorine-based products" and reduced gross margin, "as [Leslie's] was stuck with over-priced and over-transported inventory at a time when it was 'unable to successfully maintain [the prior years'] higher pricing levels.'"  (*Id.* (second alteration in original).)

## E.    End-of- and Post-Class-Period Events

### 1.    The July 2023 Press Release and Form 8-K

On July 13, 2023, Leslie's filed a Form 8-K with the SEC and issued a press release, which stated that Weddell would depart from Leslie's effective August 7, 2023, and that the quarter's earnings "were well below market expectations."  (*Id.* ¶ 78.)  The press release quoted Egeck's statement that "low double digit traffic declines in [Leslie's] Residential and Pro businesses drove negative comps across both discretionary and non-discretionary categories" and that customer surveys indicated "increased price sensitivity and that consumers entered the pool season with a greater than normal amount of chemicals leftover from [the previous] year."  (*Id.* ¶ 79.)  Gross margins, too, were "down year-over-year due to higher product costs that [Leslie's] could not pass through to consumers, the impact of higher distribution-related expenses and capitalized costs as [Leslie's] reduce[d] inventory from peak levels, and fixed cost deleverage."  (*Id.* ¶ 80.)

The price of Leslie's stock dropped from a closing price of $9.52 per share (July 13) to a closing price of $6.70 per share (July 14).  (*Id.* ¶ 81.)  "Leslie's stock price continued to fall another $1.24 per share the following trading day, or over 18%, closing at $5.46 per

1    share on July 17, 2023." (*Id.*)  In addition, several analysts downgraded their ratings for

2    Leslie's stock.  (*Id.* ¶ 118.)

3              **2.**        **The August 2023 Press Release and Earnings Conference Call**

4          On August 2, 2023, Leslie's issued a press release, which "reported the same results

5    given in its preliminary release" on July 13.  (*Id.* ¶ 82.)  Leslie's also held a conference call

6    with investors, in which Egeck stated that "a portion of [Leslie's] customers had a greater-

7    than-normal amount of chemicals left over from last year," which was "not something

8    [Leslie's had] seen before."  (*Id.*)  He also stated that gross margins were affected in part

9    by "the inventory buildup and the associated costs with that, offsite storage, additional

10   labor, [and] increased transportation, though those were flexed up given a rather

11   extraordinary inventory levels [Leslie's] took to ensure supply."  (*Id.* ¶ 83.)  They were

12   also affected by "lower[ed] chemical prices in the face of lower demand" and higher

13   product costs for Leslie's.  (*Id.* ¶ 84.)

14             **3.**        **The November 2023 Press Release, Earnings Conference Call,**
15                           **and Form 10-K**

16         On November 28, 2023, Leslie's issued a press release, which stated that "sales

17   decreased 9.1% compared to the prior year same quarter," and "gross profit decreased

18   26.3% compared to the prior year period due in part to inventory-related expenses,

19   including a larger-than-expected adjustment that had to be taken after completion of

20   [Leslie's] year-end physical inventory count, and the expensing of capitalized distribution

21   costs associated with the reduction in inventory."  (*Id.* ¶ 86.)

22         The same day, Leslie's held a conference call, in which Scott Bowman—the new

23   CFO—stated that Leslie's "incurred unexpected incremental inventory adjustment costs."

24   (*Id.* ¶ 87.)  Bowman identified the "root of the problem" for the inventory adjustments as

25   "having too much inventory."  (*Id.* ¶ 89.)

26         The next day, Leslie's filed its Form 10-K with the SEC for the 2023 fiscal year.

27   (*Id.* ¶ 90.)  The Form 10-K disclosed that, "as of September 30, 2023, [Leslie's] did not

28   maintain effective internal control over financial reporting because of material weaknesses

1    related to the design and/or operations of controls that were not performed at a sufficient

2    level of precision" with regard to "the performance of physical inventories and the

3    validation of data utilized in inventory costing."  (*Id.*)  It also disclosed that Leslie's was

4    engaged in remediation efforts.  (*Id.* ¶ 92.)

5    ## II.  PROCEDURAL HISTORY

6        On September 8, 2023, Plaintiff West Palm Beach Police Pension Fund filed the

7    instant suit against Defendants.  (Doc. 1.)

8        After considering briefing to appoint a lead plaintiff and approve counsel (Docs.

9    12–23), the Court granted the Treasurer's Motion for Appointment of Lead Plaintiff and

10   Approval of Selection of Lead Counsel, appointing the Treasurer as Lead Plaintiff.  (Doc.

11   24.)

12       On February 20, 2024, the Treasurer filed a Consolidated Complaint, asserting

13   claims for (1) violation of § 10(b) of the Exchange Act and SEC Rule 10b-5 and (2)

14   violation of § 20(a) of the Exchange Act.  (Doc. 30 ¶¶ 129–44.)

15       On April 22, 2024, Defendants filed the Motion to Dismiss.  (Doc. 34.)  The motion

16   has since become fully briefed.  (Docs. 37, 38.)

17   ## III.  LEGAL STANDARD

18       "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

19   accepted as true" and construed in a light most favorable to the plaintiff, "to state a claim

20   to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation

21   marks omitted); *Irving Firemen's Relief & Retirement Fund v. Uber Techs., Inc.*, 998 F.3d

22   397, 403 (9th Cir. 2021).  A claim is plausible if the plaintiff pleads "factual content that

23   allows the court to draw the reasonable inference that the defendant is liable for the

24   misconduct alleged." *Iqbal*, 556 U.S. at 678.  In making this determination, the Court does

25   not accept legal conclusions as true, nor does the Court consider "[t]hreadbare recitals of

26   the elements of a cause of action, supported by mere conclusory statements." *Id.*; *see also

27   id.* ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual

28   enhancement." (citation modified)).  That said, "a complaint attacked by a Rule 12(b)(6)

motion to dismiss does not need *detailed* factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (emphasis added). A "well-pleaded complaint may proceed even if" actual proof of those facts "is improbable and that a recovery is very remote or unlikely." *Id.* at 556 (quotation marks omitted). A court still applies common sense in evaluating a motion to dismiss, however, *Iqbal*, 556 U.S. at 664, and need not "check [its] disbelief at the door." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020).

## IV.    DISCUSSION

Defendants seek dismissal of both counts asserted in the Consolidated Complaint for failure to state a claim based on three arguments. First, they argue the Treasurer's allegations do not meet the particularity requirement for fraud claims under Federal Rule of Civil Procedure 9(b). (Doc. 34 at 1.) Second, they argue the Treasurer did not sufficiently plead that "each Defendant had an intent to deceive that is cogent and compelling." (*Id.* at 2.) Third, they argue the Treasurer did not sufficiently allege loss causation. (*Id.*) The Court takes Defendants' arguments in turn.

### A.    Documents Attached to Defendants' Motion

Before turning to the merits, the Court first examines whether it can consider the documents attached by Defendants to their motion. (*See* Docs. 34-3, 34-4.) Specifically, Defendants attach the following: (1) copies of transcripts from several earnings or conference calls by Leslie's, (2) copies or excerpts of certain SEC filings by Defendants (*e.g.*, Form 10-K), and (3) a copy of Leslie's July 13, 2023, press release. (*See* Doc. 34-2.) Defendants argue that the Court may consider each of these documents in ruling on the Motion either because the document was incorporated by reference into the Consolidated Complaint or because the document is subject to judicial notice. (Doc. 34 at 3 nn. 3, 5; *id.* at 5 n.6.) The Treasurer "do[es] not object to the Court taking judicial notice of the exhibits which were publicly filed (Exs. 10–11) nor incorporating by reference exhibits which form the basis of the complaint (Exs. 1–9) for the limited purpose of identifying their contents," but does object to the extent Defendants attempt to use the exhibits "for the truth of the matters asserted therein or to raise a factual dispute." (Doc. 37 n.2 (quotation marks

1    omitted).)

2        Because the parties agree that the Court may consider Defendants' attached exhibits,

3    and the Court's independent review confirms that the documents are either incorporated by

4    reference or subject to judicial notice, the Court will consider them in ruling on the Motion.

5    *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("An investor

6    call transcript submitted to the SEC generally qualifies as a source whose accuracy cannot

7    reasonably be questioned." (citation modified)); *id.* at 1002 ("A defendant may seek to

8    incorporate a document into the complaint if the plaintiff refers extensively to the document

9    or the document forms the basis of the plaintiff's claim." (citation modified)); *Dreiling v.*

10   *Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (noting that "SEC filings" are subject

11   to judicial notice); *Patel v. Parnes*, 253 F.R.D. 531, 545–47 (C.D. Cal. 2008) (taking

12   judicial notice of SEC Forms 4 and press releases and collecting cases).

13       The Court does not, however, take judicial notice of facts in the documents that are

14   "subject to varying interpretations," such that there "is a reasonable dispute as to what the

15   [document] establishes." *Khoja*, 899 F.3d at 1000 (citation omitted).  Nor does the Court

16   "assume the truth of an incorporated document if such assumptions only serve to dispute

17   facts stated in a well-pleaded complaint." *Id.* at 1003.

18       **B.    Count One:  Violation of Section 10(b) and Rule 10b-5**

19       "Section 10(b) of the Securities Exchange Act of 1934 and the Securities and

20   Exchange Commission's Rule 10b-5 prohibit making any material misstatement or

21   omission in connection with the purchase or sale of any security." *Halliburton Co. v. Erica*

22   *P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).  The elements that a plaintiff must

23   sufficiently plead are (1) "a material misrepresentation or omission by the defendant" (*i.e.*,

24   falsity),[4] (2) scienter, (3) "a connection between the misrepresentation or omission and the

25   purchase or sale of a security," (4) "reliance upon the misrepresentation or omission,"

26   (5) economic loss, and (6) loss causation.  *Id.* (citation omitted); *In re Genius Brands Int'l,*

27   ───────────────

28   [4]    Pure omissions—"when a speaker says nothing, in circumstances that do not give
     any particular meaning to that silence"—are not actionable.  *Macquarie Infrastructure*
     *Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263–65 (2024).

*Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024). "Each of these elements must be independently satisfied." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 835 (9th Cir. 2022).

Under the Private Securities Litigation Reform Act ("PSLRA"), a plaintiff must meet a heightened pleading standard. *Nguyen*, 962 F.3d at 413. In addition, under Federal Rule of Civil Procedure 9(b), when "alleging fraud . . . a party must state with particularity the circumstances constituting fraud." The Treasurer's claims under the Exchange Act and Rule 10b-5 are subject to Rule 9(b)'s higher pleading standard. *In re Cloudera, Inc.*, 121 F.4th 1180, 1186 (9th Cir. 2024). "To properly plead fraud with particularity under Rule 9(b), a pleading must identify the who, what, when, where, and how of the misconduct charged." *Id.* at 1187 (citation omitted). Defendants challenge whether the Treasurer sufficiently pled the falsity, scienter, and loss causation elements under these heightened standards. (*See* Doc. 34 at 1–2.)

### 1. Falsity

"To determine whether a statement or omission is misleading, [the Court's] central inquiry is whether a reasonable investor would have been misled about the nature of his investment." *Genius Brands*, 97 F.4th at 1181 (quotation marks omitted). "This is an objective inquiry that requires [the Court] to assess whether an investor who had been reasonably diligent in reviewing the statement or omission at issue would have been misled." *Id.* (quotation marks omitted). "Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at the time." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 928 (9th Cir. 2023) (citation omitted). "Even if a statement is not false, it may be misleading," which is met if a statement would "give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Id.* (citations omitted).

Importantly, falsity must be pled with particularity. *In re Sorrento Therapeutics, Inc. Sec. Litig.*, 97 F.4th 634, 640 (9th Cir. 2024). The complaint "must explain what is false or misleading about the purportedly fraudulent statement," and why the statements

1    "were false or misleading at the time they were made." *Id.* (quotation marks omitted); *see*

2    *also* 15 U.S.C. § 78u-4(b)(1). A "litany of alleged false statements, unaccompanied by the

3    pleading of specific facts indicating why those statements were false, is insufficient."

4    *Cloudera*, 121 F.4th at 1187 (quotation marks omitted).

5                          **a.    Sufficiency Under Pleading Requirements**

6            Defendants first argue that the Treasurer has not sufficiently pled that each of the

7    alleged thirty-two false or misleading statements[5] were false in light of the four alleged

8    "omitted facts" in the Consolidated Complaint. (Doc. 34 at 7–9.) Defendants argue the

9    Treasurer has made "it impossible to discern why each challenged statement was false or

10   misleading when made." (*Id.* at 7.) The Treasurer responds that the "allegations provide[d]

11   Defendants adequate notice of the particular conduct at issue to defend against the fraud

12   claims." (Doc. 37 at 9.)

13           The Court agrees with Defendants that the Treasurer has not sufficiently alleged the

14   "reason or reasons why the statement is misleading," as required by the PSLRA. 15 U.S.C.

15   § 78u-4(b)(1). Put simply, the Treasurer has not connected the dots between the alleged

16   misstatements and omitted facts to specify what omitted fact made the misstatement false,

17   what in the specific misstatement was rendered false by the specific omitted fact, or how

18   the omitted fact made the misstatement false. *See Metzler Inv. GMBH v. Corinthian Colls.,*

19   *Inc.*, 540 F.3d 1049, 1071 (9th Cir. 2008) (holding complaint failed to comply with the

20   PSLRA because its "connection between the falsity of the[] statements and the [non-

21   _____

22   [5]    Defendants created, and attached as Appendix A to the Motion, a table titled
         "Summary of Alleged Misstatements in the Complaint and Reasons Why They are Non-
23   Actionable." (Doc. 34-1.) The table sets forth each of the alleged misstatements, along
         with an assigned "Statement Number," the identity of the alleged speaker(s), and a column
24   titled "Reasons Why Statement Is Not Actionable." (*Id.*) The Treasurer argues the last
         column in the table should be stricken "as improper argument beyond the page limits
25   permitted by the Court." (Doc. 37 at 8 n.3.) Defendants respond that the table "does not
         add arguments but organizes them." (Doc. 38 at 2 n.1.) Having reviewed Defendants'
26   table for the purpose of determining whether the Court could properly consider it, the Court
         finds that most of the last column summarizes arguments Defendants made in their motion,
27   but some of the last column contains additional argument not explicitly contained in
         Defendants' briefing. Specifically, Defendants' table at times ties specific statements to
28   arguments that were not made in their briefing. The Court only considers arguments made
         by the parties in their briefing and does not consider new arguments made in the last
         column.

- 16 -

disclosure was] extraordinarily vague" and the PSLRA "requires a clearer explication of why a statement is false").  Take, for example, Statement 3[6]—

> We have an always-on procurement strategy at Leslie's.  Our team continues to proactively work with our vendor partners to manage the flow of inventory, and we continue to identify opportunities to strategically invest in inventory to meet heightened consumer demand and prepare for pool season.

(Doc. 30 ¶ 42 (emphasis omitted); Doc. 34-1 at 3.)  The Consolidated Complaint does not make clear what, if anything, is specifically false about this statement:  that Leslie's has an "always-on procurement strategy," that Leslie's was "proactively work[ing] with [its] vendor partners to manage the flow of inventory," that Leslie's was "identify[ing] opportunities to strategically invest in inventory," that there was a "heightened consumer demand," or that Leslie's was "prepar[ing] for pool season"?  Nor is it clear which, or if all, of the four allegedly omitted facts rendered the statement—or any part of it—false or misleading.  (*See id.* ¶ 77 (referring to all paragraphs with alleged misstatements).)  Indeed, the Treasurer simply concludes that Defendants' statements "were materially false and/or misleading," but the Treasurer does not identify which or whether statements were false *or* literally true but misleading.  (*Id.*)   This ambiguity—the statements could be false or not false but misleading (or neither), *see E. Ohman*, 81 F.4th at 928—only confirms that the Consolidated Complaint falls short of the PSLRA's specificity requirements.

In light of the PSLRA's "exacting requirements for pleading falsity," *Metzler*, 540 F.3d at 1070 (citation and quotation marks omitted), the Treasurer's allegations are insufficient.  *See, e.g.*, *United Ass'n Nat'l Pension Fund v. Carvana Co.*, 2024 WL 863709, at *10 (D. Ariz. 2024) ("[M]erely bolding and italicizing swaths of text does not assist the Court in determining which statements are allegedly misleading or why."); *Patel*, 253 F.R.D. at 551–52 (allegations were insufficient where they did not "tie the[] reasons to particular statements; instead, the reasons appear[ed] to apply generally to the statements quoted in the preceding paragraphs"); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F.

---

[6]     For simplicity, the Court refers to the "Statement Number" used in Defendants' Appendix A.  (Doc. 34-1.)

Supp. 2d 1059, 1074–75 (N.D. Cal. 2001) (allegations were insufficient where plaintiff "quote[d] long passages from various documents and . . . highlight[ed] portions of the quoted passages" and then required the reader to "scan subsections (a) through (m) of [a single paragraph] to select those which contain[ed] the basis for the claims that the statements [were] false and misleading"); *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 841–42 (N.D. Cal. 2000) (allegations, most of which contained "more than a single assertion," were insufficient because it was not clear "what [was] alleged to be false" or "which portion [of the asserted reasons for falsity was] meant to explain why the statement quoted . . . [was] false or misleading").

Further, the Treasurer's argument that it "provide[d] adequate notice of the particular conduct at issue to defend against the fraud claim," (Doc. 37 at 9), is unavailing because, providing notice under Rule 9(b) is only one component of a securities fraud plaintiff's pleading burden. *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1106 (9th Cir. 2021) (noting the "dual pleading requirements" for securities fraud claims under Rule 9(b) *and* the PSLRA. In other words, it is not enough that a plaintiff complies with Rule 9(b), for it must also comply with the "formidable pleading requirements" under the PSLRA. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023) (citation omitted). Thus, even if the Treasurer met the requirements of Rule 9(b)— which is not a foregone conclusion—the Treasurer has not met the pleading requirements of the PSLRA because it only offered a "litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false," *Cloudera*, 121 F.4th at 1187 (quotation marks omitted).

The Court will therefore dismiss the Consolidated Complaint for failure to adequately plead falsity under the PSLRA. Because the deficiencies in the Consolidated Complaint could be cured by amendment, the Court will grant the Treasurer leave to amend. *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995) (stating that a "district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts"

and that failure to grant leave to amend in such circumstances is an abuse of discretion).

### b.    Sufficiency on the Merits

Defendants also argue that the Treasurer's alleged misstatements are not actionable under the PSLRA for a variety of reasons, including that the alleged misstatements are (1) statements of opinion, (2) statements of corporate optimism, and (3) forward-looking statements covered by the "safe harbor" of the PSLRA.  (Doc. 34 at 9–14.)  Because the Consolidated Complaint does not clearly identify what specifically is false in the alleged misstatements when connected with the alleged omitted facts, and in light of the Court's grant of leave to amend, the Court determines that it would not be prudent to resolve these arguments at this time.  It is possible that an allegation Defendants challenged as an unactionable statement of opinion or of corporate optimism could, after amendment, be actionable as false or misleading with additional context.  *See Glazer*, 63 F.4th at 764, 770 (noting that a statement is false or misleading if the statement "directly contradicts what the defendant knew at the time or omits material information" and that even statements of corporate optimism "when taken in context, may form a basis for a securities fraud claim" (citation modified)).  The Court therefore will not address Defendants' arguments that the alleged misstatements are not actionable.

### 2.    Scienter

"To plead scienter, a complaint must state with particularity facts giving rise to a strong inference that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors."  *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 535 (9th Cir. 2024) (quotation marks omitted).  This "strong inference" "must be cogent and compelling, thus strong in light of other [countervailing] explanations, not merely reasonable or permissible."  *Id.* (alteration in original) (quotation marks omitted). Like allegations of falsity, allegations of scienter must be pled with particularity.  *Sorrento Therapeutics*, 97 F.4th at 640.  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* (alteration in original) (citation

omitted).

The "strong inference requirement is exacting." *In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1058 (9th Cir. 2023) (quotation marks omitted); *see also Webb v. Solarcity Corp.*, 884 F.3d 844, 855 (9th Cir. 2018) ("The [scienter] bar . . . is not easy to satisfy . . . ."). For example, a "company's apparent error—even an embarrassing or inexplicable one—does not establish fraudulent intent, especially if the plaintiff cannot offer a plausible motive for the company's conduct." *Prodanova*, 993 F.3d at 1107. But the "inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007) (quotation marks omitted). And "[e]ven if no single allegation, standing alone, is sufficient to give rise to a strong inference of scienter, a holistic review of all the allegations may combine to give rise to a strong inference of scienter." *E. Ohman*, 81 F.4th at 940 (quotation marks omitted).

Defendants argue that the Treasurer has not, "and cannot, plead that any Defendant acted with 'scienter' or the required fraudulent intent." (Doc. 34 at 14.) Defendants make several points in support of this argument, each of which is discussed in greater detail below. Although the Court need not address scienter in light of the Court's dismissal on other grounds, the Court does so, in part, to focus or narrow certain disputes in future Rule 12(b)(6) motion practice, which the Court assumes will take place if the Treasurer files an amended complaint.

### a. Motive

Defendants first argue that the Consolidated Complaint "does not allege that either Egeck or Weddell had any motive to defraud investors," and the Treasurer's theory of scienter—"that Defendants knowingly increased Leslie's inventory of chlorine-based products beyond predicted customer demand, only to 'offload' this excess inventory by encouraging stockpiling, which drove down future demand, while continuing to increase inventory"—"makes no sense" and does not meet the "strong inference" pleading standard under the PSLRA. (*Id.* at 15.) Defendants note that Egeck and Weddell "each *purchased*

shares" during the Class Period, "which further tips the scales against any inference of scienter." (*Id.* at 16.)

The Treasurer responds that it has alleged "a sufficiently strong correlation between Leslie's financial performance and Defendants' cash awards to support a finding of scienter." (Doc. 37 at 22.) And, even if Egeck and Weddell purchased stock during the Class Period, the Treasurer argues that "there are several explanations for why an individual defendant would not sell stock even if she knew about [the fraud], such as a desire to avoid drawing the market's attention to the problem." (*Id.* at 22 n.15 (alteration in original) (citation omitted).) The Treasurer also notes that the absence of motive is not fatal to a securities fraud claim. (*Id.* at 22.) In reply, Defendants argue that Egeck's and Weddell's compensation cannot lend support to scienter because the Consolidated Complaint does not "tie compensation to the alleged fraud." (Doc. 38 at 7.)

As the Treasurer notes, the Supreme Court has held that "the absence of a motive allegation is not fatal" to a "scienter inference." *Tellabs*, 551 U.S. at 325. Instead, motive is a "relevant consideration" to be considered with the other allegations "collectively": "the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." *Id.* Defendants and the Treasurer have offered competing arguments for whether Egeck's and Weddell's compensation can satisfy an inference of scienter. Because of the deficiencies in the Consolidated Complaint already outlined in this Order and the potential for amendment, it would be premature for the Court to "assess all the allegations holistically" and determine whether a "reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." *Id.* at 326. Accordingly, the Court declines to address the parties' motive arguments at this juncture, without prejudice to Defendants raising the argument in response to any amended complaint as part of the holistic scienter analysis.

### b.    Confidential Witnesses

"Where the plaintiff relies upon statements by confidential witnesses, the complaint must also pass two additional hurdles": (1) "the confidential witnesses whose statements

are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge" and (2) "those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144–45 (9th Cir. 2017) (citation and quotation marks omitted).  The Ninth Circuit has held that witnesses were alleged with sufficient particularity where the complaint included "each confidential witness's job description and responsibilities, and, in some instances, the witness's exact title and to which . . . executive the witness reported."  *Id.* at 1045 (quotation marks omitted).  But ultimately, the "complaint must provide an adequate basis for determining that the witnesses in question have personal knowledge of the events they report." *Zucco, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).  Further, even if a confidential witness is described with sufficient specificity, the complaint may nevertheless fail to "allege with particularity facts supporting its assumptions that the confidential witnesses were in a position to be personally knowledgeable of the information alleged." *Id.* at 996.

Defendants argue the Consolidated Complaint's references to former employees' statements do not show scienter because not enough information is included to "establish their reliability and knowledge" and the statements are not otherwise indicative of scienter. (Doc. 34 at 17–18.)  Defendants assert the Treasurer should have alleged "when each employee worked at Leslie's, where they worked, [and] what their responsibilities entailed."  (*Id.* at 17.)  They also argue the Consolidated Complaint contained no allegations showing "temporal proximity between the witness observations and Defendants' purportedly false or misleading statements."  (*Id.* (citation omitted).)  Nor did the Consolidated Complaint contain any allegations that the former employees had "any interactions with the Individual Defendants" or "insight into Leslie's supply chain."  (*Id.* at 18 (emphasis omitted); Doc. 38 at 9.)

The Treasurer contends that the Consolidated Complaint sufficiently describes the former employees by including information about "job description or responsibility and

1    duration of employment," and that it need not "identify the former employees' exact dates

2    of employment."    (Doc. 37 at 20.)    The Treasurer also argues that non-executive

3    confidential witnesses can still be credited even if they had no interaction with the

4    defendants.  (*Id.* at 21.)

5            The Court disagrees with Defendants' arguments that the Treasurer was required to

6    demonstrate that the former employees' observations had "temporal proximity" to the

7    alleged misstatements.  The Ninth Circuit has stated that a court may properly consider

8    statements from former employees who had knowledge even predating the class period,

9    because it could "confirm what a defendant should have known during the class period."

10   *Webb*, 884 F.3d at 851 n.1 (citation omitted); *see also E. Ohman*, 81 F.4th at 939 (finding

11   former employee's statements about the defendant's "practices in the period immediately

12   preceding the Class Period" were "relevant and probative [in] showing how [the defendant]

13   would have behaved and what he would have known during the . . . Class Period").  So

14   even if the former employees were employed before the alleged misstatements were made,

15   that alone would not be a valid basis to discount their statements.  *Cullen v. Ryvyl Inc.*,

16   2024 WL 4536471, at *9 n.6 (S.D. Cal. 2024) ("[T]here is no rule that confidential

17   witnesses must have been employed during the class period at all, let alone for the whole

18   time.").  In any event, the Consolidated Complaint makes clear that the former employees'

19   observations occurred during the Class Period and at the same time as several alleged

20   misstatements, so their observations would meet Defendants' test.  (Doc. 30 ¶¶ 35

21   (observation by former allocations and planning analyst in 2022), 36 (observations by

22   general manager and former inventory planner in or around 2022), 37 (observation by

23   former district manager in 2022).)

24           Additionally, at the motion to dismiss stage, the Treasurer did not need to provide

25   the former employees' exact dates of employment or their locations.  (Doc. 34 at 17.)  The

26   Treasurer alleged that each of the former employees worked for Leslie's during the Class

27   Period, which is sufficient.  (Doc. 30 ¶¶ 35–37.)  Likewise, the Treasurer did not need to

28   identify each former employee by location.  Defendants argue that each location has

1    different inventory turnover rates, (Doc. 34 at 17 n.13), but even if that is true, this

2    argument relies on facts outside of the Consolidated Complaint that the Court may not

3    consider in resolving the motion to dismiss.  *See, e.g.*, *Romero v. San Bernardino Cnty.*

4    *Sheriff's Dep't*, 2012 WL 13426225, at *5 n.31 (C.D. Cal. 2012) ("[T]he court cannot

5    consider the factual contentions the parties have made in their briefs in deciding this

6    motion.").

7          The Consolidated Complaint, however, does not sufficiently establish the former

8    employees' reliability and personal knowledge.  For instance, the Consolidated Complaint

9    provides no information about the job responsibilities for the former allocations and

10   planning analyst or the former inventory planner that would show the former employees

11   had personal knowledge about, for example, what "management's goal" was or how it was

12   "internally recognized that [Leslie's] financial projections for 2023 were unachievable."

13   (Doc. 30 ¶¶ 35–36.)  *Cf. Nguyen*, 962 F.3d at 416–17 (rejecting statements of confidential

14   witness that lacked detail); *Zucco*, 552 F.3d at 996–97 (rejecting allegations by confidential

15   witness who "was a human-resources employee who . . . had no firsthand knowledge of

16   the workings of the finance or corporate departments").  It is also unclear how the cited

17   district manager (1) knew that "Leslie's maintained records of customers' purchasing

18   histories and knew whether they were sitting on excess supplies of products"; (2) knew

19   that, because of this data, "management was pushing stores to sell excess amounts of

20   chemical products"; or (3) personally knew—as opposed to through hearsay or gossip—

21   that stores in his district were being overstocked.  (Doc. 30 ¶ 37.)  *Cf. Espy*, 99 F.4th at 537

22   (confidential witness's reliance "on secondhand information" undermined testimony

23   because it was "unclear whether [certain] statements [came] from general knowledge,

24   gossip, or the meeting where [the witness] was present"); *Costas v. Ormat Techs., Inc.*,

25   2019 WL 6700199, at *5 (D. Nev. 2019) ("While Plaintiffs allege that [a former employee]

26   had some sort of access to [the defendant's] financial models, they do not provide any

27   information which would allow the Court to determine the extent of [the former

28   employee's] personal familiarity with those models.").  In essence, the Consolidated

Complaint fails to demonstrate how these former employees came to know certain information. *See E. Ohman*, 81 F.4th at 940 (crediting former employee statements where the complaint "explain[ed] how [the former employees] obtained their knowledge"); *Glazer*, 63 F.4th at 771 (crediting confidential witness statements where the complaint "provide[d] a basis for each [witness's] knowledge about the specific statements he made").

Because the Court is granting leave to amend, however, the Treasurer may be able to cure these deficiencies by amendment. Accordingly, as mentioned, the Court declines at this time to determine conclusively whether the former employees' statements are indicative of scienter.

### c.    Core Operations

Defendants' final basis for challenging scienter is that the Treasurer cannot rely on a core operations theory because there are insufficient allegations that pool chemical inventory is a "critical core operation" and insufficient allegations of Egeck's and Weddell's knowledge of information supposedly conflicting with what they told shareholders. (Doc. 34 at 18–19.)

The "core operations" doctrine permits the Court to "infer that facts critical to a business's core operations or an important transaction are known to a company's key officers." *Webb*, 884 F.3d at 854 (quotation marks omitted). Typically, to use this theory to support a strong inference of scienter, the case must "involve[s] specific admissions from top executives that they are involved in every detail of the company or where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Espy*, 99 F.4th at 539 (quotation marks omitted). As for specific admissions from top executives, allegations that the executives "signed off on every" item or "received detailed reports" does not meet this standard. *Id.* And "[m]ere access to reports containing undisclosed sales data is insufficient to establish a strong inference of scienter." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014). Accordingly, to rely on a core operations theory, the plaintiff

"face[s] a high burden of proof." *Prodanova*, 993 F.3d at 1111.

First, although the Court reserves ruling on whether the allegations are sufficient for an inference of scienter, the Court is skeptical of Defendants' argument that the Consolidated Complaint "contains no particularized allegations that demonstrate the Individual Defendants had *actual* access to information that contradicted the challenged statements about Leslie's anticipated consumer demand or its inventory." (Doc. 34 at 19.) Egeck and Weddell made several statements on conference calls with investors addressing Trichlor/chlorine-based chemical demand and inventory and also affirmatively stating that they carefully track such information. (Doc. 34-3 at 5 ("With regard to chlorine tabs, supply remains constrained and retail prices elevated. . . . The result is that domestic Trichlor capacity is tight and falling short of elevated consumer demand."); *id.* at 10 ("[W]e track that very carefully. We're able to see by consumer what they purchased prior years versus what they've purchased year-to-date. It's one of the things that we try to pay a lot of attention to. And we just haven't seen any indication of any meaningful pull forward."); *id.* at 14 (addressing inventory and stating that Leslie's was "pre-buying and pulling inventory in to get it through [Leslie's] self-distributed network" and Leslie's had "the inventory either sitting in . . . distribution centers or moved out to [its] store locations"); *id.* at 17–18 (stating that Leslie's was "in line to buy even more [Trichlor] next year"); *id.* at 29 ("We took a – made a strategic decision last year at a heavily invested inventory. To remember, most of the inventory that we have is non-discretionary. It's not subject to fashion, risk or obsolescence. . . . [W]e worked very hard and closely with our vendors to procure effectively as much inventory as we can to meet the heightened demand that we see today . . . ."); *id.* at 47 ("[M]ost of the inventory growth is in trichlor as well as equipment, but not all equipment, some equipment."); *id.* at 55–56 (discussing inventory, "expect[ing] inventory to remain elevated," and noting that the "two primary areas of increase year on year for Q3 were trichlor and equipment," which should not "necessarily [be] view[ed] . . . as permanent increases, but in the current environment [it was] the appropriate level of inventory," and which Leslie's would "actively manage in the year-

1   end and through next year"); *id.* at 63 (addressing the "current elevated inventory
2   position"); *id.* at 84 (addressing Trichlor demand); *id.* at 89 (addressing inventory levels,
3   stating that Leslie's approach to inventory was "strategic" and "purposeful," and that
4   Leslie's was not "backing off of that until [it had] absolute certainty" of being at "levels of
5   inventory to serve the demand [it saw]"); Doc. 34-4 at 4–5 (discussing Trichlor sales); *id.*
6   at 7 (addressing inventory); *id.* at 11 (same and describing the growth in inventory as
7   "[v]ery purposeful"); *id.* at 14 ("I would say everybody is fully inventoried in Trichlor.");
8   *id.* at 16 (discussing Trichlor inventory and "anecdotal" information from stores and noting
9   "we ask our general managers what's going on"); *id.* at 17 (discussing inventory and
10  Trichlor pricing); *id.* at 18 (addressing Trichlor inventory); *id.* at 24 (discussing Trichlor
11  sales and pricing); *id.* at 26 (discussing inventory); *id.* at 29 (discussing what "pool owners
12  have said" with regard to supply chain issues); *id.* at 32 (describing increase in inventory
13  as "[h]ighly unusual" and that Leslie's had "never increased inventory in the back half of
14  the year"); *id.* at 33 (discussing Trichlor pricing); *id.* at 35 ("When you think about where
15  we're at from an inventory position today versus pre-pandemic, it's certainly elevated and
16  very intentional."); *id.* at 38 (discussing Trichlor product size "penetration . . . over the last
17  few years").)

18      That Egeck and Weddell specifically and frequently addressed demand and
19  inventory for Trichlor/chlorine-based chemicals,[7] including in response to questions from
20  attendees, suggests that it was "unlikely that [they were] not aware of" relevant information
21  concerning these issues. *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014), *overruled on*
22  *other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.,*
23  *Inc.*, 856 F.3d 605, 616 (9th Cir. 2017); *id.* ("It is unclear what further facts plaintiffs would
24  need to plead to create a stronger inference that [the defendant] had access to information
25  she discussed publicly."); *see also Zucco*, 552 F.3d at 1000.

26      Further, some of Leslie's conference calls suggest that inventory and the chlorine
27  market were important topics around the time of some of the alleged misstatements, which

---

28  [7]    (*See, e.g.*, Doc. 34-3 at 30–31 ("[Y]ou've talked a lot about it [the Trichlor market]
    . . . . Yeah, we get this question a lot . . . .").)

further undermines that Defendants would not have had actual access to relevant information.  (Doc. 34-3 at 29 ("[I]nventory has been a popular topic in retail for the last couple of weeks.  How does inventory look for you guys?"); *id.* at 30 ("A lot of investors ask us about the state of the trichlor market, implications for chlorine tab prices."); *id.* at 54 (noting "media coverage of the chlorine shortage last year" and that the shortage was due to "really extraordinary events"); *id.* at 93 ("We acquired a lot of customers with the chlorine shortage and media blitz . . . ."); *id.* at 98 (describing a "chlorine media coverage event"); Doc. 34-4 at 14 (stating there was "a lot of chatter about [the] potential outcome [of price deflation for Trichlor]"); *id.* at 15 ("the big Trichlor disruption"); *id.* at 37 ("I mean, 2021 and 2022, consumers were very concerned about scarcity of product during pool season, as were we.").)

The Court agrees with Defendants, however, that the Treasurer has not pled sufficient allegations to apply a core operations theory based solely on Trichlor's prominence to Leslie's business due to the "high burden" imposed by the Ninth Circuit.  *Prodanova*, 993 F.3d at 1111.  On one hand, Egeck included chemicals in a list of Leslie's "core businesses."  (Doc. 34-3 at 12; *see also id.* at 20 ("Our real business is the 14 million bodies of water that are out there that need ongoing non-discretionary maintenance.  So . . . that's where we're really focused on."); Doc. 34-4 at 18 (stating that Leslie's "control[s] most of [the Trichlor] supply chain now").)  It is thus difficult to imagine how chemicals such as Trichlor/chlorine could not meet the threshold for "core operations" when taking such statements at face value.  (*See also* Doc. 34-3 at 72 ("For chemicals [the percentage of product offerings that are exclusive to Leslie's] is over 85%."); *id.* at 99 (describing chemicals "and particularly trichlor" as the "promotional vehicle for the industry" and a "proven traffic driver for pool supply retailers, [Leslie's] included").)  That said, it is unclear whether Trichlor/chlorine-based chemicals specifically, as opposed to chemicals overall, could be considered in and of itself in Leslie's core businesses.  The Consolidated Complaint alleges that 45% of Leslie's business is in chemicals but also alleges that Trichlor only comprises 15% of Leslie's total sales.  (Doc. 30 ¶ 95.)

The Court thus cannot, on the allegations of the Consolidated Complaint, deem Trichlor/chlorine-based chemicals a core operation solely on prominence grounds. *Bajjuri v. Raytheon Techs. Corp.*, 641 F. Supp. 3d 735, 765 (D. Ariz. 2022). The Treasurer may, however, be able to cure this deficiency, so the Treasurer may amend these allegations if it so chooses. Again, the Court will not undertake the holistic analysis of whether Defendants' statements raise a strong inference of scienter at this time. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (stating that the "core-operations inference can be one relevant part of a complaint that raises a strong inference of scienter").

### d.    Sarbanes-Oxley Certifications

Defendants argue that the SEC form certifications (called "SOX certifications") by Egeck and Weddell are insufficient to give rise to knowledge. (Doc. 34 at 21.) The Treasurer agrees that SOX certifications are "insufficient on their own" to raise a strong inference of scienter but argues the certifications can be considered in the holistic analysis. (Doc. 37 at 22.) The Treasurer is correct. *Zucco*, 552 F.3d at 1004 ("Sarbanes-Oxley certifications are not sufficient, *without more*, to raise a strong inference of scienter." (emphasis added) (quotation marks omitted)); *Bajjuri*, 641 F. Supp. 3d at 762 (considering the SOX certifications in the holistic analysis only). As discussed, however, the Court will not engage in the holistic scienter analysis at this time.

### e.    Weddell's Departure

The Treasurer contends that Weddell's departure "announced concurrently with the Q3 2023 disclosure" supports scienter. (Doc. 37 at 21.) Defendants argue that the Treasurer did not allege any facts "connecting the departure to the alleged fraud" and notes that Weddell "remained with Leslie's in an advisory role for months following his departure," which they argue "opposes a scienter inference." (Doc. 38 at 10.)

"[A]n employee's resignation supports an inference of scienter only when the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances." *City of Dearborn Heights*, 856 F.3d at 622 (quotation marks omitted). The "[m]ere conclusory

allegation[] that a financial manager resigns or retires . . . shortly before the corporation issues [a statement] . . . without more, cannot support a strong inference of scienter." *Id.* (first three alterations in original) (quotation marks omitted).

The Court agrees with Defendants that the Consolidated Complaint's allegations concerning Weddell's departure are insufficient on their own to establish scienter, even though Weddell's departure was announced at the same time as the disappointing financial results. *See, e.g.*, *id.* (rejecting that CFO's resignation "coinciding with [company's] announcement . . . that it would record" a significant reduction in its goodwill was sufficient "without more" to support a strong inference of scienter); *Zucco*, 552 F.3d at 1002 (holding the "bare fact of [an officer's] retirement cannot support . . . allegations of scienter" where the complaint did not "indicate whether [the officer] was nearing retirement age, whether he left to pursue other opportunities, or even the length of his tenure"); *Ng. v. Berkeley Lights, Inc.*, 2024 WL 695699, at *15 (N.D. Cal. 2024) ("[R]esignations that occur shortly after a company announces poor financial results do not suggest that an executive intentionally deceived investors unless the plaintiff plead[s] facts refuting the reasonable assumption that the resignations occurred as a result of the poor results themselves." (second alteration in original) (quotation marks omitted)); *Cullen*, 2024 WL 4536471, at *11 (resignation of CFO did not raise a strong inference of scienter where the "allegations surrounding [his] departure [were] not specific enough to show that . . . suspected fraud was the reason for his resignation," as opposed to errors or inadequate supervision over his department). The Treasurer may be able to cure these deficiencies, however, in an amended complaint.

### 3.    Loss Causation

"The loss causation prong is simply a variant of proximate cause." *Espy*, 99 F.4th at 540 (quotation marks omitted). To sufficiently plead loss causation, the plaintiff must plausibly allege that the "misstatement, as opposed to some other fact, foreseeably caused [the plaintiff's] loss." *Id.* (citation omitted). "In a fraud-on-the-market case . . . loss causation begins with the allegation that the defendant's misstatements (or other fraudulent

conduct) artificially inflated the price at which the plaintiff purchased her shares." *Genius Brands*, 97 F.4th at 1183 (quotation marks omitted). "Next, a plaintiff must allege that the truth became known." *Id.* (quotation marks omitted). Last, a "plaintiff must allege that the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *Id.* (quotation marks omitted). "At that point, the plaintiff has suffered an economic loss caused by the misstatements because she is no longer able to recoup in the marketplace the inflationary component of the price she originally paid." *In re Bofl Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020).

Although a "disclosure followed by an immediate drop in stock price is more likely to have caused the decline," there is no "bright-line rule requiring an immediate market reaction." *Irving Firemen's Relief*, 998 F.3d at 407 (citation omitted); *see also Bofl Holding*, 977 F.3d at 790 (outlining "ground rules" for what qualifies as a corrective disclosure). "The plaintiff need not show that a misrepresentation was the *sole* reason for a price decline, but rather that it was one substantial cause." *Genius Brands*, 97 F.4th at 1183 (quotation marks omitted). Ultimately, a plaintiff "need only show a causal connection between the fraud and the loss." *Id.* (citation omitted). But the allegations still must be sufficiently pled to meet the requirements of the PSLRA. *Irving Firemen's Relief*, 998 F.3d at 404.

Defendants argue the Treasurer has not sufficiently pled loss causation because (1) the Treasurer "fail[s] to specify which of the Defendants' statements were [revealed to be] untrue by these subsequent disclosures" and (2) the allegations "fail to establish that the revelation of any 'truth' about Defendants' alleged misstatements caused [the] purported losses." (Doc. 34 at 22–23 (second alteration in original) (quotation marks omitted).) As for the second argument, Defendants reason that "[n]one of the challenged statements discuss Leslie's anticipated sales or profits; they focus on increasing inventory levels." (*Id.* at 23.) The Treasurer argues that there are sufficient allegations of loss causation, largely mirroring its allegations for the Consolidated Complaint's sufficiency as a whole. (*See* Doc. 37 at 24–25.)

As with many of the parties' other arguments, the Court does not at this time rule on the sufficiency of the Treasurer's loss causation allegations, in large part because the Consolidated Complaint is not sufficiently clear about what specific portions of statements are allegedly false or how.  Thus, it would be difficult for the Court to decide whether the Treasurer sufficiently pled a causal relationship between the alleged misstatements and the drop in share price, because the scope of the alleged misstatements and their tie to the alleged "reveal" in July 2023, is still uncertain.

### C.    Count Two:  Violation of Section 20(a)

"Claims under Sections 20(a) and 20A of the Exchange Act are derivative and therefore require an independent violation of the Exchange Act, so [plaintiffs] must successfully plead a Section 10(b) claim to succeed on their claims under Sections 20(a) and 20A."  *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 947 (9th Cir. 2023) (quotation marks omitted).  Because the Treasurer has not sufficiently pled a violation of Section 10(b), the Court also dismisses the derivative Section 20(a) claim.  *Khoja*, 899 F.3d at 1018 ("Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b)." (alteration original) (citation omitted)).

## V.    CONCLUSION

For the reasons explained, the Consolidated Complaint is dismissed with leave to amend, because the Treasurer may be able to cure the deficiencies raised in this Order through amendment.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss (Doc. 34) is **granted**.  The Consolidated Complaint is dismissed.

**IT IS FURTHER ORDERED** that the Treasurer may have **30 days** to file an amended complaint.  Consistent with LRCiv 15.1, the Treasurer shall file, concurrently with any amended complaint, a notice of filing the amended pleading that attaches a copy of the amended pleading indicating in what respect it differs from the Consolidated Complaint.  If the Treasurer does not file an amended complaint within 30 days, the Clerk

of Court is directed to enter judgment in favor of Defendants and close this case.

**IT IS FURTHER ORDERED** that Defendants may have **30 days** to respond to any amended complaint.

Dated this 14th day of July, 2025.

Honorable Sharad H. Desai
United States District Judge