1  ZIMMERMAN REED, LLP
   HART L. ROBINOVITCH (AZ SBN 020910)
2  14648 N. Scottsdale Road., Suite 130
3  Scottsdale, AZ 85254
   Telephone: 480/348-6400
4  480/348-6415 (fax)
   Email: hart.robinovitch@zimmreed.com
5
6  *Local Counsel for Lead Plaintiff*

7  ROBBINS GELLER RUDMAN
     & DOWD LLP
8  DARREN J. ROBBINS
   TOR GRONBORG
9  LAURIE L. LARGENT
   SARAH A. FALLON
10 655 West Broadway, Suite 1900
   San Diego, CA  92101-8498
11 Telephone:  619/231-1058
12 619/231-7423 (fax)
13
   *Lead Counsel for Lead Plaintiff*
14
15 [Additional counsel appear on signature page.]

16              UNITED STATES DISTRICT COURT

17                    DISTRICT OF ARIZONA

18 Treasurer of the State of North Carolina,      )   No. CV-23-1887-PHX-SHD
   Individually and on Behalf of All Others       )
19 Similarly Situated,                            )   FIRST AMENDED COMPLAINT FOR
                                                  )   VIOLATIONS OF THE FEDERAL
20                              Plaintiff,         )   SECURITIES LAWS
                                                  )
21         vs.                                     )   (Assigned to the Honorable Sharad H.
                                                  )   Desai)
22 Leslie's, Inc., Michael R, Egeck, and          )
   Steven M. Weddell,                             )
23                                                )   DEMAND FOR JURY TRIAL
                                                  )
24                              Defendants.        )
                                                  )
25
26
27
28

4928-3328-1113.v1

# TABLE OF CONTENTS

**Page**

I. SUMMARY OF ACTION .................................................................................... 1

II. INTRODUCTION AND OVERVIEW ............................................................... 1

III. JURISDICTION AND VENUE ......................................................................... 4

IV. PARTIES ........................................................................................................... 5

V. CONFIDENTIAL WITNESS ACCOUNTS ...................................................... 7

VI. FACTUAL BACKGROUND ............................................................................ 9

VII. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ....................... 15

    A. Defendants' False and Misleading Statements In Leslie's Q1 2022 Earnings Report and Quarterly Reports on Form 10-Q ......... 15

    B. Defendants' False and Misleading Statements In Q2 2022 Earnings Report ...................................................................................... 20

    C. Defendants' False and Misleading Statements In June 6 and 7, 2022 Analyst Conference Calls ...................................................... 24

    D. Defendants' False and Misleading Statements In Leslie's Q3 2022 Earnings Report .......................................................................... 26

    E. Defendants' False and Misleading Statements In Leslie's Q4 2022 and FY 2022 Earnings Report and Investor Day Conference .................................................................................... 29

    F. Defendants' False and Misleading Statements In Leslie's Q1 2023 Earnings Report ........................................................................... 32

    G. Defendants' False and Misleading Statements In Leslie's Q2 2023 Earnings Report ........................................................................... 39

VIII. DISCLOSURE OF THE TRUTH AND POST CLASS PERIOD EVENTS ........ 44

IX. ADDITIONAL ALLEGATIONS OF DEFENDANTS' KNOWLEDGE AND ACCESS TO INFORMATION ................................................................ 49

    A. The Fraud Involved Leslie's Core Business and the Individual Defendants Were Senior Executives Directly Involved In and Informed of the Company's Operations and Performance Metrics .............................................................................................. 49

    B. Defendants' Frequent, Detailed Comments on Leslie's Sales, Demand, and Inventory, Showed Their Personal Knowledge of the Company's Chlorine Products ............................................. 51

**Page**

      C.    Egeck and Weddell Signed Sarbanes-Oxley Act Certifications Attesting that They Personally Supervised Leslie's Controls and Procedures ................................................................ 57

X.      LOSS CAUSATION ................................................................ 58

XI.      APPLICABILITY OF THE PRESUMPTION OF RELIANCE .......................... 60

XII.      CLASS ACTION ALLEGATIONS ................................................... 61

XIII.      CAUSES OF ACTION ............................................................. 63

COUNT I
    For Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ......................................... 63

COUNT II
    For Violation of §20(a) of the Exchange Act Against All Defendants ................. 65

PRAYER FOR RELIEF ................................................................. 66

JURY DEMAND ........................................................................ 67

4928-3328-1113.v1

1    Lead Plaintiff Treasurer of the State of North Carolina, on behalf of the North
2    Carolina Retirement Systems, and the North Carolina Department of State Treasurer and the
3    North Carolina Supplemental Retirement Board of Trustees, on behalf of the North Carolina
4    Supplemental Retirement Plans ("Lead Plaintiff" or "North Carolina") and plaintiff Macomb
5    County Employees' Retirement System ("Macomb County ERS") (collectively, "Plaintiffs"),
6    by and through their counsel, allege the facts herein upon personal knowledge as to
7    themselves and their own acts, and upon information and belief as to all other matters.
8    Plaintiffs' information and belief is based on, among other things, the independent
9    investigation of counsel, which includes, but is not limited to, a review and analysis of:
10   (a) Leslie's Inc.'s ("Leslie's" or the "Company") public filings with the U.S. Securities and
11   Exchange Commission ("SEC"); (b) transcripts of Leslie's senior management's conference
12   calls with investors and analysts; (c) releases and media reports issued about and
13   disseminated by the Company; (d) analyst reports issued about Leslie's; (e) interviews of
14   individuals familiar with the Company and its operations; (f) other public information and
15   data regarding the Company; and (g) documents cited herein.  Plaintiffs believe that
16   substantial additional evidentiary support will exist for the allegations set forth herein after a
17   reasonable opportunity for discovery.

18   **I.    SUMMARY OF ACTION**

19       1.    This securities fraud class action is brought on behalf of those who purchased
20   or otherwise acquired the common stock of Leslie's between February 3, 2022 and July 13,
21   2023, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of
22   the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78j(b), 78t(a)), and
23   Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b 5).

24   **II.    INTRODUCTION AND OVERVIEW**

25       2.    Leslie's is the nation's largest direct-to-consumer brand in the pool and spa
26   care industry, serving residential and professional consumers.  Founded in 1963, Leslie's is
27   the only direct-to-consumer pool and spa care brand with a nationwide physical presence,
28   operating a network of over 900 branded locations throughout the United States during the

- 1 -

Class Period.  Leslie's core business is the sale of chemical treatment products, which include chlorine-based chemical products ("chlorine product(s)") that are essential and non-optional for routine pool and spa maintenance.  Leslie's characterizes these chemical products as "non-discretionary," claiming that their essential role in pool and spa maintenance generates an annuity-like stream of demand that underpins what the Company touts as a highly predictable, recurring revenue model.

3.      This case is brought against Leslie's, its former Chief Executive Officer, Michael R. Egeck, and its former Chief Financial Officer, Steven M. Weddell (collectively, "Individual Defendants," and together with Leslie's, "Defendants") and arises out of Defendants' false and misleading statements about Leslie's chlorine product inventory and customer demand during FY 2022 and FY 2023.[1]  While publicly assuring investors that demand for Leslie's core products was strong and inventory levels were appropriate, Defendants concealed that Leslie's was: (a) accumulating chlorine product inventory in quantities that far exceeded customer demand; and (b) using misleading warnings of impending product shortages to pull forward customer purchases, knowing that doing so was eroding future demand for Leslie's core products.

4.      Throughout 2020 and early 2021 Defendants leveraged Leslie's supplier relationships to build up chlorine product inventory during a temporary industry shortage.  But as supply conditions normalized in late 2021, Leslie's was locked into long-term purchase agreements that forced the Company to keep buying chlorine it didn't need, saddling it with an inventory of chlorine products that far exceeded actual customer demand.  In fact, Leslie's excess supply of chlorine products was so extreme during the Class Period, that Leslie's distribution centers exceeded their physical capacity to store chlorine products, forcing Leslie's retail stores to accept far more inventory than the stores could store safely, let alone sell.  And, even though the improper storage of chlorine products creates serious safety risks, Leslie's retail locations had no choice but to keep excess product in closets and

---

[1]    Leslie's fiscal year ends on the Saturday closest to September 30th, thus fiscal year 2022 and 2021 ended on October 1, 2022 and October 2, 2021, respectively.

then in parking lots, as managers shifted inventory around to cope with the inventory overflow and its associated dangers. As the situation became untenable, Leslie's even went so far as to hire third-party storage companies to house the overflow, shuffling products from site to site, which drove up product costs.

5.      Defendants further concealed that they had implemented carefully formulated scare tactics to offload Leslie's growing excess of chlorine inventory, advising Leslie's loyalty customers that the Company "couldn't guarantee product availability in the second half" of 2022, and "encourag[ing] them to purchase [chlorine products] early prior to the pool season." Defendants were fully aware that pulling chlorine sales forward in this manner would force customers to stockpile product far beyond their current season maintenance needs – creating what Leslie's internally called "garage and shed inventory" – and artificially inflate FY 2022 sales while directly cannibalizing sales for the FY 2023 pool season. Moreover, as chlorine inventory piled up in Leslie's retail stores, store managers and staff continued to push customers to buy more chlorine than they could use in the current season, further inflating FY 2022 sales and compounding FY 2023 revenue erosion. Sure enough, by the end of 2022, Defendants' efforts to unload the excess inventory of chlorine products by pulling forward customer purchases began to manifest, causing Leslie's product sales to drop significantly, leading to a collapse in Leslie's FY 2023 revenue and earnings.

6.      The Individual Defendants served as Leslie's top two executives and repeatedly professed their granular knowledge of and familiarity with: (a) industry factors affecting chlorine supply; (b) the Company's inventory levels and strategies for inventory management and procurement; (c) the predictable "annuity-like" nature of the pool and spa industry; and (d) customer demand through the Company's close tracking of customer purchases. Thus, the Individual Defendants were aware that their Class Period misrepresentations and omissions involved Leslie's non-discretionary core product offerings, and specifically chemical products that made up over 45% of Leslie's revenue.

7.      The relevant truth was revealed to investors on July 13, 2023, when Leslie's was forced to pre-announce disastrous Q3 2023 results. Leslie's announced a decline in Q3

2023 comparable sales and slashed the FY 2023 guidance it had given just two months earlier, blaming the fact that demand for its chemical products had collapsed as customers still had excess product leftover from purchases they had been pressured to make in 2022. On this news, Leslie's share price plummeted nearly 30%, from a closing price of $9.52 per share on July 13, 2023, to a closing price of $6.70 per share on July 14, 2023 and dropped another 18% the following trading day to close at $5.46 per share, causing Plaintiffs and other investors to suffer significant losses.  Weddell was immediately removed as CFO, Egeck was gone as CEO one year later.  Leslie's stock price has never recovered and currently trades for less than $0.40 per share.

### III.    JURISDICTION AND VENUE

8.    The claims alleged herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

10.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because Leslie's is headquartered in this District, and the statements by Defendants alleged herein to be actionable were prepared and reviewed in and disseminated from this District and were received by Leslie's shareholders in this District.  As such, substantial acts in furtherance of the alleged misconduct have occurred in this District.

11.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce of the United States, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.  Among other acts, Defendants prepared, authorized, and issued statements and omissions in releases, SEC filings, and conference calls that they knew or should have known would be relied on by U.S. investors.

- 4 -

## IV.    PARTIES

12.    Lead Plaintiff manages over $120 billion in assets for the benefit of nearly one million active and retired public employees, including teachers, police officers, firefighters, and public servants throughout North Carolina.  As set forth in its previously filed certification (ECF 18-2), North Carolina acquired Leslie's common stock at artificially inflated prices during the Class Period and was damaged thereby.

13.    Plaintiff Macomb County Employees Retirement System is a retirement system based in Mount Clemens, Michigan with over $1 billion in assets.  It provides retirement benefits to thousands of beneficiaries.  As set forth in its previously filed certification (ECF 30 at 53-54), Macomb County acquired Leslie's common stock at artificially inflated prices during the Class Period and was damaged thereby.

14.    Defendant Leslie's is a national retailer of pool and spa supplies, equipment, and repair services incorporated under the laws of Delaware and headquartered in Phoenix, Arizona.  Leslie's went public on the U.S. stock market on October 29, 2020, and during the Class Period the Company's common stock traded in an efficient market on the Nasdaq Global Select Market (the "Nasdaq") under the ticker symbol "LESL."

15.    Defendant Michael R. Egeck was, at all relevant times, the Company's Chief Executive Officer and Director.  He served as the CEO from February 2020 to August 2024, when he departed from the Company and resigned from his Board seat.  In connection with the Company's Initial Public Offering ("IPO"), Egeck was granted 196,079 performance-vesting stock options eligible to vest upon the Company achieving an adjusted net income target for FY 2022.  For the 2022 and 2023 fiscal years, Egeck received a base salary of $1,025,000.  Egeck was also eligible to receive performance-based bonus compensation each year pursuant to the Company's achievement of EBITDA thresholds and target amounts, targeted at 100% of his base salary.  Egeck's annual cash bonus earned was $761,575 for 2022 but fell to zero for 2023.

16.    Defendant Steven M. Weddell was, at all relevant times, the Company's Chief Financial Officer and Executive Vice President.  On July 13, 2023, together with its release

- 5 -

of a revised fiscal 2023 outlook, Leslie's announced without prior warning that Weddell would step down as CFO effective August 7, 2023 and would serve as a Special Advisor to the Company until December 31, 2023.  Weddell was under 55 years old at the time of his departure from Leslie's, did not announce that he was retiring or taking a position at another company, and since his departure from Leslie's has been unemployed or self-employed.  In connection with the Company's IPO, Weddell was granted 122,549 performance-vesting stock options eligible to vest on the Company achieving of the adjusted net income target for FY 2022.  For the 2022 and 2023 fiscal years, Weddell's base salary was $570,000.  Weddell also received performance-based bonus compensation each year pursuant to the Company's achievement of EBITDA thresholds and target amounts, targeted at 100% of his base salary.  Weddell's annual cash bonus earned was $423,510 for 2022 but, like Egeck, fell to zero for 2023.

17.    Each of the Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;

(e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

## V.    CONFIDENTIAL WITNESS ACCOUNTS

18.    Former Company employees have provided information confirming that, despite unloading excess inventory onto customers at the cost of future sales, Leslie's continued to pile up excess inventory of chemical pool treatment products and that this inventory strained storage capacity and caused significant logistical issues throughout the Class Period.

19.    **Confidential Witness No. 1** ("CW-1"): CW-1 was an allocations and planning analyst at Leslie's from 2021 through early 2023 and had responsibility for maintaining inventory levels at Leslie's distribution centers, overseeing the transfer of inventory from the distribution centers to the Company's retail stores.  CW-1 was responsible for analyzing inventory and allocating product from Leslie's company-operated distribution centers to its more than 900 retail stores during CW-1's tenure.  CW-1 attended weekly meetings where storage projections for the retail stores were presented to Leslie's Director of Allocations.  CW-1 confirmed that, by the beginning of 2022, the inventory at the Company's distribution centers exceeded physical storage capacity, so that CW-1 and CW-1's colleagues were instructed to push inventory to retail stores even though stores had no current need for the product, and retail stores had inventory levels that were already so high they lacked the physical space to store it.  The situation got so bad in FY 2022 that Leslie's stores refused to accept shipments of chlorine products and other pool supplies and were trying to send inventory back to the distribution centers, citing fire hazards as a reason.  CW-1 attended weekly meetings during CW-1's tenure with Leslie's Chief Merchandising and Supply Chain Officer, who reported to Egeck, during which the issue of too much inventory in Leslie's retail stores was discussed.

20.    **Confidential Witness No. 2** ("CW-2"): CW-2 worked at Leslie's as an inventory planner through late 2023.  In this role, CW-2 was responsible for directing inventory to retail stores, tracking sales, and placing purchase orders for inventory with suppliers.  CW-2 had visibility into the performance of chemicals, including chlorine, through participation in weekly inventory team meetings.  There were about a dozen

attendees at these meetings, including Leslie's Director of Inventory and Senior Vice President of Merchandise Planning and Allocation, where they discussed inventory-related topics, including prior week sales and the amount of inventory flowing into stores.  CW-2 confirmed that Leslie's had made long-term purchase agreements with its suppliers that exceeded sales projections.  CW-2 confirmed that retail locations were carrying as much inventory as, or even more inventory than their designated capacity allowed, and that inventory, including Trichlor, was being stored in closet space and outside in parking lots. Regional managers were forced to shift inventory from one store to another because the stores were overflowing with chlorine products and had nowhere safe to put it.

21.    **Confidential Witness No. 3** ("CW-3"): CW-3 was a general manager at Leslie's from years prior to the Class Period until November 2023.  CW-3's role included responsibility for managing a high-volume store in the Midwest region with more than $1 million dollars in annual sales.  CW-3 recounted that, beginning in 2022, as the chlorine shortage abated, the retail store which CW-3 managed received so much unplanned chemical inventory from Leslie's distribution centers that there was nowhere to store it all and still adhere to safety and fire codes.  CW-3 stated there was no way to stop the shipments from coming to the store, whereas prior to 2022, general managers like CW-3 could direct that a store not receive additional shipments.  This meant that, unlike before, stores were forced to take on excess inventory regardless of actual customer need or available storage space.

22.    **Confidential Witness No. 4** ("CW-4"): CW-4 was a district manager at Leslie's and worked with the Company from before the IPO to Q1 2023.  CW-4 was responsible for 20 stores in Leslie's Southwest district, which included Texas, Leslie's largest market.  CW-4 stated that, as a district manager, CW-4 had access to Leslie's records of purchasing histories for each of its customers.  Leslie's maintained records of customers' purchasing histories showing that customers were sitting on excess supplies of products. CW-4 further described that this customer data was highly depended upon throughout the Company, including for marketing to customers, and was available to the CEO and CFO.

23.    CW-4 explained that in 2020, during the chlorine shortage, stores were instructed to strictly limit sales of chlorine products.  For example, stores would reassure customers that a smaller amount was enough for the entire summer and encourage them to buy less so there would still be a supply at the store to bring in other customers.  But by the following year, after the shortage ended, Leslie's reversed course, with stores pushing much larger quantities to individual customers in a single sale.  According to CW-4, customer data showed that customers who previously purchased one bucket of chlorine tabs every few months were now buying three or four buckets every few months.  From CW-4's perspective, it was obvious that Leslie's was pushing far more product than customers required for the current season.

24.    CW-4 confirmed Leslie's inventory kept growing in 2022, and the stores in CW-4's district were overstocked with chemical products to the point that stores were in violation of fire codes and regulations regarding the storage of chemical products.  CW-4 further stated that, when CW-4 went to the stores in CW-4's district and witnessed the oversupply of chlorine being sent to them, CW-4 reported the issue to CW-4's regional director and the allocations team.

25.    CW-4 also stated that chlorine was Leslie's anchor product; Leslie's would not be in business without it.  CW-4 described chlorine as the product that got customers in the door.  Customers would otherwise not come to a Leslie's store if they were looking only for equipment or inflatables that they could order from Amazon or pick up on their usual Walmart trip, for example.  CW-4 stated that Leslie's stores used the draw-in from chlorine products to sell higher-margin products, including high-margin chemicals such as enzymes.

## VI.    FACTUAL BACKGROUND

26.    Leslie's was the nation's largest retailer of swimming pool and spa supplies, services, and repairs during the Class Period.  Leslie's serves commercial, residential, and professional customers, and more than 80% of its product assortment comprises non-discretionary items, including chemicals and equipment necessary for proper maintenance of pools and spas.  Heading into 2020, Leslie's promotional material touted that the Company

- 9 -

1   had over 55 years of consecutive growth because of its "highly predictable, recurring

2   revenue model."

3       27.    In February 2020, Egeck was hired to be Leslie's CEO.  Immediately

4   thereafter, the COVID-19 pandemic hit the United States.  The pandemic and society's turn

5   to at-home activities raised the tide on Leslie's predictable growth.  New pool permit activity

6   grew 32% through July 2020 compared to the same period in 2019.  The industry forecast

7   similar growth in pool installations through 2020 and 2021.

8       28.    In the wake of this pool-building boom, on October 29, 2020, Leslie's

9   conducted its IPO, listing its stock on the Nasdaq under the symbol "LESL."  Forty million

10   shares of stock were sold in the offering at $17 per share.  The proceeds of the offering were

11   intended to be used to pay $390 million in previously issued debt and pay down Leslie's

12   term loan, which had $815 million outstanding as of June 2020.

13       29.    In the offering documents, Leslie's emphasized that each new pool and spa

14   installation represented a predictable, "annuity-like stream of chemical, equipment, and

15   service revenue" and stated, "[g]iven we play primarily in the aftermarket business, we have

16   a highly predictable, recurring revenue model, which is evidenced by our 57 years of sales

17   growth."  The Company also identified that "[m]ore than 80% of our product sales are non-

18   discretionary and recurring in nature" and "80% of our chemical sales are derived from

19   proprietary brands and custom-formulated products, which allow us to create an entrenched

20   consumer relationship [and] control our supply chain[s]."

21       30.    The offering documents also identified Leslie's "consumer-centric integrated

22   ecosystem" and touted that "[o]ver the last two years, we have invested in new capabilities,

23   including global inventory visibility."  Moreover, in 2014, Leslie's launched a loyalty

24   membership program which, as of 2020, served more than 3.2 million customers who

25   represented more than 70% of the Company's total sales.  As a result, Defendants

26   acknowledged in the offering documents, "[w]e track consumer preferences, order

27   frequency, and pool profiles in order to curate and enhance our recommendations and

28

1    promotions, anticipate product demand, and track lifetime value to better incentivize our

2    loyalty members."

3        31.    In August 2020, a fire shut down the Louisiana manufacturing facility of the

4    nation's second-largest maker of dry chlorine products, BioLab.  Approximately 40% of the

5    country's chlorine tablet supply was destroyed.  Combined with the pandemic's impact on

6    available labor and constraints on the global supply chain, the fire resulted in significant

7    shortages of Trichlor – a key chlorine product used for pool maintenance.  As a result of

8    tightening supply, the market price for chlorine products, including Trichlor, skyrocketed.

9    The fire and its impact on the pool supply industry was heavily reported on.

10       32.    Still riding the wave of its COVID success, Leslie's leveraged its relationships

11   with suppliers to maintain strong Trichlor inventory levels in 2020 and into 2021.  On

12   February 4, 2021, during the Company's Q1 2021 earnings conference call, Egeck

13   highlighted that "[d]espite widespread industry [chlorine] shortages, we are confident in our

14   ability to both serve our existing consumers as well as a significant number of new

15   consumers we are acquiring with our growth strategies."  Egeck continued, "[w]e have a 30-

16   year relationship and a history of superior performance with our primary supplier, and we

17   have a contract in place that secures both volume and cost through 2025."  Later on the call,

18   after stating that Leslie's "will have supply of products that other retailers don't," Egeck

19   emphasized that this benefit

20           allows us to capture a sale, but more importantly, it's allowing us to capture
21           new customers.  And with the emphasis we put on consumer file growth,
             keeping customers with our loyalty program, wrapping our arms around them
22           once we've got them in our system, we see this, this industry shortage
             situation, not just as us getting immediate sale, but us getting a new customer,
23           which is much more durable.

24       33.    Egeck also confirmed that Leslie's supply chain would remain resilient through

25   the pandemic issues: "We're constantly managing our supply chain, both for efficiency and

26   quantity.  So we're certainly not just sitting here not looking at it closely, but we feel very

27   good of where we're at."

28

- 11 -

4928-3328-1113.v1

34.     The Company again reiterated its ability to manage its supply chain on the May 5, 2021 2Q22 earnings call, with Egeck reiterating: "[W]e remain confident in our supply chain and in our ability to serve both our existing consumers as well as the new consumers we are acquiring with our growth initiatives."

35.     Thus, the chlorine shortage and price increases served as a windfall for Leslie's, which has traditionally been able to pass inflationary costs associated with its non-discretionary products on to its customers.  Defendants assured investors that the shortage was a growth opportunity for Leslie's.  As Weddell described:

> We're seeing, based on some of the recent news around [chlorine] shortages, that we're attracting a lot of first-time consumers to Leslie's and getting introduced to the experience and what we have to offer.  So the durability of the opportunity for us is really wrapping our arms around those consumers and showing them more than just the supply of chlorine in the current season.

36.     Because of its ability to take advantage of the chlorine shortage impacting other pool supply companies, Leslie's stock price increased significantly.  By the end of January 2021, the stock price had increased from the $17 per share IPO price to over $28 per share.  By June of 2021, the stock was trading above $29.75 per share.

37.     Taking advantage of Leslie's ability to maintain a steady flow of chlorine products and other inventory and the accompanying increased Company revenue and stock price, Defendants conducted secondary offerings of Leslie's stock in February, June, and September 2021.  During the February 16, 2021 offering, 33.35 million shares of stock were sold by Company insiders and investors at a price of $26 per share.  Defendants Egeck and Weddell sold $19.2 million and $13.6 million of their stock, respectively, and the Executive Chairman of Leslie's, Steven Ortega, sold another $20.8 million in stock.  During the June 14, 2021 offering, investors and insiders sold another 24.5 million shares of stock at a price of $27.64 per share.  Once again, Egeck, Weddell, and Ortega sold millions of dollars of their stock: $13.5 million, $12.5 million, and $20 million, respectively.  During the September 17, 2021 offering, investors and insiders sold another 15.82 million shares of

stock at a price of $22 per share.  Leslie's did not receive proceeds from any of these offerings.

38.    In the offering documents for the 2021 offerings, Defendants continued to assure investors about the predictable, "annuity-like" nature of Leslie's business and their ability to track and predict product demand.  That included emphasizing, again, that "[g]iven we play primarily in the aftermarket business, we have a highly predictable, recurring revenue model" and "[w]e track consumer preferences, order frequency, and pool profiles in order to curate and enhance our recommendations and promotions, anticipate product demand, and track lifetime value to better incentivize our loyalty members."

39.    But as 2021 came to a close, Defendants' prior ability to take advantage of the chlorine supply chain problems turned into a liability.  The chlorine supply chain stabilized just as Leslie's was increasing inventory in Trichlor and other products in the hope that shortages would persist through 2022 and 2023.  Moreover, in an effort to effectively corner the market on chlorine treatment products, Defendants had made long-term purchase agreements that obligated Leslie's to purchase Trichlor throughout 2022 and into 2023.  By the end of Q1 2022 (January 1, 2022), Leslie's reported total inventory of $245 million, an increase of 40% ($70 million) from Q1 2021 and more than 23% ($46 million) from October 2021.  Throughout 2022, including during the key summer pool season when inventory levels historically decreased, Leslie's reported inventory continued to increase, from $345 million at the end of Q2 2022, to $361 million at the end of Q3 2022, to $362 million at the end of Q4 2022.  By the end of Q1 2023 (December 31, 2022), reported inventory was $430 million, more than 75% higher than the Company's inventory at the end of Q1 2022.

40.    CW-1, CW-3, and CW-4 confirm that Leslie's found itself with excess supplies of Trichlor and chemical treatment products just as the supply of chlorine was normalizing at the beginning of 2022 and that Leslie's problems with excess inventory only worsened during 2022 and into 2023.  In an effort to dump excess inventory, starting in late 2021, Defendants had letters sent to the Company's loyalty program members, customers responsible for more than 70% of the Company's total sales. Despite Leslie's "contract[s] in

- 13 -

place that secure[d] both volume and cost through 2025" for chlorine products, the Company's burgeoning inventory levels, and the end of the chlorine shortage, the letters urged customers to "purchase early prior to the pool season" and stock up on treatment products because "we [can't] guarantee product availability" later in the year.  The letters and a campaign to have Leslie's stores push customers to buy more chlorine products than they needed to maintain their pools for the FY 2022 season boosted sales going into FY 2022, but did so at the cost of future sales.  As Defendants knew, the product customers were sitting on at the end of FY 2022 – what became known as "garage and shed inventory" – would directly reduce the volume of chlorine products that would be purchased for the FY 2023 season.

41.    Former Company employees also confirm that, despite unloading excess inventory onto loyalty customers, Leslie's long-term purchase commitments caused it to continue to pile up excess chemical pool treatment product inventory.  For example, as CW-1, an allocations and planning analyst, confirmed, by 2022, the Company's distribution centers had far too much inventory, which was being pushed to stores even though the stores did not have the physical space to even store the chemical inventory, let alone the need to sell it.  The situation got so bad in 2022 that Leslie's stores tried to refuse accepting shipments of chlorine products and other pool supplies and were trying to send inventory back to the Company's distribution centers.

42.    As a result of Leslie's management pushing excess, unneeded inventory out to stores, chlorine products, including Trichlor, were being stored in closet space and outside in store parking lots.  Regional managers were forced to shift inventory from one store to another because the stores were overflowing with chlorine products and had nowhere safe to put them.  CW-3 recounted that, beginning in 2022, CW-3's store was receiving so much unplanned chemical inventory from Leslie's distribution centers that there was nowhere to store it all and still adhere to safety and fire codes.  CW-3 confirmed that during this inventory crisis, general managers were prohibited from stopping the excess shipments from coming to the stores, whereas prior to the inventory build-up, general managers like CW-3

- 14 -

1  could direct that stores not receive additional shipments.  This meant that, unlike before,

2  stores were forced to take on excess inventory regardless of actual need or available storage

3  space.

4        43.     According to CW-4, Leslie's maintained records of customers' purchasing

5  histories and knew whether they were sitting on excess supplies of products.  Prior to the

6  Class Period and at the height of the chlorine shortage, Leslie's used this information to

7  discourage customers from purchasing too much Trichlor and other chlorine products.  But,

8  as described above, by 2022, Leslie's management had reversed course and was pushing

9  stores to sell excess amounts of chemical products, and it was clear the Company was selling

10  more pool treatment products than customers required, undercutting sales for the FY 2023

11  pool season.  Nevertheless, as CW-4 confirmed, Leslie's inventory kept growing in 2022,

12  resulting in stores being overstocked with chemical products to the point that they were in

13  violation of fire codes and regulations regarding the storage of chemical products.  Notably,

14  Leslie's Class Period practices, as described by the former Company employees, failed to

15  satisfy its own chemical storage standards which it has published on its site: "How to Store

16  Pool Chemicals the Right Way."

17        44.     Ultimately in 2022 and 2023, as Leslie's distribution centers and stores became

18  so overstocked with chemical treatment product inventory, Defendants were forced to retain

19  the services of third party chemical logistics and storage companies.  As Defendants later

20  admitted in November 2023, the Company's excess chemical product inventory "required us

21  to use several third-party off-site storage facilities with a lot of movement of product

22  between those facilities," incurring millions of dollars in incremental inventory adjustment

23  costs.

24  **VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

25      **A.    Defendants' False and Misleading Statements In Leslie's Q1**
   **2022 Earnings Report and Quarterly Reports on Form 10-Q**
26

27        45.     On February 3, 2022, after the market closed, Leslie's issued a release and

28  convened a conference call to report the Company's Q1 2022 results.

46.     The release reported record Q1 2022 sales of $184.8 million, an increase of 27.5%, with comparable sales growth of 20.5%.  Gross profit increased 30.2% to $67.3 million, with gross margins increasing 70 basis points.  Adjusted EBITDA improved to $1.1 million compared to a slight loss in the prior year period.  On these results, Leslie's raised its FY 2022 sales guidance by $20 million, gross profit by $10 million, and adjusted EBITDA by $5 million.

47.     Explaining the reasons behind Q1 2022's stellar results, Egeck stated that "***the competitive advantages derived from our integrated platform of physical and digital assets, and strong execution of our strategic growth initiatives drove record first quarter results***."

48.     The statement made by Egeck in ¶47 was materially misleading when made. Egeck knew, but failed to disclose, that Leslie's Q1 2022 results were not driven by Leslie's strategic growth initiatives, but by Defendants' efforts to pull forward sales using misleading warnings of impending product shortages that induced loyalty customers to purchase chlorine products far beyond their current needs, in order to reduce Leslie's mounting inventory.  During 2020 and early 2021, Defendants had leveraged supplier relationships to aggressively build up chlorine inventory, including Trichlor, in response to industry-wide shortages and expectations that shortages would persist.  But as supply conditions started to stabilize in late 2021, Leslie's was contractually obligated to continue buying chlorine regardless of need, because the Company was locked into long-term purchase agreements, leaving the Company with supplies of Trichlor and other chlorine products that exceeded predicted customer demand.  The excess inventory overwhelmed Leslie's distribution centers, forcing Leslie's to push more inventory into retail stores even though the stores lacked the physical space to safely store it.  To alleviate the excess inventory issue, in Q1 2021, Defendants pulled forward sales by sending letters to Leslie's loyalty customers, misleadingly claiming that the Company "couldn't guarantee product availability in the second half" of 2022 and urging customers to "purchase [chlorine products] early prior to the pool season."  Retail stores were also pushing Leslie's customers to buy far more chlorine product than they actually needed for the current season to clear out mounting inventory and

1   avert safety hazards.  Internal Company data showed that, as a result of Defendants' efforts,

2   Leslie's customers were buying three to four times more product than they actually needed

3   for the current pool season, which was artificially inflating Q1 2022 sales and resulting in

4   customers stockpiling chlorine supplies far beyond their immediate pool maintenance needs

5   for the current season.  Defendants knew that Q1 2022 sales were being driven by their

6   efforts to pull forward chlorine sales.  According to CW-4, Egeck and Weddell had access to

7   customer purchasing history and Egeck also acknowledged on Leslie's May 5, 2022

8   conference call, that Defendants tracked Leslie's sales "very carefully" and were "able to see

9   by consumer what they purchased prior years versus what they've purchased year-to-date.

10  It's one of the things that we try to pay a lot of attention to."

11      49.    On the February 3, 2022 conference call, Egeck emphasized that customer

12  demand for Leslie's products remained strong and the Company was "***benefiting from***

13  ***strong secular macro trends that are driving durable consumer demand and are showing***

14  ***no signs of slowing***."

15      50.    Egeck's statement in ¶49 was materially misleading when made because Egeck

16  knew, but omitted, that Leslie's was manipulating demand for its chlorine products by

17  pulling forward sales, fully aware that doing so was cannibalizing sales for the FY 2023 pool

18  season.  Defendants were sending letters to Leslie's loyalty customers containing misleading

19  warnings of impending product shortages, while Leslie's retail stores were pushing

20  customers to buy far more product than they needed for the current pool season.  Both were

21  undertaken as part of Defendants' effort to offload the dangerous glut of inventory that had

22  built up in the stores, resulting in customers buying three to four times more than they

23  actually needed for the 2022 pool season.  Defendants knew this over-purchasing was

24  cannibalizing sales for the FY 2023 pool season.  According to CW-4, Leslie's tracked

25  customers' purchasing histories, which showed when customers were holding excess product

26  supplies.  CW-4 confirmed Egeck and Weddell had access to this data and Egeck also

27  acknowledged on Leslie's May 5, 2022 conference call, that Defendants tracked Leslie's

28  sales "very carefully" and were "able to see by consumer what they purchased prior years

1  versus what they've purchased year-to-date. It's one of the things that we try to pay a lot of

2  attention to."

3      51.    On the February 3, 2022 conference call, Weddell assured investors that, while

4  inventory conditions in the industry, particularly for chemicals and equipment, remained

5  constrained, the Company's end-of-quarter inventory was up 40% to $245 million compared

6  to $175 million at the end of the prior year quarter, stating: "***Our team continues to***

7  ***proactively work with our vendor partners to manage the flow of inventory, and we***

8  ***continue to identify opportunities to strategically invest in inventory to meet heightened***

9  ***consumer demand and prepare for pool season***."

10      52.    Weddell's statements in ¶51 were materially misleading when made. Leslie's

11  was neither managing the flow of inventory to meet demand, nor strategically investing in

12  inventory to meet heightened customer demand. Rather, Weddell knew, but failed to

13  disclose, that Leslie's was, in fact, being forced to purchase chlorine product inventory it did

14  not need to meet demand as a result of existing long-term purchase agreements that Leslie's

15  entered into during the chlorine shortage. Rather than managing the flow of inventory and

16  investing opportunistically in inventory as Weddell led investors to believe, Leslie's was

17  taking on excess inventory it was contractually obligated to, and then Defendants were

18  pushing customers to buy more chlorine product than they needed for the current pool

19  season. Defendants did this by sending letters to Leslie's loyalty customers containing

20  misleading warnings of impending product shortages, and pushing customers to buy far more

21  chlorine product than they actually needed to clear out the dangerous glut of inventory that

22  was building up in the stores. As a result, customers were buying three to four times more

23  product than they actually needed for the current pool season. Defendants knew their efforts

24  were cannibalizing sales for the FY 2023 pool season. According to CW-4, Leslie's tracked

25  customers' purchasing histories, which showed when customers were holding excess product

26  supplies. CW-4 confirmed Egeck and Weddell had access to this data and Egeck also

27  acknowledged on Leslie's May 5, 2022 conference call, that Defendants tracked Leslie's

28  sales "very carefully" and were "able to see by consumer what they purchased prior years

1  versus what they've purchased year-to-date.  It's one of the things that we try to pay a lot of

2  attention to."

3      53.    On February 4, 2022, the Company filed its Form 10-Q with the SEC.  The

4  Form 10-Q was signed by Weddell and attached Sarbanes-Oxley Act certifications signed by

5  Egeck and Weddell.  The Q1 2022 Form 10-Q stated: "There have been no material changes

6  from the risk factors disclosed in our Annual Report on Form 10-K for the year ended

7  October 2, 2021," filed on December 10, 2021 ("FY 2021 Form 10-K").  Leslie's FY 2021

8  Form 10-K contained the following purported risk disclosures that were incorporated by

9  reference in the Company's Q1 2022 Form 10-Q, as well as the Company's Forms 10-Q

10  filed on May 6, 2022 (Q2 2022) and August 5, 2022 (Q3 2022):[2]  "***We may not be able to***

11  ***successfully manage our inventory to match consumer demand, which could have a***

12  ***material adverse effect on our business, financial condition, and results of operations***."

13      54.    The risk disclosure in Leslie's Q1 2022 Form 10-Q was materially false and

14  materially misleading when made as the conditions warned of as potential risks had in fact

15  already manifested.  In truth, by February 4, 2022, Leslie's was already in an inventory crisis

16  and even though current inventory exceeded current demand, Leslie's was forced to continue

17  buying chlorine under long-term purchase agreements, resulting in inventory of Trichlor and

18  other chlorine products that far exceeded projected customer demand.  Leslie's inventory of

19  Trichlor and other chemical products had ballooned to the point that it exceeded the physical

20  capacity of Leslie's distribution centers, forcing the Company to offload excess stock onto

21  retail stores even though the stores did not request or need the product, were unequipped to

22  handle it, and lacked adequate storage space for it.  Despite the flammable nature of chlorine,

23  Leslie's stores resorted to storing inventory in closets, stockrooms, and even parking lots,

24  creating serious fire hazards.  Defendants were trying to offload the excess inventory by

25  sending loyalty customers letters with misleading warnings of impending product shortages,

26  and Leslie's retail stores were pushing Leslie's customers to buy far more chlorine product

27  ―――――――――――――――
[2]    Leslie's May 6, 2022 and August 5, 2022 Form 10-Q filings were also signed by Weddell

28  and included Sarbanes-Oxley Act certifications signed by Egeck and Weddell.

4928-3328-1113.v1

than they actually needed to clear out mounting inventory and avert safety hazards, resulting in customers buying three to four times more product than they actually needed for the current season, which was cannibalizing sales for the FY 2023 pool season.

**B.      Defendants' False and Misleading Statements In Q2 2022 Earnings Report**

55.      On May 5, 2022, after the market closed, Leslie's issued a release and convened a conference call to report the Company's Q2 2022 results.  The release reported record sales for Q2 2022, or $228.1 million, an 18.5% increase.  The release also reported comparable sales growth of 13.3%, and a gross profit increase of 19.5% to $85.6 million, with gross margins increasing 30 basis points.  Adjusted EBITDA for the quarter was $8.7 million compared to $9.5 million in the prior year period.  With this announcement, the Company again substantially raised its guidance for fiscal 2022, increasing its outlook for sales by $85 million, gross profit by $38 million, and adjusted EBITDA by $18 million.

56.      The release quoted Egeck who stated that the "***key drivers of our performance***" were "***our team's strong execution against our strategic growth initiatives***" as well as Leslie's "***advantaged inventory position***."

57.      Egeck's statement in ¶56 was materially false and misleading when made. Egeck knew, but omitted, that Leslie's Q2 2022 performance was driven by Defendants' pulling forward demand under misleading claims of product shortages and the push by Leslie's retail stores to sell customers more chlorine product than needed for the current pool season in an effort to rid the stores of excess inventory coming from Leslie's distribution centers that they could neither return nor safely store.  Internal data showed that customers were being induced to purchase three to four times more product than in prior seasons, which was far more than they needed or could use for the FY 2022 pool season.  Leslie's Q2 2022 sales spiked as a result of customers stockpiling chlorine supplies as Defendants falsely advised Leslie's customers that chemical supplies were limited and encouraged them to make purchases early and out of season.

4928-3328-1113.v1

58.     On the May 5, 2022 conference call, Weddell also spoke about constrained industry supply conditions, stating that Leslie's "continue[d] to expect inventory conditions in the industry to remain tight throughout fiscal 2022, particularly for chemical," and that the Company ended the quarter with inventory of $345 million, up 24% compared to $278 million at the end of the prior year same quarter.  Weddell assured investors that the Company "*continues to proactively work with our vendor partners to manage the flow of inventory and we continue to identify opportunities to strategically invest in inventory to meet heightened consumer demand and prepare for pool season*."

59.     Weddell's statements in ¶58 were materially misleading when made.  Weddell knew, but failed to disclose, that Leslie's was not strategically investing in inventory or acquiring it in response to heightened customer demand.  Rather, Leslie's was purchasing inventory as a result of existing long-term purchase agreements entered into during the chlorine shortage.  Rather than investing opportunistically in inventory as Weddell led investors to believe, Leslie's was taking on excess inventory that exceeded demand because it was contractually obligated to.  As a result, Leslie's was forced to push customers to buy more chlorine product than needed for the current pool season.  Defendants were sending letters to Leslie's loyalty customers containing misleading warnings of impending product shortages, and Leslie's retail stores were pushing to sell the dangerous glut of inventory that had built up in the stores, resulting in customers buying three to four times more product than in prior seasons, which was far more than they needed or could use for the FY 2022 pool season.  In doing so, Defendants knew they were cannibalizing sales for the FY 2023 pool season.  According to CW-4, Leslie's tracked customers' purchasing histories, which showed when customers were holding excess product supplies.  CW-4 confirmed Egeck and Weddell had access to this data and Egeck also acknowledged on Leslie's May 5, 2022 conference call, that Defendants tracked Leslie's sales "very carefully" and were "able to see by consumer what they purchased prior years versus what they've purchased year-to-date. It's one of the things that we try to pay a lot of attention to."

4928-3328-1113.v1

60.     During the May 5, 2022 conference call, a William Blair analyst asked Egeck and Weddell specifically if they were seeing customers making chlorine purchases earlier than usual ("pull-forward" purchases): "So have you tried to calculate a potential pull-forward estimate or is this just not your view because of the macro drivers and share gain in price?"

61.     Egeck responded to the pull-forward question by denying any pull-forward, stating:

> I would say it's not our view, both for the reasons you stated.  And also, due to the fact that we track [sales] very carefully.  We're able to see by consumer what they purchased prior years versus what they've purchased year-to-date. It's one of the things that we try to pay a lot of attention to.  ***And we just haven't seen any indication of any meaningful pull-forward***.
>
> *        *        *
>
> ***I started with the first question saying we don't see any evidence of any significant pull-forward***.  And in fact, with [unit per transaction], I think we're seeing kind of just the opposite people buying more items but perhaps smaller quantities.

62.     Egeck's statements in ¶61 that Defendants had not seen any indication or evidence of any meaningful pull-forward of chlorine product purchases by customers, were materially false and misleading when made.  Egeck knew, but failed to disclose, that Leslie's was not only seeing, but was driving a pull forward of customer purchases for the Company's chlorine products.  In order to offload the Company's growing surplus of chlorine inventory Defendants were using misleading warnings to induce Leslie's loyalty customers into believing that chlorine supplies were limited and encouraging Leslie's customers to make purchases early and out of the current pool season.  Retail stores were also pushing Leslie's customers to buy far more chlorine product than they actually needed for the current season to clear out mounting inventory and avert safety hazards.  Internal data showed that customers were being induced to purchase three to four times more product than in prior seasons, which was far more than they needed or could use for the FY 2022 pool season.  According to CW-4, Leslie's tracked customers' purchasing histories, which showed

- 22 -

when customers were holding excess product supplies.  CW-4 confirmed Egeck and Weddell had access to this data and Egeck also acknowledged on Leslie's May 5, 2022 conference call, that Defendants tracked Leslie's sales "very carefully" and were "able to see by consumer what they purchased prior years versus what they've purchased year-to-date.  It's one of the things that we try to pay a lot of attention to."  Thus, Defendants knew what, and how much, product customers were buying, shifts in their purchasing behavior, and that Defendants' efforts were causing customers to stockpile chlorine, cannibalizing sales for the FY 2023 pool season.

63.    On the May 5, 2022 conference call a Morgan Stanley analyst asked Egeck and Weddell about what they were seeing in terms of future demand for Leslie's nondiscretionary products, including chlorine-related products, and whether there were any "areas where the consumer could still choose to either trade down or pull back in certain ways?" Egeck responded by assuring analysts that "***in the core businesses of chemicals and equipment and parts and repair and maintenance, we have not seen any indication of a decrease in demand***."

64.    Egeck's statement in ¶63 that Leslie's was not seeing "any indication of a decrease in demand" in Leslie's "core business of chemicals," in response to the analyst's question about future demand, was materially misleading when made.  Egeck knew, but failed to disclose, that Leslie's was pulling forward chlorine sales in an effort to offload Leslie's excess inventory, which was collapsing future demand for those core products. Leslie's was sending letters to loyalty customers containing misleading warnings of impending product shortages, and its retail stores were pushing customers to buy more chlorine than they actually needed for the current pool season to rid Leslie's of the excess inventory and address growing storage and safety risks.  Defendants' efforts to pull forward chlorine sales were inducing customers to purchase three to four times more product than in prior seasons, which was far more than they needed or could use for the FY 2022 pool season.  According to CW-4, Leslie's tracked customers' purchasing histories, which showed when customers were holding excess product supplies, CW-4 confirmed Egeck and Weddell

had access to this data and Egeck also acknowledged on Leslie's May 5, 2022 conference call, that Defendants tracked Leslie's sales "very carefully" and were "able to see by consumer what they purchased prior years versus what they've purchased year-to-date. It's one of the things that we try to pay a lot of attention to." Thus, Defendants knew what, and how much, product customers were buying, shifts in their purchasing behavior, and that Defendants' efforts were causing customers to stockpile chlorine, cannibalizing sales for the FY 2023 pool season.

### C. Defendants' False and Misleading Statements In June 6 and 7, 2022 Analyst Conference Calls

65. On June 6, 2022, Weddell spoke at an analyst conference call hosted by Robert W. Baird. During the conference call, Weddell was specifically questioned about Leslie's inventory given the flow of business:

> [Analyst:] And I guess the other question would just be maybe on inventory. So I mean, inventory has been a popular topic in retail for the last couple of weeks. How does inventory look for you guys? How do you feel about that given the flow of business?

> [Weddell:] Sure. Yes. We took a strategic – we've made a strategic decision last year to heavily invest in inventory. If you remember, most of the inventory that we have is nondiscretionary. It's not something fashion risk or obsolescence. If you look at the end of Q2, our fiscal Q2, effectively at the end of March, up $70 million or up 25%. ***So we worked very hard and closely with our vendors to procure effectively as much inventory as we can to meet the heightened demand that we see today, and it's a competitive advantage***.

> ***So I feel very good with our inventory position today***.

66. Weddell's statement in ¶65 that the Company was working hard with its vendors to procure effectively as much inventory as it could to meet heightened demand and that Leslie's inventory levels were a competitive advantage, was materially misleading when made. Weddell's statement misleadingly portrayed Leslie's inventory build-up as a strategic move to meet the heightened demand and as a competitive advantage, when that was not so. Weddell knew, but failed to disclose, that Leslie's inventory buildup was due to the long-term purchase agreements made during the chlorine shortage, which contractually obligated

Leslie's to keep buying chlorine even after the shortage ended and even as its existing inventory was overflowing.  Weddell's statement that Leslie's felt very good with its current inventory position was also materially misleading as it misrepresented the truth about the Company's inventory position.  Weddell knew, but omitted, that Leslie's inventory far exceeded demand.  The inventory of chlorine products at Leslie's distribution centers and retail stores had ballooned to the point that Leslie's distribution centers were beyond physical capacity, forcing the Company to offload excess stock onto retail stores.  The stores neither requested nor needed this inventory and were unequipped to handle the chlorine products shipped to them because they lacked adequate storage space.  While Weddell portrayed Leslie's inventory purchases as a calculated response to market conditions, Leslie's was saddled with excess inventory and was pushing chlorine products onto customers who stockpiled chlorine, cannibalizing sales for the FY 2023 pool season.

67.     The next day, on June 7, 2022, Weddell spoke at an analyst conference call hosted by William Blair.  During the conference call, Weddell was again asked about Leslie's inventory.  In response, he stated, "we wish we had more," further explaining: "*we will still not have all the inventory that we need to meet all the demand that's out there, but certainly feel better about the inventory position today than in prior years*."

68.     Weddell's statements in ¶67 that Leslie's still did not have all the inventory it needed to meet demand and that Defendants felt better about Leslie's current inventory position than in prior years were materially false and misleading when made.  Weddell knew, but failed to disclose, that Leslie's already had excess chlorine related inventory and Leslie's was locked into long-term purchase agreements that contractually obligated the Company to buy chlorine in amounts far beyond predicted customer demand.  Defendants were attempting to offload the excess inventory onto loyalty customers by sending them letters misleadingly warning them of impending product shortages to induce them to purchase more product than they needed for the current pool season.  Retail stores were also pushing customers to purchase more chlorine product than was needed for the current pool season because of excess supplies for which Leslie's had no safe storage space.  Internal data

1    showed that customers were being induced to purchase three to four times more product than

2    in prior seasons, which was far more than they needed or could use for the FY 2022 pool

3    season. According to CW-4, Leslie's tracked customers' purchasing histories, which showed

4    when customers were holding excess product supplies. CW-4 confirmed Egeck and Weddell

5    had access to this data and Egeck also acknowledged on Leslie's May 5, 2022 conference

6    call, that Defendants tracked Leslie's sales "very carefully" and were "able to see by

7    consumer what they purchased prior years versus what they've purchased year-to-date. It's

8    one of the things that we try to pay a lot of attention to." Thus, Defendants knew what, and

9    how much, customers were buying, shifts in their purchasing behavior, and that Defendants'

10   efforts were causing customers to stockpile chlorine products, cannibalizing sales for the FY

11   2023 pool season.

12        **D.    Defendants' False and Misleading Statements In Leslie's Q3
                 2022 Earnings Report**

13

14        69.    On August 5, 2022, after the market closed, Leslie's issued a release and

15   convened a conference call to report the Company's Q3 2022 results. The release reported

16   that financial performance in the quarter was adversely impacted by "execution issues" at the

17   Company's New Jersey distribution center. The release highlighted that, even with the

18   logistical problems, sales increased 12.9% to $673.6 million, compared to the prior year

19   period, with a comparable sales increase of 7.4%. Although gross profit increased 7% to

20   $303.6 million during the quarter, gross margins decreased by 250 basis points, "primarily

21   due to shifts in business mix, decreased product margin and higher distribution expenses."

22   Additionally, adjusted EBITDA increased 2% compared to the prior year period to $182.9

23   million. The operational setback caused Leslie's to reduce its guidance for fiscal 2022,

24   lowering the sales outlook to $1.55 to $1.57 billion (from $1.575 to $1.61 billion), gross

25   profit to $655 to $670 million (from $700 to $715 million), and adjusted EBITDA to $287 to

26   $297 million (from $315 to $330 million).

27

28

- 26 -

70.     On the August 5, 2022 conference call, Weddell stated that "***demand for [Leslie's] core nondiscretionary product remains solid***," and Egeck reiterated that "***demand, we think, is very much alive and stable***."

71.     Weddell and Egeck's statements in ¶70 that demand for Leslie's core product remained solid and very much alive and stable were materially misleading when made as Defendants knew, but failed to disclose, the fact that Leslie's was manipulating demand by intentionally pulling forward sales in an effort to shed Leslie's excess chlorine inventory leaving customers overstocked and cannibalizing sales for the FY 2023 pool season. Leslie's was only able to post the revenue numbers it did during FY 2022 because it had unloaded excess inventory on customers by sending them letters with misleading warnings of impending product shortages, and retail stores were pushing to sell the excess chlorine product being shipped from the distribution centers. Internal Leslie's data showed that customers were being induced to purchase three to four times more product than in prior seasons, which was far more than they needed or could use for the FY 2022 pool season. According to CW-4, Leslie's tracked customers' purchasing histories, which showed when customers were holding excess product supplies. CW-4 confirmed Egeck and Weddell had access to this data and Egeck also acknowledged on Leslie's May 5, 2022 conference call, that Defendants tracked Leslie's sales "very carefully" and were "able to see by consumer what they purchased prior years versus what they've purchased year-to-date. It's one of the things that we try to pay a lot of attention to." Thus, Defendants knew what, and how much, customers were buying, shifts in their purchasing behavior, and that Defendants' efforts were causing customers to stockpile chlorine, cannibalizing sales for the FY 2023 pool season.

72.     During the August 5, 2022 conference call, Weddell also spoke about Leslie's inventory. He reported that Leslie's ended the quarter with $361 million in inventory, up 61% from $224 at the end of Q3 2022. Weddell stated: "***[W]e view our current inventory position as appropriate given the uncertainty of supply for the balance of the year and into fiscal 2023***."

73.    Weddell's statement in ¶72 that Leslie's viewed its current inventory position as appropriate, was materially misleading when made because Weddell knew, but failed to disclose, that Leslie's was continuing to pile up excess Trichlor and chemical inventory because the Company was locked into long-term purchase agreements that contractually obligated Leslie's to buy chlorine far beyond what was needed to meet customer demand. Weddell also knew, but failed to disclose, the fact that Leslie's distribution centers were overwhelmed with inventory, so much so that Leslie's was diverting surplus stock to retail stores, regardless of whether the stores needed it or had space to store it safely. Chlorine products, including Trichlor, ended up in storage closets and placed outside in parking lots. With stores overflowing, regional managers went so far as to shuttle excess chemical inventory between locations, as they struggled to find adequate storage space. Stores were trying to refuse further shipments of chlorine products and other pool supplies, citing fire hazards and attempting to return the inventory to the distribution centers, but they were not allowed to. By Q3 2022, Leslie's was sitting on so much excess inventory that it was forced to rent multiple third-party off-site storage facilities and continually shuffle products between distribution centers, off-site storage, and stores. This constant movement drove up costs and rendered products unsaleable or lost.

74.    Egeck also noted on the August 5, 2022 conference call that "***Trichlor inventory is in good shape***."

75.    Egeck's statement in ¶74 that Leslie's Trichlor inventory is in good shape, was materially misleading when made as it omitted that Leslie's inventory of Trichlor and other chlorine products was exceeding customer demand and had ballooned to the point that the inventory at Leslie's distribution centers exceeded the physical capacity available to store it, forcing the Company to push excess stock onto retail stores that neither requested nor needed the products and lacked adequate space to safely store it. Leslie's had accumulated so much excess inventory that it was forced to rent multiple third-party off-site storage facilities and continually shuffle products between distribution centers, off-site storage, and stores. This constant movement drove up costs and rendered products unsaleable or lost. Internal

Company data showed that retail stores were still pushing customers to buy three to four times more product than they actually needed for the current pool season. Despite Defendants' efforts to unload excess inventory on customers by sending them letters with misleading warnings of impending product shortages and Leslie's retail stores pushing customers to buy more chlorine products than they actually needed for the current season, Leslie's was continuing to stockpile chlorine inventory because long-term purchase agreements contractually obligated Leslie's to buy Trichlor and other chlorine products far beyond what customer demand required.

E. **Defendants' False and Misleading Statements In Leslie's Q4 2022 and FY 2022 Earnings Report and Investor Day Conference**

76. On November 30, 2022, after the market closed, Leslie's issued a release and convened a conference call to report the Company's Q4 2022 and FY 2022 results. While Leslie's reported Q4 2022 sales in line with market expectations, it gave FY 2023 sales guidance that was below market expectations. Leslie's reported FY 2023 sales guidance of $1.56 to $1.64 billion, gross profit of $667 to $708 million, and adjusted EBITDA of $280 and $310 million, which was below market forecasts.

77. During the November 30, 2022 conference call, Weddell reported FY 2022 year-end inventory of $362 million, an 82% increase compared to FY 2021 year-end inventory of $199 million. Weddell doubled down on his previous misrepresentations, telling investors that the inventory increase related to non-discretionary product, explaining that "[b]oth, the equipment and chemical product categories, are nondiscretionary in nature and are not subject to technology or fashion risk. "***We view our current elevated inventory position as appropriate given the uncertainty of supply going into fiscal 2023***."

78. Weddell's statement in ¶77 that Leslie's viewed its current elevated inventory position as appropriate, was materially misleading when made because it directly contradicted the true state of Leslie's inventory problems and was designed to, and did, quell investor concerns about Leslie's rising inventory levels. Weddell knew, but omitted that

Leslie's was continuing to pile up excess Trichlor and chlorine inventory because the Company was locked into long-term purchase agreements that contractually obligated Leslie's to buy chlorine in amounts far beyond what was needed to meet customer demand. Weddell also knew, but failed to disclose, that Leslie's distribution centers were overwhelmed with inventory, so much so that Leslie's was diverting surplus stock to retail stores, regardless of whether the stores needed it or had space to store it safely. Chlorine products, including Trichlor, ended up stored into storage closets and placed outside in parking lots. With stores overflowing, regional managers went so far as to move excess inventory between locations, as they struggled to find space. Stores were trying to refuse further shipments of chlorine products and other pool supplies, citing fire hazards and attempting to return the inventory to the distribution centers, but they were not allowed to. Leslie's had accumulated so much excess inventory that it was forced to rent multiple third-party off-site storage facilities and continually shuffle products between distribution centers, off-site storage, and stores. This constant movement drove up costs and resulted in products becoming unsaleable or lost.

79. Further attempting to ease investor concerns about Leslie's rising inventory levels, on the November 30, 2022 conference call, Weddell added that "***when we feel we can adequately meet consumer demand and we see an improvement in supply chains, then we will pursue opportunities to reduce inventory***."

80. Weddell's statement in ¶79 was materially misleading when made. Weddell's statement that Leslie's was not inclined to reduce inventory was an attempt to deflect investor concerns about Leslie's elevated inventory levels, and omitted that inventory levels were the product of: (a) a lack of customer demand resulting from Leslie's efforts earlier in FY 2022 to have customers buy excess amounts of chlorine based products; and (b) the fact that during FY 2022 and the first two months of FY 2023, Leslie's was forced to continue purchasing chlorine products pursuant to long-term purchase agreements at a rate far exceeding customer demand. Leslie's inventory of chlorine products far exceeded what was necessary to satisfy customer demand for the FY 2023 pool season. That is, Leslie's

- 30 -

distribution centers still had excess inventory and retail stores were being forced to take excess inventory even though they lacked the capacity to do so. Also, Leslie's had accumulated so much excess inventory that it was forced to rent multiple third-party off-site storage facilities and continually shuffle products between distribution centers, off-site storage, and stores. This constant movement drove up costs and rendered products unsaleable or lost.

81. On November 30, 2022, the Company also filed its Form 10-K for the year ended October 1, 2022 with the SEC reporting the Company's FY 2022 results. The FY 2022 Form 10-K was signed by Egeck and Weddell and included Sarbanes-Oxley Act certifications, signed by Egeck and Weddell. The FY 2022 Form 10-K identified the following purported risk factors with regard to Leslie's business: "***We may not be able to successfully manage our inventory to match consumer demand, which could have a material adverse effect on our business, financial condition, and results of operations***."

82. The risk disclosure in ¶81 was materially false and misleading when made, as the conditions warned of as potential risks had in fact already manifested. In truth, Leslie's inventory was already far exceeding customer demand, which was impacting the Company's operations. First, Defendants knew, but failed to disclose, that Leslie's was contractually obligated to continue purchasing chlorine products pursuant to long-term purchase agreements at a rate far exceeding customer demand. As a result, Leslie's inventory of chlorine products had ballooned to the point that it exceeded the physical capacity of its distribution centers, forcing the Company to offload excess stock onto retail stores even though the stores did not request or need it, were unequipped to handle it, and lacked adequate storage space for it. Second, in an attempt to address the excess inventory of chlorine products, Defendants had been manipulating chlorine demand by sending loyalty customers letters with misleading warnings of impending product shortages, and Leslie's retail stores had been pushing customers to buy extra chlorine products. This resulted in customers buying three to four times more product than in prior seasons, which was far more than they needed or could use for the FY 2022 pool season. This pull forward of chlorine

1   sales had eroded FY 2023 demand for Leslie's chlorine products.  According to CW-4,

2   Leslie's tracked customers' purchasing histories, which showed when customers were

3   holding excess product supplies.  CW-4 confirmed Egeck and Weddell had access to this

4   data and Egeck also acknowledged on Leslie's May 5, 2022 conference call, that Defendants

5   tracked Leslie's sales "very carefully" and were "able to see by consumer what they

6   purchased prior years versus what they've purchased year-to-date.  It's one of the things that

7   we try to pay a lot of attention to."  Thus, Defendants knew what, and how much, customers

8   were buying, shifts in their purchasing behavior, and that Defendants' efforts were causing

9   customers to stockpile chlorine, cannibalizing sales for the FY 2023 pool season.  Finally,

10  Leslie's had accumulated so much excess inventory that it was forced to rent multiple third-

11  party off-site storage facilities and continually shuffle products between distribution centers,

12  off-site storage, and stores.  This constant movement drove up inventory costs and rendered

13  products unsaleable or lost.

14      **F.    Defendants' False and Misleading Statements In Leslie's Q1**
            **2023 Earnings Report**

15

16  83.    On February 2, 2023, after the market closed, Leslie's issued a release and

17  convened a conference call to report the Company's Q1 2023 results.  The release reported

18  that, compared to the prior year period, first quarter sales increased 5.6% to $195.1 million

19  but noted that the poor weather in the quarter caused a 4% decrease in comparable sales.  For

20  gross profit, the released noted a 3.0% decrease to $65.3 million compared to the prior year

21  period, and gross margin was 33.5%, down 290 basis points year-over-year.  Additionally,

22  adjusted EBITDA decreased to an $11.9 million loss, compared to a $1.1 million gain in the

23  same quarter the prior year.

24  84.    During the February 2, 2023 conference call, Egeck noted in his prepared

25  remarks that the Company saw decreased customer demand for Trichlor.  When analysts

26  raised concerns about this topic, Egeck addressed them, stating:

27      ***I think the way to think about demand is to keep in mind, it's a very small***
        ***quarter, right, for the whole industry.  And I know we've said that a lot.  But***

28

4928-3328-1113.v1

*again, trying to extrapolate trends from this first quarter, which is: a, small; and b, had a really outsized weather impact, I just think that's tricky*.

\*    \*    \*

*[A]gain, super small quarter, upsized weather impact being very careful not to draw any trends for the full year from it.  And we didn't see anything despite those 2 factors that would tell us we need to*.

85.    Egeck's statements in ¶84 were materially misleading when made.  Egeck knew, but failed to disclose, that the decrease in customer demand for Trichlor in Q1 2023 was due to the impact of Defendants' FY 2022 efforts to pull forward chlorine purchases, which had collapsed demand for Leslie's chlorine products for the FY 2023 pool season.  Internal data showed that in FY 2022 customers had been induced to purchase three to four times more product than in prior seasons, which was far more than they needed or could use for the FY 2022 pool season.  According to CW-4, Leslie's tracked customers' purchasing histories, which showed when customers were holding excess product supplies.  CW-4 confirmed Egeck and Weddell had access to this data and Egeck also acknowledged on Leslie's May 5, 2022 conference call, that Defendants tracked Leslie's sales "very carefully" and were "able to see by consumer what they purchased prior years versus what they've purchased year-to-date.  It's one of the things that we try to pay a lot of attention to."  Thus, Defendants knew what, and how much, customers were buying, and their shifts in their purchasing behavior.  They also knew that their demand manipulation efforts left customers entering the FY 2023 pool season with excess chlorine products.  Defendants were aware that customers had accumulated what Egeck and Weddell later referred to as "garage and shed inventory," directly contributing to decreased Q1 2023 demand.

86.    During the February 2, 2023 conference call, Weddell reported that the Company had quarter end inventory of $430 million, a 76% increase compared to $245 million at the end of the prior year quarter.  Weddell told investors that "our first priority is to put the company in a position to meet customer demand for the season.  ***In furtherance of that objective, we continue to view our current elevated inventory position as appropriate and sensible given the uncertainty of supply***."  Weddell added that "***[w]hen we believe we***

- 33 -

1    ***have sufficient inventory to meet consumer demand through season, and after we see***

2    ***supply chains across the industry become more predictable, then we will strategically***

3    ***manage inventory levels down***."

4         87.    Weddell's statements in ¶86 were materially misleading when made.

5    Attempting to deflect attention from the increase in inventory, Weddell's description of

6    Leslie's elevated inventory position as appropriate and sensible was designed to mislead

7    investors, as were his comments that inventory growth was attributable to the uncertainty of

8    supply and his follow up comment that Leslie's would strategically manage inventory levels

9    down when the Company believed it had sufficient inventory to meet customer demand.  In

10    truth, Weddell knew, but failed to disclose, that Leslie's inventory of chlorine products far

11    exceeded the volumes necessary to satisfy customer demand through the FY 2023 pool

12    season.  Leslie's possessed inventory levels which not just exceeded customer demand but

13    also physical storage capacity in both Leslie's distribution centers and its retail stores as

14    Leslie's was still forced to buy chlorine under long-term purchase agreements, even though

15    the amounts it was contractually obligated to purchase far exceeded projected customer

16    demand.  Leslie's inventory levels were neither appropriate nor sensible as Leslie's

17    distribution centers still had excess inventory and retail stores were being forced to take the

18    excess inventory even though they lacked the room to do so or to safely store the chlorine

19    products.  Also, as Defendants later admitted, Leslie's had accumulated so much excess

20    inventory that it was forced to rent multiple third-party off-site storage facilities, which

21    required the continual shuffling of products between distribution centers, off-site storage,

22    and stores.  In fact, in FY 2023, Leslie's was forced to write down the reported value of its

23    inventory because the use of the third-party storage facilities resulted in products becoming

24    untraceable, unsaleable, or lost.  Moreover, the Company was later forced admit in its FY

25    2023 Form 10-K that Leslie's lacked effective internal controls and processes to physically

26    verify inventory accurately or otherwise ensure the accuracy of the data used to value

27    Leslie's inventory in FY 2023.  Thus, Weddell had no reasonable basis to believe, and did

28    not in fact believe, that his statements about Leslie's inventory were accurate when made.

4928-3328-1113.v1

88.     During the February 2, 2023 conference call, several analysts raised concerns about Leslie's increased inventory levels.  Specifically, a William Blair research analyst asked about inventory and Weddell responded, stating:

> [William Blair:] Can we start with inventory, Mike?  The inventory kind of pops off the page and up a bit sequentially.  How much is safety stock?  And when do you see inventory normalizing?

> [Weddell:] . . . ***[T]here's 2 key reasons that inventory is up, one is sales growth over the last year – last few years.  And then importantly, the strategic decision that we made to intentionally pull forward 2023 receipts in advance of season***.

> . . . ***So the pull forward allows us to load our stores with more product and facilitate the replacement cycle during the early part of our season***.

> . . . ***But again, the inventory that we're procuring today is for this season. And it's inventory that is being brought in earlier in preparation for season. It's not stocking up for kind of longer-term needs***.

89.     Weddell's statements in ¶88 were false and materially misleading when made. Weddell's statements were designed to mislead investors by downplaying analysts' concerns about Leslie's high inventory levels and falsely portraying the increase as a planned, strategic move to bring in FY 2023 products early and to stock stores ahead of the pool season, when in fact it was not.  Weddell knew, but failed to disclose, that Leslie's was having to buy chlorine under long-term purchase agreements, even though the amounts it was contractually obligated to purchase far exceeded projected customer demand.  Leslie's excess inventory was so overwhelming that it exceeded the physical space at Leslie's distribution centers and was being forced into retail stores even though they did not need it and could not safely store it.  Weddell's statement that Leslie's had procured higher inventory to allow Leslie's to load its stores ahead of the season, was also false because, at the time Weddell made the statement, Leslie's retail stores were already overstocked with chlorine inventory they could not safely store.  Also, as Defendants later admitted, Leslie's had accumulated so much excess inventory that it was forced to rent multiple third-party off-site storage facilities, which required the continual shuffling of products between distribution

centers, off-site storage, and stores. In fact, in FY 2023 Leslie's was forced to write down the reported value of its inventory because the use of third-party storage facilities resulted in products becoming untraceable, unsaleable, or lost. Moreover, the Company was later forced to admit in its FY 2023 Form 10-K, that Leslie's lacked effective internal controls and processes to physically verify inventory accurately or ensure the accuracy of the data used to value Leslie's inventory in FY 2023. Thus, Weddell had no reasonable basis to believe, and did not in fact believe, that his statements about Leslie's inventory were true when made.

90. On the February 2, 2023 conference call, Weddell also addressed analyst concerns about Trichlor inventory and inventory growth in Q1 2023, stating:

> ***We feel good about the inventory that we have in our facilities and in our stores.*** Again, when you think about that composition of product that we're bringing in early, it's high-turn product, top SKUs that we know we need for full season and where last year we talked a lot about kind of getting behind the curve and replenishment cycle.

> . . . ***So I feel good with the position we have in inventory today***.

91. Weddell's statements in ¶90 that Leslie's was confident with its current inventory position, and the inventory in the Company's distribution centers and retail stores, were materially misleading when made. Weddell knew, but failed to disclose, that Leslie's excess inventory levels of chlorine products far exceeded the volumes necessary to satisfy customer demand through the FY 2023 pool season. Leslie's possessed inventory levels which not just exceeded customer demand but also physical storage capacity in Leslie's distribution centers and its retail stores as Leslie's was still forced to buy chlorine under long-term purchase agreements, even though the amounts it was contractually obligated to purchase far exceeded projected customer demand. Leslie's distribution centers still had excess inventory, and retail stores were being forced to take the excess inventory even though they still lacked the room to do so or to safely store the chlorine products. Also, as Defendants later admitted, Leslie's had accumulated so much excess inventory that it was forced to rent multiple third-party off-site storage facilities, which required the continual shuffling of products between distribution centers, off-site storage, and stores. In fact, in FY

1    2023, Leslie's was forced to write down the reported value of its inventory because the use

2    of third-party storage facilities resulted in products becoming untraceable, unsaleable, or lost.

3    Moreover, the Company was forced to later admit in its FY 2023 Form 10-K that Leslie's

4    lacked effective internal controls and processes to physically verify inventory accurately or

5    ensure the accuracy of the data used to value Leslie's inventory in FY 2023. Thus, Weddell

6    had no reasonable basis to believe, and did not in fact believe, that his statements about

7    Leslie's inventory were true when made.

8        92.    During the February 2, 2023 conference call, Egeck also addressed analysts'

9    concerns about Leslie's Trichlor inventory levels. When asked about his thoughts on the risk

10   of Leslie's competitors sitting on too much Trichlor inventory, Egeck responded: "***So we feel***

11   ***good about where we are with Trichlor, but we've also bulked up the inventory there as***

12   ***well, with the idea that we're going to preposition a much higher percentage of it into the***

13   ***stores themselves***."

14       93.    Egeck's statements in ¶92 were materially misleading when made. Egeck's

15   statements that Leslie's had bulked up on Trichlor, that Leslie's felt good about its Trichlor

16   inventory, and that the Company was planning to place more chlorine inventory into the

17   stores themselves, were intended to mislead investors by assuring them that Leslie's growing

18   inventories were intentional and designed to meet demand. In truth, Egeck knew, but failed

19   to disclose, that Leslie's was forced to keep stockpiling chlorine inventory because Leslie's

20   was locking the Company into long-term purchase agreements, leaving the Company with

21   supplies of Trichlor and chemical products that exceeded predicted customer demand and the

22   physical storage capacity in Leslie's distribution centers and its retail stores. Leslie's

23   distribution centers still had excess inventory, and its retail stores were being forced to take

24   the excess inventory even though they still lacked the room to do so or to safely store the

25   chlorine products. Also, as Defendants later admitted, Leslie's had accumulated so much

26   excess inventory that it was forced to rent multiple third-party off-site storage facilities,

27   which required the continual shuffling of products between distribution centers, off-site

28   storage, and stores. In fact, in FY 2023 Leslie's was forced to write down the reported value

1    of its inventory because the use of third-party storage facilities resulted in products becoming

2    untraceable, unsaleable, or lost.  Moreover, the Company was forced to later admit in its FY

3    2023 Form 10-K that Leslie's lacked effective internal controls and processes to physically

4    verify inventory accurately or ensure the accuracy of the data used to value Leslie's

5    inventory in FY 2023.  Thus, Weddell had no reasonable basis to believe, and did not in fact

6    believe, that his statements about Leslie's inventory were true when made.

7        94.    On February 3, 2023, the Company filed its Form 10-Q for Q1 2022 with the

8    SEC, which was signed by Weddell and included Sarbanes-Oxley Act certifications signed

9    by Egeck and Weddell, reporting the Company's Q1 2023 results.  The Q1 2023 Form 10-Q

10   stated: "There have been no material changes from the risk factors disclosed in our Annual

11   Report on Form 10-K for the year ended October 1, 2022," filed on November 30, 2022.

12   Leslie's FY 2022 Form 10-K contained the following purported risk disclosure that were

13   incorporated by reference in the Company's Q1 2023 Form 10-Q, as well as the Company's

14   Form 10-Q filed on May 5, 2023 (Q2 2023):[3]  "***We may not be able to successfully manage***

15   ***our inventory to match consumer demand, which could have a material adverse effect on***

16   ***our business, financial condition, and results of operations***."

17       95.    The risk disclosure in ¶94 was materially false and misleading when made as

18   the conditions warned of as potential risks had in fact already manifested.  In truth, Leslie's

19   inventory already far exceeded customer demand, which was adversely impacting the

20   Company's operations.  First, Defendants knew, but failed to disclose, that by the beginning

21   of the Class Period, Leslie's was contractually obligated to continue purchasing chlorine

22   products pursuant to long-term purchase agreements at a rate far exceeding customer

23   demand.  As a result, Leslie's inventory of chlorine products had ballooned to the point that

24   it exceeded the physical capacity of its distribution centers, forcing the Company to offload

25   excess stock onto retail stores even though the stores did not request or need the product,

26   were unequipped to handle it, and lacked adequate storage space for it.  Second, in an

---

27   [3]   The May 5, 2023 Form 10-Q was signed by Weddell and included Sarbanes-Oxley Act
28        certifications signed by Egeck and Weddell.

1    attempt to address the excess inventory of chlorine products, Defendants had been

2    manipulating chlorine demand by sending loyalty customers letters containing misleading

3    warnings of impending product shortages, and Leslie's retail stores were pushing customers

4    to buy extra chlorine products, which had resulted in customers buying three to four times

5    more product than in prior seasons, far more than they needed or could use for the FY 2022

6    pool season.  According to CW-4, Leslie's tracked customers' purchasing histories, which

7    showed when customers were holding excess product supplies.  CW-4 confirmed Egeck and

8    Weddell had access to this data and Egeck also acknowledged on Leslie's May 5, 2022

9    conference call, that Defendants tracked Leslie's sales "very carefully" and were "able to see

10   by consumer what they purchased prior years versus what they've purchased year-to-date.

11   It's one of the things that we try to pay a lot of attention to."  Thus, Defendants knew what

12   customers were buying, and how much, and were aware of shifts in their purchasing

13   behavior.  Also, as Defendants later admitted, Leslie's had accumulated so much excess

14   inventory that it was forced to rent multiple third-party off-site storage facilities, which

15   required the continual shuffling of products between distribution centers, off-site storage,

16   and stores.  In fact, in FY 2023 Leslie's was forced to write down the reported value of its

17   inventory because the use of third-party storage facilities resulted in products becoming

18   untraceable, unsaleable, or lost.  Moreover, the Company was forced to later admit in its FY

19   2023 Form 10-K, that during FY 2023 Leslie's lacked effective internal controls and

20   processes to physically verify inventory accurately or ensure the accuracy of the data used to

21   value Leslie's inventory in FY 2023.

22          **G.    Defendants' False and Misleading Statements In Leslie's Q2
                     2023 Earnings Report**

23

24          96.    On May 3, 2023, after the market closed, Leslie's issued a release and

25   convened a conference call to report the Company's Q2 2023 results.  The release reported

26   decreased sales for the quarter, which Defendants attributed to "the impact of the

27   normalization of the seasonal purchasing cycle to pre-pandemic patterns and adverse

28   weather."  Additionally, compared to the prior year, gross profit decreased, gross margins

4928-3328-1113.v1

1    fell 410 basis points, and adjusted EBITDA came in at a loss compared to a gain the prior

2    year.  In the release, Defendants reaffirmed FY 2023 guidance.

3    97.    The release quoted Egeck as stating that results were due to "the industry and

4    *Leslie's experienc[ing] comparable sales headwinds related to the normalization of the*

5    *seasonal purchasing cycle to pre-pandemic patterns, as well as adverse weather in key*

6    *markets*," but that "*[u]nderscoring these results was the strong execution of our diversified*

7    *growth initiatives by our teams which helped to drive continued market share gains and*

8    *position us well to deliver against our objectives as we head into the all-important pool*

9    *season*."

10    98.    Egeck's statements in ¶97 were materially misleading when made because he

11    knew, but failed to disclose, that Leslie's Q2 2023 results were really caused by Leslie's

12    inventory issues and the prior FY 2022 pulled forward purchases, and not the impact of the

13    normalization of the seasonal purchasing cycle to pre-pandemic patterns or adverse weather.

14    By the beginning of FY 2023, Defendants' prior efforts to pull forward sales had collapsed

15    demand for Leslie's chlorine products in FY 2023, as customers were sitting on surplus

16    supplies they had been induced to purchase in 2022.  Internal data showed that in FY 2022

17    customers had purchased three to four times more product than in prior seasons, which was

18    far more than they needed or could use for the FY 2022 pool season.  According to CW-4,

19    Leslie's tracked customers' purchasing histories, which showed when customers were

20    holding excess product supplies.  CW-4 confirmed Egeck and Weddell had access to this

21    data, and Egeck also acknowledged on Leslie's May 5, 2022 conference call, not only that

22    Defendants tracked Leslie's sales "very carefully" and were "able to see by consumer what

23    they purchased prior years versus what they've purchased year-to-date," but that "[i]t's one

24    of the things that we try to pay a lot of attention to."  Thus, Defendants knew what, and how

25    much, customers were buying and were aware of shifts in their purchasing behavior.  While

26    Defendants' actions had succeeded in boosting sales going into and during FY 2022, it left

27    customers with excess chlorine products, collapsing demand for the FY 2023 pool season.

28

- 40 -

Customers' accumulation of "garage and shed inventory" was directly responsible for the Company's weakened sales in Q2 2023.

99.    During the May 3, 2023 conference call, Egeck assured investors that the Company's lower-than-expected Q2 results were a temporary issue, stating:

> *[W]e believe we are seeing a return to a more normalized pre-pandemic revenue contribution breakdown with 25% in the first half of the year and 75% in the second half.  To be clear, we believe this change in seasonal consumer purchasing behavior is a timing shift and not a reduction in underlying demand for the year*.

100.    Egeck's statement in ¶99 was materially misleading when made.  Egeck blamed lower chlorine-related product demand on customer buying patterns returning to pre-pandemic norms and assured investors that lower demand was not a reduction in underlying demand for the year.  Egeck knew, but failed to disclose, that Q2 2023 sales were lower because Leslie's customers were holding excess chlorine products from the extra purchases they were induced to make in FY 2022, and did not require more products for the FY 2023 pool season.  By FY 2023, the impact of Defendants' efforts in FY 2022 to offload excess chlorine inventory by pulling purchases forward had cannibalized sales for the FY 2023 pool season, and ballooning inventories were increasing costs.   Internal data showed that customers had been induced in FY 2022 to purchase three to four times more product than in prior seasons, which was far more than they needed or could use for the FY 2022 pool season.  According to CW-4, Leslie's tracked customers' purchasing histories, which showed when customers were holding excess product supplies.  CW-4 confirmed Egeck and Weddell had access to this data and Egeck also acknowledged on Leslie's May 5, 2022 conference call, that Defendants tracked Leslie's sales "very carefully" and were "able to see by consumer what they purchased prior years versus what they've purchased year-to-date.  It's one of the things that we try to pay a lot of attention to."  Thus, Defendants knew what, and how much, customers were buying and were aware of shifts in their purchasing behavior.  While Defendants' efforts to offload excess chlorine inventory had succeeded in boosting sales in FY 2022, it left customers with excess chlorine products, which collapsed demand

- 41 -

1  for the FY 2023 pool season.  By Q2 2023, customers' accumulation of "garage and shed

2  inventory" was directly responsible for the Company's weakened demand.

3      101.    Weddell further assured investors on the May 3, 2023 conference call about

4  demand and that customers were just reverting back to seasonal buying patterns, adding, "***we***

5  ***believe consumers are more closely aligning their purchases with their need for product***

6  ***during the primary pool season, which runs from May to September***," and "***[i]t's important***

7  ***to note that we believe this behavior impacts the timing of sales, not the absolute dollars***

8  ***expected to be generated this year***."

9      102.    Weddell's statements in ¶101 were materially misleading when made.

10  Weddell's statements were misleadingly designed to ease investors' concerns about weaker

11  Q2 2023 demand and mislead investors into believing that demand for Leslie's chlorine

12  products would rebound in Q3 2023.  In truth, Weddell knew, but failed to disclose, that

13  demand had collapsed for the FY 2023 pool season because Leslie's customers were holding

14  excess chlorine products from the extra purchases they had been induced by Leslie's to make

15  in FY 2022 and did not need more chlorine for the FY 2023 pool season.  Internal data

16  showed that, in FY 2022, customers had been induced to purchase three to four times more

17  product than in prior seasons, which was far more than they needed or could use for the FY

18  2022 pool season.  According to CW-4, Leslie's tracked customers' purchasing histories,

19  which showed when customers were holding excess product supplies.  CW-4 confirmed

20  Egeck and Weddell had access to this data, and Egeck acknowledged on Leslie's May 5,

21  2022 conference call, that Defendants tracked Leslie's sales "very carefully" and were "able

22  to see by consumer what they purchased prior years versus what they've purchased year-to-

23  date.  It's one of the things that we try to pay a lot of attention to."  Thus, Defendants knew

24  what, and how much, customers were buying and were aware of shifts in their purchasing

25  behavior.  While Defendants' campaign to offload excess chlorine inventory had succeeded

26  in boosting sales in FY 2022, it left customers with excess chlorine products, and collapsed

27  demand in the FY 2023 pool season.  By Q2 2023, customers' accumulation of "garage and

28  shed inventory," was directly responsible for the Company's weakened demand.

- 42 -

103.    During the May 3, 2023 conference call, Egeck also acknowledged, for the first time, that higher sales in Q2 2022 (prior year same quarter) had been driven by a letter Defendants sent to Leslie's customers warning them of purported limited chemical supply and encouraging them to make purchases early and out of season, stating:

> *[W]e, at one point last year in the first quarter, actually sent a letter to our loyalty file, saying we couldn't guarantee product availability in the second half and encouraged them to purchase early prior to the pool season.  And whether on their own or because of that letter, we saw a lot of that.  And that was that 210 to 260 basis points increase in last year's Q2 in terms of the total year's contribution.*

104.    Egeck's statement in ¶103 was materially misleading when made as Defendants knew, but failed to disclose, that the real purpose of the letter had been to rid the Company of excess inventory that had begun piling up at the end of 2021 as Leslie's inventory of chemical products, specifically chlorine products, exceeded the volumes necessary to satisfy predicted demand during the Class Period.  Defendants further failed to disclose that, because this excess inventory was being pushed to stores which could not store it safely, Leslie's retail stores were also pushing customers to buy extra chlorine products.  This, in combination with Defendants' letters, resulted in customers buying three to four times more product than in prior seasons, which was far more than they needed or could use for the FY 2022 pool season.

105.    During the May 3, 2023 conference call, analysts again raised concerns about Leslie's Trichlor inventory and asked Egeck and Weddell if they had a sense of whether customers were currently sitting on inventory:

> [Jeffries LLC:] Do you have a sense of how much safety stock your PRO customers have to run through before they need to purchase in greater quantities?  And I guess, similar question for the homeowner, although I presume safety stock is less of a relevant concept here.  But just trying to get a sense of kind of it sounds like this is going to be the peak for inventory and you're going to kind of focus on working down that inventory and convert to cash flow.  So just trying to get some sense around that dynamic.

*        *        *

- 43 -

4928-3328-1113.v1

[Weddell:] ***We feel very good with where we're at going into season if you look at the year-on-year change in Q2, primarily around chemicals. . . .  So at this point, going into season, heaviest use from a chemical perspective, we feel very good with our current inventory balances***.

106.    Weddell's statements in ¶105 were materially misleading when made. Weddell's statements that Leslie's felt not just good but "very good" about the Company's chemical inventory (including chlorine products) going into the FY 2023 pool season were specifically designed to ease investors' concerns about Leslie's growing chlorine product inventory.  Weddell knew, but failed to disclose, that Leslie's was carrying inventory that far exceeded predicted demand for FY 2023 and that, in addition to ballooning inventory, the FY 2023 pool season demand for Leslie's chlorine products had collapsed because Leslie's customers did not need more chlorine for the FY 2023 pool season as they were holding excess chlorine products from the extra purchases they were induced to make in 2022.  By concealing both the oversupply and the self-inflicted collapse in demand, Weddell misled investors about the true extent of Leslie's worsening inventory problems and the Company's ability to sell its core products.  Also, as Defendants later admitted, Leslie's had accumulated so much excess inventory that it was forced to rent multiple third-party off-site storage facilities, which required the continual shuffling of products between distribution centers, off-site storage, and stores.  In fact, in FY 2023 Leslie's was forced to write down the reported value of its inventory because the use of third-party storage facilities resulted in products becoming untraceable, unsaleable, or lost.  Moreover, the Company was forced to later admit in its FY 2023 Form 10-K, that Leslie's lacked effective internal controls and processes to physically verify inventory accurately or ensure the accuracy of the data used to value Leslie's inventory in FY 2023.  Thus, Weddell had no reasonable basis to believe, and did not in fact believe, that his statements about Leslie's inventory were true when made.

## VIII.   DISCLOSURE OF THE TRUTH AND POST CLASS PERIOD EVENTS

107.    After the market closed on July 13, 2023 – less than two months after reaffirming FY 2023 guidance – Leslie's issued a release and filed a Form 8-K with the SEC,

signed by Weddell, announcing preliminary Q3 2023 financial results.  Defendants were forced to disclose a staggering downward revision of FY 2023 guidance and the departure of Weddell as CFO effective as of August 7, 2023.  In the release, Leslie's reported preliminary Q3 2023 earnings that were well below market expectations and announced that the Company was cutting full year fiscal 2023 guidance by nearly 60%.  The release explained that demand for the Company's chemical products in the quarter decreased because many of the Company's customers had larger than normal chemical inventories entering into the FY 2023 pool season.

108.    Specifically, in the release, Egeck stated:

Our fiscal third quarter results were well below our expectations as low double digit traffic declines in our Residential and Pro businesses drove negative comps across both discretionary and non-discretionary categories.  While abnormal weather continued to pressure traffic levels, customer surveys conducted towards the end of the quarter also indicated increased price sensitivity and that consumers entered the pool season with a greater than normal amount of chemicals leftover from last year.

109.    The release also disclosed that lower demand in Q3 2023 resulted in an inability to pass through cost increases, which negatively impacted gross margins.  The release also confirmed that gross margins were impacted by higher inventory-related expenses, including higher distribution expenses.  In the release, Egeck stated:

Our third quarter gross margins were down year-over-year due to higher product costs that we could not pass through to consumers, the impact of higher distribution-related expenses and capitalized costs as we reduce inventory from peak levels, and fixed cost deleverage. . . .  We also continue to aggressively manage our inventory balances . . . .

110.    As a result of Defendants' disclosures, the price of Leslie's stock dropped nearly 30%, from a closing price of more than $9.50 per share on July 13, 2023, to a closing price of $6.70 per share on July 14, 2023.  Leslie's stock price continued to fall another $1.24 per share the following trading day, dropping another 18%, to close at $5.46 per share on July 17, 2023.

4928-3328-1113.v1

111.    After the end of the Class Period, on August 2, 2023, Leslie's issued a release announcing its financial results for the third quarter of 2023 ended July 1, 2023.  The Company reported the same results given in its preliminary release and hosted an earnings conference call with investors to provide further color on the factors impacting its financial results.  During the conference call, Egeck explained "that a portion of our customers had a greater-than-normal amount of chemicals left over from last year . . . validated by 2 separate consumer surveys," stating that this "consumer behavior is not something we have seen before."  Egeck added that "the lack of [loyalty] file growth, . . . has a lot to do with the 2 surveys that we ran, which showed a larger-than-normal amount of product left over in the industry in the consumers' hands.  We've turned to calling it the garage and shed inventory internally."

112.    During the conference call, Egeck also admitted that the costs associated with Leslie's build-up of chemical inventory were the primary cause of gross margin erosion in the quarter, stating: "[G]ross margins were impacted by 4 primary factors.  First, incremental distribution expenses, including those related to capitalized distribution costs and investments in labor, offsite storage and transportation costs, lowered gross margin by 150 basis points."  Later on the call, Egeck added: "Obviously, the inventory buildup and the associated costs with that, offsite storage, additional labor, increased transportation, those costs are in our margin, though those were flexed up given a rather extraordinary inventory levels we took to ensure supply."

113.    Egeck also told investors that the Company experienced higher product costs in Q3 2023 and Leslie's had to lower chemical prices in the face of lower demand, which negatively impacted gross margins in the quarter.  Egeck stated: "While we experienced higher product costs across categories, the largest impact was in our chemicals categories.  We initially increased our selling prices for chemicals at the start of the season, but we were unable to successfully maintain those higher pricing levels."

- 46 -

4928-3328-1113.v1

114.    On the conference call, Egeck also acknowledged that Leslie's retail stores had been providing feedback to Defendants about customers putting off chemical purchases because of stockpiled inventory.  Egeck stated:

> We've got some feedback from our stores.  They were hearing that from customers as they were coming in, particularly with regards to our water tests [AccuBlue].  Even in a down quarter, we ran more water tests than the prior year's period, but the conversion of those tests was lower.  And what we were hearing from the stores when we questioned it was that they were hearing that people had – already had those chemicals.
>
>        So it's a highly unusual situation when we think of what the duration might be.

115.    On November 28, 2023 Leslie's issued a release announcing its financial results for Q4 2023 and also hosted a conference call with investors to discuss the results.  In the release, Leslie's reported that sales decreased 9.1% compared to the prior year same quarter and comparable sales decreased 11% compared to the prior year same quarter.  Leslie's also reported in the release that gross profit decreased 26.3% compared to the prior year period due in part to inventory-related expenses, including a larger-than-expected adjustment that had to be taken after completion of the Company's year-end physical inventory count, and the expensing of capitalized distribution costs associated with the reduction of inventory – in other words, the cost to the Company of using third-party storage locations and moving inventory between those locations compounded costs when writing off unsaleable or lost inventory.

116.    During the conference call, Egeck acknowledged that prior "customer stockpiling" of chlorine products was still plaguing demand for Leslie's products.  Also, both Egeck and the new CFO, Scott Bowman discussed the inventory adjustment that impacted gross margin in the quarter.  Bowman stated:

> [W]e incurred unexpected incremental inventory adjustment costs [that] resulted in a 260 basis point headwind in the quarter.  This increase was mainly due to excess shrink and scrap [due to] higher levels of inventory and third-party storage locations, higher movement of goods between facilities and higher levels of [unsellable] returns.

- 47 -

117.    Bowman added that, in addition to the inventory adjustment, the Company identified a material weakness in internal controls over financial reporting related "to controls over the performance of physical inventories[].  As a result, we are designing and implementing new processes [and] enhanced controls to address the underlying causes of the material weakness in fiscal 2024."

118.    During the November 28, 2023 conference call, analysts asked about the Q4 2023 inventory adjustment, including:

> [Morgan Stanley:] [Y]ou said that the biggest gap in the guidance you gave was the inventory adjustments.  Can you talk about why those were not observable in July?
>
> [Bowman:] . . . The main reason is, as we kind of step back and look at the issue on inventory adjustments.  The main issue, which is having too much inventory.  We [peaked] close to $500 million, [then it] start[ed] to come down, but it's more inventory than we've had.  In the past, I mean that required us to use several third party off-site storage facilities with a lot of movement of product between those facilities.  We had some higher and sellable return[s].  So, it just created a lot of movement of goods [and] goods not in our – inside our four walls.
>
> And so, that is the root of the problem . . . .

119.    On November 29, 2023, the Company filed its Form 10-K for the year ended September 30, 2023 with the SEC, reporting the Company's FY 2023 results.  The FY 2023 Form 10-K also discussed the inventory adjustment and associated material weakness, stating:

> In connection with our year-end assessment of internal control over financial reporting as part of this Annual Report on Form 10-K, we determined that, as of September 30, 2023, we did not maintain effective internal control over financial reporting because of material weaknesses related to the design and/or operation of controls that were not performed at a sufficient level of precision with respect to (i) the performance of physical inventories and the validation of data utilized in inventory costing for a subset of our inventory . . . .

120.    In the Management's Report on Internal Control over Financial Reporting section, the FY 2023 Form 10-K further acknowledged:

- 48 -

4928-3328-1113.v1

We identified a material weakness in the Company's internal control over financial reporting related to the operation of controls over the performance of a subset of the Company's physical inventories held at certain locations to validate inventory existence and the completeness and accuracy of data used in validating the appropriateness of inventory costing for a subset of the Company's inventories and inventory reserves.

121.    The FY 2023 Form 10-K also outlined the Company's remediation efforts related to the material weakness in internal controls over financial reporting with regard to inventory management, including: "[E]nhancement of the procedures over certain of our annual physical inventory counts, including the augmentation of training and validation of system generated reports utilized in performing certain annual physical counts and clear instruction as to the process for the recording of adjustments to inventory as a result of physical counts and validation of data used in inventory costing" and "examination and enhancement of the procedures over the completeness and accuracy of data utilized in computing inventory reserves."

## IX.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' KNOWLEDGE AND ACCESS TO INFORMATION

### A.    The Fraud Involved Leslie's Core Business and the Individual Defendants Were Senior Executives Directly Involved In and Informed of the Company's Operations and Performance Metrics

122.    As the CEO and Director and Executive Vice President and CFO, respectively, Egeck and Weddell occupied Leslie's highest executive positions and were responsible for, and remained well-informed of, issues critical to the Company's success.

123.    The fraud alleged herein involves one of Leslie's core product offerings – chlorine-based chemicals.  Thus, a strong inference arises that Defendants were aware of, or recklessly disregarded, the true facts contradicting their false and misleading statements. Approximately 80% of the Company's product assortment is comprised of non-discretionary products required for proper maintenance of pools and spas.  Chemicals represent a large portion of this product mix, and include "core sanitizer" chlorine products such Trichlor, Cal Hypo, and liquid bleach.  In the pool industry, these chlorine products are essential and non-

optional for ongoing water maintenance. Chlorine dominates the U.S. market for maintaining pools and spas because it's effective, affordable, and works well in a wide range of conditions. According to Leslie's FY 2022 Form 10-K filed with the SEC, because "[n]eglecting pool maintenance can result in equipment failure, structural damage, or other costly issues," Leslie's chemical products, including chlorine products, are core to pool and spa maintenance and "drive[] an annuity-like stream of demand" for the Company.

124. Forty-five percent of Leslie's sales are chemicals, making chemicals Leslie's highest revenue-contributing product category, and Trichlor generates one third of those sales, contributing approximately 15% of total Company sales on its own. Further, leading up to and during the Class Period, the Company and its officers were paying particular attention to the Trichlor contribution as it constituted an increasing percentage of the Company's year-over-year growth. For example, Egeck reported during Leslie's Q2 2022 earnings call that Trichlor sales had increased 96% in the quarter and, over a 2-year period, had increased 159%.

125. The Company emphasized in its offering documents that its proprietary brands, which comprise 80% of chemical sales, "allow[] us to create an entrenched consumer relationship [and] control our supply chain[s]." Leslie's chemical sales are principally responsible for establishing customer loyalty, so much so that Leslie's referred to them as "the backbone of our product assortment" during its Investor Day. Egeck himself identified chemicals as one of Leslie's "core businesses" in Leslie's Q2 2022 earnings call.

126. Former company employees also reported that chlorine specifically was key to Leslie's business as it was responsible for bringing most customers in to the stores. Customers' visits to the stores to purchase chlorine then often resulted in their purchase of high-margin products. This account is corroborated by Egeck's own admission: "We've talked about this in the past, chemicals and particularly Trichlor is the promotional vehicle for the industry. . . . But throughout the year, it's a proven traffic driver for pool supply retailers are [sic] self-included." Moreover, Leslie's operated more than 900 branded locations during the Class Period, which it boasted in its offering documents as a physical

4928-3328-1113.v1

1    network "larger than the sum of [its] 20 largest competitors."  Foot traffic into Leslie's

2    physical locations was therefore highly important to its business and its position as the

3    largest pool supply retailer in the United States, and chlorine products were the primary

4    driver of that traffic.

5        127.    Leslie's further boasted, in its blog post entitled "Best Chlorine: Leslie's 3"

6    Jumbo Tabs," that its chlorine tabs are the best in the industry.  Leslie's tabs "use the purest

7    ingredients, with a 99% active ingredient level and 90% available chlorine, which is the

8    highest rating on the market," setting it apart from competitors.  Egeck emphasized that the

9    quality of its Trichlor helped solidify the Company's predominance in this market during the

10   February 2, 2023 earnings call: "And then in Trichlor, that's really us, and we control most

11   of that supply chain now, particularly with our – particularly with our investment in stellar

12   tableting."

13       128.    As recognized by multiple industry sources and Leslie's own publications,

14   chlorine is the most common means of sanitizing a pool, and by a wide margin, making it the

15   "bread and butter of business" for a pool retailer.[4]  Thus, Leslie's was attempting to corner a

16   market in which almost every pool owner participates and which generates foot traffic and

17   loyalty.

18       **B.    Defendants' Frequent, Detailed Comments on Leslie's Sales,**
         **Demand, and Inventory, Showed Their Personal Knowledge of**
19       **the Company's Chlorine Products**

20       129.    On quarterly earnings calls with analysts and investors, Egeck and Weddell

21   frequently discussed and held themselves out as knowledgeable about Leslie's inventory

22   levels and, more specifically, the factors affecting supply of and demand for chlorine

---

23

24   [4]    *Liquid Chlorine vs. Tablets*, Leslie's Pool Care (Oct. 13, 2022),
     https://lesliespool.com/blog/liquid-chlorine-vs-tablets-which-is-best-for-pool-water.html;
25   Martha Kendall Custard, *The 2022 Chlorine Shortage: Another Year of Poolmageddon*,
     Tools Group (May 17, 2022), https://www.toolsgroup.com/blog/chlorine-shortage/; *see also*
26   *Swimming Pool Chemicals Market Size Will Attain USD 5,254 Million by 2030 growing at*
     *3.5% CAGR – Exclusive Report*, Acumen Research & Consulting (Oct. 10, 2022),
27   https://www.globenewswire.com/news-release/2022/10/11/2531386/0/en/Swimming-Pool-
     Chemicals-Market-Size-Will-Attain-USD-5-254-Million-by-2030-growing-at-3-5-CAGR-
28   Exclusive-Report-by-Acumen-Research-and-Consulting.html

products, including Trichlor.  Defendants provided updates on the market for Trichlor and Leslie's inventory levels on *every* earnings call during the Class Period – both in their prepared remarks and in response to analysts' questions.  Buttressing these updates were Defendants' own assurances that they carefully tracked sales and closely monitored customer behavior.

130.  For example, Egeck responded to analysts' questions regarding chlorine pricing dynamics in both Q1 and Q2 2022 with granular-level detail:

- "[W]hat will happen is the factory that was taken down by the hurricane will come back online.  The volume that comes out of that plant will replace the domestic import volume that had come in to make up the gap.  It should – it will be at a lower price than the imports.  But I think most importantly, what the industry has seen is that the current prices on chlorine have not decreased demand at all.  So we're not expecting any kind of reversion to pre-2020 pricing.  There's a potential that we might see some reduction in prices, but I think the most likely scenario is a stabilized price environment for the industry on chlorine at these new higher levels."  (February 3, 2022 conference call);

- "With regard to chlorine tabs, supply remains constrained and retail prices elevated.  Over the last 2 years, our retail price for a 35-pound bucket tabs has increased from $99 to $199.  We get a lot of questions about what happens if chlorine tab pricing reverses and we have price deflation.  We do not believe that is likely in the near or medium term.  And let me explain why.  What consumers commonly referred to as chlorine tabs are actually Trichlor tabs.  Trichlor is manufactured by combining chlorine, caustic soda and urea.  That combination creates Trichlor granules, which are then compacted into [a] tab.  While domestic Trichlor capacity was impacted in 2020 and 2021 by the much discussed plant fire.  The industry is also facing very tight chlorine supply conditions, which have created corresponding cost increases.  Shortage in chlorine has 2 drivers.  The first is structural.  In the last 16 months, chlorine capacity in North [[America has been reduced by about 7%.  The second factor is that chlorine is a key component of PVC.  Chlorine used in PVC]] has a higher value than chlorine used and Trichlor manufacturing.  The reduction in total chlorine capacity and the growth in PVC manufacturing has caused the amount of North American sourced chlorine available to U.S.  Trichlor manufacturers to decrease by about 20%.  The result is that domestic Trichlor capacity is tight and falling short of elevated consumer demand."  (May 5, 2022 conference call);

- "And as we've said in the past, some Trichlor imports could come down when additional Trichlor capacity comes up in the U.S. but the kind of newer

information that we have is what I went through in the script that the chlorine input from North America is now a limiting factor and chlorine imports from China, which is the biggest exporter or Spain or tough economics. So what I would say is that the current pricing in the market reflects where people have become comfortable with margins at those higher imported prices. So I think when we look out to next year, supply will continue to be tight inputs will continue to be high. They could potentially go higher, but we certainly don't see them coming down. Yes. Dan, the one thing I'll add because we sometimes get this question as well, what if just more chlorine manufacturing capacity comes online globally. And from what we understand, it takes about 4 years and $1 billion to build a core alkaline plant. So I'm sure there's some in the design phase, potentially domestic, but we don't know of any. But I would say probably overseas, but it takes time. There's no quick remedy to the supply side." (May 5, 2022 conference call); and

- [Analyst:] "A lot of investors ask us about the state of the Trichlor market implication for chlorine tab prices. I mean you've talked a lot about it. But maybe give us your view of the situation. You gave a good update on the last earnings call . . . ."

  [Egeck:] "Yes. We get this question a lot, and it's a little bit complicated. So I apologize to begin with. But this much for sure, chlorine prices are still elevated and supply is still constrained. And by prices being elevated, we mean 2 years ago, a 35-pound bucket of chlorine tab, which will get a midsized pool through a pool season, was $99. Today, that's $199. So the question is, top of everybody's mind, what happens when that reverses? And our view on that is that there are several factors in play that could keep them elevated." (June 6, 2022 conference call).

131. Weddell's public statements also confirmed that he too closely monitored chlorine inventory conditions. For example, during his prepared remarks on the Q2 2022 earnings call, Weddell reported: "On inventory, we continue to expect inventory conditions in the industry to remain tight throughout fiscal 2022, particularly for chemicals and equipment."

132. Not only did they evaluate industry conditions, but Egeck and Weddell repeatedly assured investors of their knowledge and management of Leslie's inventory levels. In fact, the Company's inventory levels became such a significant metric for investors that analysts asked Egeck and Weddell for explanations about it on *every* earnings call during the Class Period. For example, on the Q1 2023 call, an analyst started off the

- 53 -

Q&A session with a question about Leslie's inventory, observing that it "pops off the page." In response, Weddell again confirmed his personal familiarity with and knowledge of the Company's inventory:

> Yes. It's a great question, Ryan. And as we think about our inventory growth, I mean there's 2 key reasons that inventory is up, one is sales growth over the last year – last few years. And then importantly, the strategic decision that we made to intentionally pull forward 2023 receipts in advance of season.
>
> We believe that pull forward is appropriate. . . . So the pull forward allows us to load our stores with more product and facilitate the replacement cycle during the early part of our season.
>
> . . . But again, the inventory that we're procuring today is for this season. And it's inventory that is being brought in earlier in preparation for season. It's not stocking up for kind of longer-term needs.

133.    In response to analyst questions about how they should be thinking about inventory levels going forward, Weddell responded during the Q3 2022 earnings call:

> And if the choice is to take inventory at a little bit higher level today, going into the end of the year and to start off next year in a better position versus try[ing] to run leaner[,] [w]e will take the former in the current environment. So it's something we expect to actively manage in the year-end and through next year, don't necessarily view these levels as permanent increases. But in the current environment, it's the appropriate level of inventory.

He further clarified that he analyzed inventory at a granular level, stating: "[M]ost of the inventory growth is in Trichlor." Egeck confirmed on the same call that he also had confidence in inventory levels, stating: "Trichlor inventory is in good shape."

134.    During the Q1 2023 earnings call, in response to an analyst's question about Leslie's bringing in "a lot" of inventory, Egeck responded:

> [I]n Trichlor, that's really us, and we control most of that supply chain now, particularly with our – particularly with our investment in stellar tableting.
>
> So we feel good about where we are with Trichlor, but we've also bulked up the inventory there as well, with the idea that we're going to preposition a much higher percentage of it into the stores themselves.

- 54 -

135.    When an analyst expressed concern about inventory growth during the same call, Weddell reassured investors: "I feel good with the position we have in inventory today." He further stated:

> We feel good about the inventory that we have in our facilities and in our stores.  Again, when you think about that composition of product that we're bringing in early, it's high-turn product, top SKUs that we know we need for full season and where last year we talked a lot about kind of getting behind the curve and replenishment cycle.

136.    Defendants further demonstrated their knowledge and awareness of Leslie's inventory levels and associated customer demand throughout the Class Period by renewing assurances that Leslie's was appropriately matching inventory to customer needs.  For example, on each of the Q4 2022, Q1 2023, and Q2 2023 earnings calls, Weddell confirmed that he and Egeck closely monitored Leslie's inventory:

- "And most of the incremental inventory falls into the chemical and equipment categories that are not subject to technology or fashion risk.  When we believe we have sufficient inventory to meet consumer demand through season and after we see supply chains across the industry become more predictable, then we will strategically manage inventory levels down to recoup some of the investments we have made in working capital over the last few years." (November 30, 2022 conference call);

- "[W]e continue to view our current elevated inventory position as appropriate and sensible given the uncertainty of supply. . . .  When we believe we have sufficient inventory to meet consumer demand through season, and after we see supply chains across the industry become more predictable, then we will strategically manage inventory levels down."  (February 2, 2023 conference call); and

- "We feel very good with where we're at going into season if you look at the year-on-year change in Q2, primarily around chemicals. . . .  So at this point, going into season, heaviest use from a chemical perspective, we feel very good with our current inventory balances.  The top 2 contributors, the inventory increase were still the chemical and equipment categories, which we've talked a lot about being nondiscretionary in nature.  So we feel good with where we're at.  And as you stated, I absolutely believe that we're at peak and we have an opportunity to materially decrease our inventory levels into year-end and beyond."  (May 3, 2023 conference call).

- 55 -

137.    Egeck bolstered the reliability of Defendants' statements on calls and responses to analysts by detailing, prior to and during the Class Period, Egeck's personal monitoring of customer behavior and the Company's ability to track demand:

- "We're constantly managing our supply chain, both for efficiency and quantity.  So we're certainly not just sitting here not looking at it closely, but we feel very good of where we're at." (February 4, 2021 conference call); and

- "We also track new homeownership that has pools . . . we know where all the pools are, we know where all the new pools are being built, and we know when somebody moves from a home with a pool or moves into a home with a pool."  (December 21, 2020 conference call).

138.    And, in the first question of the Q&A portion of the May 5, 2022 conference call for Q2 2022 earnings, a William Blair analyst specifically asked Egeck to "address the pull-forward question again, because from a high level, it looks like your [sic] COVID winner" and asked if Defendants had "tried to calculate a potential pull-forward estimate or is this just not your view because of the macro drivers and share gain in price?"  Egeck responded:

I would say it's not our view, both for the reasons you stated.  And also, due to the fact that we track [sales] very carefully.  We're able to see by consumer what they purchased prior years versus what they've purchased year-to-date. It's one of the things that we try to pay a lot of attention to.  And we just haven't seen any indication of any meaningful pull-forward.

In his report, the analyst distilled his understanding of Defendants' knowledge from this exchange: "Management believes it is better prepared to deal with a consumer downturn than ever before given traction with initiatives and ability to react to data in the customer file."

139.    Egeck and Weddell admitted that "day-to-day" visibility into customer demand provided them detailed insight into the level of inventory necessary to meet that demand, supporting a strong inference that they issued the false and misleading statements alleged above with scienter.  Further, if Egeck and Weddell contend that they lacked the detailed, up-to-date knowledge of customer demand and inventory needs as they represented, then they necessarily acted with deliberate recklessness in holding themselves out as knowledgeable about these issues and in discussing them in communications with investors.

- 56 -

### C. Egeck and Weddell Signed Sarbanes-Oxley Act Certifications Attesting that They Personally Supervised Leslie's Controls and Procedures

140.    The Sarbanes-Oxley Act certifications signed by Egeck and Weddell further evidence scienter.[5]  As set forth above in ¶¶53 & n.2, 81, 94 & n.3, Egeck and Weddell signed Sarbanes-Oxley Act certifications filed with Leslie's 2022 Form 10-Qs, 2022 Form 10-K, and 2023 Form 10-Qs representing that they were both "responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting" and that the Company's financial disclosures fairly and accurately presented its financial condition.   In Leslie's quarterly and annual SEC filings, the "Controls and Procedures" section states:

> Our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e)) are designed to ensure that information required to be disclosed by us in reports we file or submit under the Securities Exchange Act of 1934, as amended, is recorded, is processed, summarized, and reported within the appropriate time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely discussions regarding required disclosure.

141.    Certifications pursuant to Sarbanes-Oxley Act are not directed solely at ensuring numerical accuracy and preventing dishonest accounting practices, and any interpretation restricting the statute's scope to these purposes would be artificially narrow and inconsistent with the remedial purpose of the statute.   The SEC interprets the fair presentation of companies' financial results to include any additional disclosure necessary to provide investors with a materially accurate and complete picture of an issuer's financial condition.   Here, the inference of Egeck's and Weddell's scienter is enhanced by the certifications they signed, which acknowledged their responsibility to investors for

---

[5]    Exchange Act Rules 13a-14(a) and 15(d)-14(a), as adopted pursuant to §302 of the Sarbanes-Oxley Act of 2002, require an issuer's principal executive and financial officers to certify that: (a) the information contained in the issuer's annual reports is accurate and reliable; and (b) they have taken certain actions with respect to establishing and maintaining disclosure controls and procedures for the collection and reporting of financial and other information.

establishing and maintaining controls to ensure that material information about Leslie's was made known to them and that the Company's disclosure-related controls were operating effectively.

**X.    LOSS CAUSATION**

142.    The market for Leslie's common stock was open, well-developed, and efficient during the Class Period.  Throughout the Class Period, Leslie's common stock traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public.  Plaintiffs and other members of the Class purchased or otherwise acquired Leslie's common stock relying upon the integrity of the market price of Leslie's common stock and market information relating to the Company, and have been damaged thereby.

143.    When the relevant truth and its impact on Leslie's financial results and prospects entered the market, the price of Leslie's common stock dropped sharply, as the artificial inflation came out of the stock price over time.  As a result of their purchases of Leslie's common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss (*i.e.*, damages), under the federal securities laws.

144.    The disclosures that corrected the market price of Leslie's common stock are detailed below.  The stock price decline that followed was due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific, non-fraud factors.

145.    As set forth above in ¶¶107-109, on July 13, 2023, after the market closed, Leslie's issued a release and filed a Form 8-K with the SEC, signed by Weddell, announcing preliminary Q3 2023 financial results and the departure of Weddell as CFO effective August 7, 2023.  The pre-release announcement revealed that Leslie's was expecting a significant decline in sales for the quarter, down 9% year-over-year, including a comparable sales decline of 12%, and that gross profits were expected to fall nearly 18% to a range of $249 to $251 million, with gross margin at 41%, dropping from 45.1% in the prior year period.  Adjusted EBITDA for the quarter was also expected to decline over 30%, falling in the range

of $124 to $128 million.  As a result of these declines, the Company also lowered its FY 2023 outlook.

146.    The release quoted Egeck, stating:

Our fiscal third quarter results were well below our expectations as low double digit traffic declines in our Residential and Pro businesses drove negative comps across both discretionary and non-discretionary categories.  While abnormal weather continued to pressure traffic levels, customer surveys conducted towards the end of the quarter also indicated increased price sensitivity and that consumers entered the pool season with a greater than normal amount of chemicals left []over from last year.

147.    In the release, Egeck added:

Our third quarter gross margins were down year-over-year due to higher product costs that we could not pass through to consumers, the impact of higher distribution-related expenses and capitalized costs as we reduce inventory from peak levels, and fixed cost deleverage. . . .  We also continue to aggressively manage our inventory balances . . . .

148.    Analysts began downgrading their rating for Leslie's that same day, calling the Company's pre-announcement "shocking."  For example, William Blair downgraded its rating of Leslie's because of "the lack of visibility into improving sales," noting that the "pull-forward of chemical needs due to shortages last year" was one of "the big issues." William Blair further cautioned investors that it "lack[ed] confidence in [their] model and believe it will take several quarters to right the ship."  Similarly, analysts at Piper Sandler downgraded Leslie's due to the fact "that consumers weren't buying due to . . . [e]levated chemical supply from last year's stock-up activity."  Analysts at Jefferies also downgraded Leslie's stock until "1) visibility into the unwind of chemical carryover from '23 is clear, and 2) comfort is established w/ the incoming CFO following a 60% guidance cut."

149.    As a direct result of the July 13, 2023 corrective disclosures, Leslie's stock price dropped nearly 30%, from a closing price of $9.52 per share on July 13, 2023 to a closing price of $6.70 per share on July 14, 2023, on a volume of almost 41.5 million shares traded, the second highest volume day since the Company's IPO in October 2020.  The NASDAQ Global Composite Index (identified as one of Leslie's comparative market indices

- 59 -

1  in the Company's Form 10-K), was essentially unchanged on July 14, 2023.  Leslie's stock

2  price continued to fall over 18% on the following trading day, July 17, 2023, closing at $5.46

3  per share.  As shown in the chart below, while Leslie's stock price declined significantly, the

4  NASDAQ Global Composite Index increased overall during the same trading period.  The

5  new Company-specific material information released on July 13, 2023 after the market

6  closed, concerning reduced demand for Leslie's chemical products because of customer

7  stockpiling, and eroding gross margins because of reduced demand and increased inventory

8  expense, was directly related to the false and/or misleading statements previously made by

9  Defendants.



XI.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE

150.    Plaintiffs will rely, in part, upon the presumption of reliance established by the

fraud-on-the-market doctrine in that during the Class Period:

• Defendants made public misrepresentations or failed to disclose material facts;

• the omissions and misrepresentations were material;

- Leslie's common stock traded in an efficient market;

- Leslie's common stock traded on the Nasdaq and was covered by multiple analysts;

- the Company's common stock was liquid and heavily traded; and

- Plaintiffs and members of the Class purchased Leslie's common stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

151.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

152.    Plaintiffs and the members of the Class are also entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XII.    CLASS ACTION ALLEGATIONS

153.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Leslie's common stock during the Class Period (the "Class") and were damaged thereby.  Excluded from the Class are Defendants, officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

154.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Leslie's common stock was actively traded on the Nasdaq.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Leslie's or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

155.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

156.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

157.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, prospects, and/or management of Leslie's;

- whether statements made by Defendants to the investing public during the Class Period omitted material facts necessary to make the statements made neither false nor misleading;

- whether Defendants acted knowingly or with reckless disregard for the truth;

- whether the price of Leslie's common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

158.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

4928-3328-1113.v1

1

## XIII.  CAUSES OF ACTION

2

### COUNT I

3

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

4

159.    Plaintiffs repeat and reallege each and every allegation set forth above as if

5

fully set forth herein.

6

160.    This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and

7

SEC Rule 10b-5 promulgated thereunder.

8

161.    Pursuant to the above wrongful course of conduct, Leslie's, Egeck, and

9

Weddell participated directly or indirectly in the preparation and/or issuance of the quarterly

10

and annual reports, SEC filings, releases, and other documents described above, such as

11

statements made to securities analysts and the media that were designed to influence the

12

market for Leslie's common stock.  Such reports, filings, releases, and statements were

13

materially false and misleading in that they failed to disclose material adverse information

14

and misrepresented the truth about Leslie's operations and business prospects.

15

162.    Egeck and Weddell had actual knowledge of the materially false and

16

misleading statements and material omissions alleged herein and intended thereby to deceive

17

Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with

18

reckless disregard for the truth in that they failed or refused to ascertain and disclose such

19

facts as would reveal the false and misleading nature of the statements made, although such

20

facts were readily available to them.  Said acts and omissions were committed willfully or

21

with reckless disregard for the truth.

22

163.    Information showing that Egeck and Weddell acted knowingly or with reckless

23

disregard for the truth is peculiarly within Egeck's and Weddell's knowledge and control.

24

As executive officers of Leslie's, Egeck and Weddell had knowledge of the details of

25

Leslie's internal affairs.

26

164.    Leslie's, Egeck, and Weddell are directly and indirectly liable for the wrongs

27

complained of herein.  Because of their positions of control and authority, Egeck and

28

- 63 -

1    Weddell were able to and did, directly or indirectly, control the content of the statements of

2    Leslie's.   As officers of a publicly held company, Egeck and Weddell had a duty to

3    disseminate timely, accurate, and truthful information with respect to Leslie's businesses,

4    operations, future financial condition, and future prospects.  As a result of Leslie's, Egeck's,

5    and Weddell's misconduct, the market price of Leslie's common stock was artificially

6    inflated throughout the Class Period.  Unaware of the adverse facts concerning Leslie's

7    business and financial condition which were concealed by Leslie's, Egeck, and Weddell,

8    Plaintiffs and other members of the Class purchased or otherwise acquired Leslie's common

9    stock at artificially inflated prices and in doing so relied upon the price of the common stock,

10   the integrity of the market for the common stock, and/or upon statements disseminated by

11   Leslie's, Egeck, and Weddell, and were damaged thereby.

12   165.   During the Class Period, Leslie's common stock was traded on an active and

13   efficient market.  Plaintiffs and the other members of the Class, relying on the materially

14   false and misleading statements described herein, which Leslie's, Egeck, and Weddell made,

15   issued, or caused to be disseminated, or relying upon the integrity of the market, purchased

16   or otherwise acquired Leslie's common stock at prices artificially inflated by Leslie's,

17   Egeck's, and Weddell's wrongful conduct.  Had Plaintiffs and the other members of the

18   Class known the truth, they would not have purchased or otherwise acquired said Leslie's

19   common stock, or would not have purchased or otherwise acquired Leslie's common stock at

20   the inflated prices paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the

21   Class, the true value of Leslie's common stock was substantially lower than the prices paid

22   by members of the Class.  The market price of Leslie's common stock declined upon public

23   disclosure of the facts alleged herein to the injury of Plaintiffs and other Class members.

24   166.   By reason of the conduct alleged herein, Leslie's, Egeck, and Weddell

25   knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act, 15

26   U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder.

27   167.   As a direct and proximate result of Leslie's, Egeck's, and Weddell's wrongful

28   conduct, Plaintiffs and the other members of the Class suffered damages in connection with

their respective purchases, acquisitions and/or sales of Leslie's common stock during the Class Period, as the truth about Leslie's operations and prospects was disclosed to the investing public.

## COUNT II
### For Violation of §20(a) of the Exchange Act Against All Defendants

168.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

169.    During the Class Period, the Individual Defendants participated in and oversaw the operation and management of Leslie's, and conducted and participated, directly and indirectly, in the conduct of Leslie's business affairs.  The Individual Defendants exercised control over Leslie's operations and possessed the power to control, and did control, the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

170.    The Individual Defendants acted as controlling persons of Leslie's within the meaning of §20(a) of the Exchange Act.  By virtue of their senior management positions as officers and/or directors of Leslie's, their participation in and awareness of the Company's operations, and their personal knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these Defendants had the power to influence and control and did influence and control, directly or indirectly, Leslie's decision-making, including the content and dissemination of the allegedly false and misleading statements and other acts in furtherance of a fraudulent scheme.

171.    In particular, as CEO and CFO, the Individual Defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular business and/or operating practices and expenditures and deficient control environment giving rise to the securities violations alleged in Count I, and exercised that power.

172.    Leslie's had the power to control and influence the Individual Defendants and other Company executives through its power to hire, fire, supervise, and otherwise control

- 65 -

1  the actions of its employees and their salaries, bonuses, incentive compensation, and other

2  employment considerations.  By virtue of the foregoing, Leslie's had the power to influence

3  and control, and did influence and control, directly or indirectly, the decision-making of the

4  Individual Defendants including the content of their public statements.

5      173.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs

6  and other members of the Class suffered damages in connection with their purchases and/or

7  acquisitions of Leslie's common stock during the Class Period when the relevant truth was

8  revealed.

9      174.    By reason of the foregoing, Defendants violated §20(a) of the Exchange Act.

10                          **PRAYER FOR RELIEF**

11      WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

12      1.    Declaring this action to be a class action properly maintained pursuant to Rule

13  23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class

14  Representatives and Robbins Geller Rudman & Dowd LLP as Class Counsel;

15      2.    Awarding compensatory damages in favor of Plaintiffs and the other members

16  of the Class against all Defendants, jointly and severally, for all damages sustained as a

17  result of Defendants' wrongdoing, in an amount to be proven at trial, including interest

18  thereon;

19      3.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred

20  in this action, including reasonable attorneys' fees, accountants' fees, and experts' fees, and

21  other costs and disbursements; and

22      4.    Awarding Plaintiffs and other members of the Class such other injunctive or

23  equitable relief, including disgorgement and/or the imposition of a constructive trust, that

24  may be deemed just and proper by the Court.

1                                                           **JURY DEMAND**

2         Plaintiffs hereby demand a trial by jury.

3  DATED: August 13, 2025            ROBBINS GELLER RUDMAN
                                                  & DOWD LLP

4

5                                          s/ Laurie L. Largent
                                       LAURIE L. LARGENT

6

7                             DARREN J. ROBBINS (admitted *pro hac vice*)
                              TOR GRONBORG (admitted *pro hac vice*)

8                             LAURIE L. LARGENT (admitted *pro hac vice*)
                              SARAH A. FALLON (admitted *pro hac vice*)

9                             655 West Broadway, Suite 1900
                              San Diego, CA 92101

10                            Telephone: 619/231-1058
                              619/231-7423 (fax)

11                            drobbins@rgrdlaw.com
                              torg@rgrdlaw.com

12                            llargent@rgrdlaw.com
                              sfallon@rgrdlaw.com

13

14                            *Lead Counsel for Lead Plaintiff*

15

16                            VANOVERBEKE, MICHAUD
                              & TIMMONY, P.C.

17                            THOMAS C. MICHAUD
                              79 Alfred Street

18                            Detroit, MI 48201
                              Telephone: 313/578-1200

19                            313/578-1201 (fax)
                              tmichaud@vmtlaw.com

20

21                            *Counsel for Macomb County Employees'*
                              *Retirement System*

22

23                            ZIMMERMAN REED, LLP
                              HART L. ROBINOVITCH

24                            14648 N. Scottsdale Road, Suite 130
                              Scottsdale, AZ 85254

25                            Telephone: 480/348-6400
                              480/348-6415 (fax)

26                            hart.robinovitch@zimmreed.com

27                            *Local Counsel for Lead Plaintiff*

28